No. 22-13410
(Consolidated with Nos: 22-14099-HH, 23-10387-J)

# In the United States Court of Appeals
## for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant*,

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOCIATES;
PETER TICKTIN, JAMIE ALAN SASSON, and THE TICKTIN LAW GROUP,
*Appellants*,

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORPORATION, PERKINS COIE, LLC, *et al*.,
*Defendants-Appellees*.

On appeal from the Southern District of Florida
Case No. 2:22-cv-14102-DMM
Hon. Donald M. Middlebrooks, U.S. District Judge

**APPENDIX FOR PLAINTIFF-APPELLANT AND APPELLANTS
VOLUME III OF III**

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

*Counsel for Appellants*

# CASE NOS. 22-13410, 22-14099, 23-10387

## APPENDIX INDEX

| **Document Description** | **District Ct. Document/Tab #** |
|---|---|

### VOLUME I

| | |
|---|---|
| District Court Docket Sheet Southern District of Florida (Ft Pierce) Case No. 2:22-cv-14102-DMM ............................................ | Dkt. |
| Complaint for Damages and Demand for Trial by Jury (03/24/2022) .......................................................................... | 1 |

### VOLUME II

| | |
|---|---|
| Amended Complaint for Damages and Demand for Trial by Jury (06/21/2022) .......................................................................... | 177 |
| Order (06/23/2022) ......................................................................... | 188 |
| Order on the Parties' Proposed Joint Stipulation Regarding Response Time to Amended Complaint (07/01/2022) .......................................................................... | 200 |

### VOLUME III

| | |
|---|---|
| Declaration of Alina Habba, Esq. .................................... | 237-1 |
| Exhibit A – Federal Election Commission First General Counsel's Report ............................................... | 237-2 |
| Order on Motions to Dismiss (09/08/2022) .......................................................................... | 267 |

| **Document Description** | **District Ct. Document/Tab #** |
|---|---|
| Notice of Civil Appeal (10/11/2022) ............................................................ | 272 |
| Order Granting Motion for Sanctions (11/10/2022) ............................................................ | 284 |
| Notice of Civil Appeal (12/09/2022) ............................................................ | 291 |
| Order on Sanctions (01/19/2023) ............................................................ | 302 |
|     Exhibit A – Summary Chart | 302-1 |
| Notice of Civil Appeal (02/06/2023) ............................................................ | 308 |

**TAB 237**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DONALD J. TRUMP | Case No.: 2:22-cv-14102-DMM |
| Plaintiff, | |
| v. | **DECLARATION OF ALINA HABBA, ESQ.** |
| HILLARY R. CLINTON, HFACC, INC., DEMOCRATIC NATIONAL COMMITTEE, DNC SERVICES CORPORATION, PERKINS COIE, LLC, MICHAEL SUSSMANN, MARC ELIAS, DEBBIE WASSERMAN SCHULTZ, CHARLES HALLIDAY DOLAN, JR., JAKE SULLIVAN, JOHN PODESTA, ROBERT E. MOOK, PHILLIPE REINES, FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR, BRUCE OHR, ORBIS BUSINESS INTELLIGENCE, LTD., CHRISTOPHER STEELE, IGOR DANCHENKO, NEUSTAR, INC., RODNEY JOFFE, JAMES COMEY, PETER STRZOK, LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE, JOHN DOES 1 THROUGH 10 (said names being fictious and unknown persons), and ABC CORPORATIONS 1 THROUGH 10 (said names being fictitious and unknown entities), , | |
| Defendants. | |

I, Alina Habba, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am managing partner of the firm of Habba Madaio & Associates LLP, counsel for

Donald J. Trump ("Plaintiff") in the above-captioned matter (the "Action").

2.      I submit this declaration pursuant to Federal Rule of Civil Procedure 65 and Local

Rule 7.1, in support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to

Dismiss the Amended Complaint. The facts herein are true and correct and, unless otherwise stated, are within my personal knowledge.

3.       As counsel for Plaintiff, I have reviewed pleadings, and other documents related to the Action, and I am familiar with the facts and circumstances of this case.

4.       Attached hereto as **Exhibit A** is a true and accurate copy of the First General Counsel's Report dated April 10, 2019 in the matter of *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission (FEC), MURs 7291, 7331 and 7449, and the corresponding Certification of the FEC executive session dated July 26, 2021.

5.       Attached hereto as **Exhibit B** is a true and accurate copy of the Indictment dated September 16, 2021 in the matter of *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District of Columbia.

6.       Attached hereto as **Exhibit C** is a true and accurate copy of the Government's motion *in limine* dated April 4, 2022 in the matter of *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District of Columbia.

7.       Attached hereto as **Exhibit D** is a true and accurate copy of the Indictment dated November 3, 2021 in the matter of *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia.

Dated: August 4, 2022,                     By:   _____
                                                  Alina Habba, Esq.
                                                  **HABBA MADAIO & ASSOCIATES LLP**
                                                  1430 U.S. Highway 206, Suite 240
                                                  Bedminster, New Jersey 07921

2

-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiff,*
*Donald J. Trump*

# **EXHIBIT A**

# FEDERAL ELECTION COMMISSION

## FIRST GENERAL COUNSEL'S REPORT

**MUR 7291**
DATE COMPLAINT FILED:  Oct. 25, 2017
DATE OF NOTIFICATION:  Oct. 27, 2017
DATE OF LAST RESPONSE:  Dec. 14, 2017
DATE OF ACTIVATION:  Oct. 30, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Campaign Legal Center |
| **RESPONDENTS:** | DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer |
| | Hillary for America and Elizabeth Jones in her official capacity as treasurer |

**MUR 7331**
DATE COMPLAINT FILED:  Feb. 26, 2018
DATE OF NOTIFICATION:  Mar. 5, 2018
DATE OF LAST RESPONSE:  June 4, 2018
DATE OF ACTIVATION:  June 1, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Americans for the Trump Agenda |
| **RESPONDENTS:** | DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer |
| | Hillary for America and Elizabeth Jones in her official capacity as treasurer |

**MUR 7449**
DATE COMPLAINT FILED:  Aug. 2, 2018
DATE OF NOTIFICATION: Aug. 8, 2018
DATE OF LAST RESPONSE:  Oct. 17, 2018
DATE OF ACTIVATION:  Oct. 30, 2018

ELECTION CYCLE:  2016
EXPIRATION OF SOL: Mar. 1, 2021/Jan. 31, 2022

| | |
|---|---|
| **COMPLAINANT:** | Coolidge Reagan Foundation |

MUR729100041

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 2 of 42

| | | |
|---|---|---|
| 1 | **RESPONDENTS:** | DNC Services Corp./Democratic National |
| 2 | | Committee and William Q. Derrough in his |
| 3 | | official capacity as treasurer |
| 4 | | Hillary for America and Elizabeth Jones in her |
| 5 | | official capacity as treasurer |
| 6 | | Perkins Coie LLP |
| 7 | | Marc Elias |
| 8 | | Fusion GPS |
| 9 | | Christopher Steele |
| 10 | | |
| 11 | **RELEVANT STATUTES AND** | 52 U.S.C. § 30104(b)(5)(A) |
| 12 | **REGULATIONS:** | 52 U.S.C. § 30121(a)(1)(A), (a)(1)(C), (a)(2) |
| 13 | | 11 C.F.R. § 104.3(b)(3), (4)(i), (vi) |
| 14 | | 11 C.F.R. § 104.9(a), (b) |
| 15 | | 11 C.F.R. § 110.20(b), (f), (g), (h)(1), (i) |
| 16 | | |
| 17 | **INTERNAL REPORTS CHECKED:** | Disclosure Reports |
| 18 | | |
| 19 | **FEDERAL AGENCIES CHECKED:** | None |

20   I.      **INTRODUCTION**

21          The three Complaints in these matters allege that the Democratic National Committee

22   and the authorized committee of Democratic Party nominee Hillary Clinton failed to file accurate

23   disclosure reports when they mischaracterized the payee and purpose of certain disbursements

24   disclosed as made to Perkins Coie LLP ("Perkins Coie") for legal services, when in fact the

25   payments were passed through to the research firm Fusion GPS ("Fusion") for the purpose of

26   opposition research and should have been disclosed as such.[1]  Hillary for America, Inc. and

27   Elizabeth Jones in her official capacity as treasurer ("HFA") and the DNC Services

---

[1]          MUR 7291 Compl. ¶¶ 1-2 (Oct. 25, 2017); MUR 7331 Compl. at 2 (Feb. 26, 2018); MUR 7449 Compl. at 2, 10-14 (Aug. 2, 2018).  The MUR 7449 Complaint also alleges that Perkins Coie partner Marc Elias and Perkins Coie aided and abetted the alleged reporting violations by the respondent committees.  MUR 7449 Compl. at 14-16. MUR 7331 is also the subject of the First General Counsel's Report in MURs 7304, 7331, *et al.* (Hillary Victory Fund), which is currently pending with the Commission, wherein we recommend that the Commission sever these allegations from MUR 7331 and merge them into MUR 7291.  *See* MUR 7331 Compl. at 2; First Gen. Counsel's Rpt. at 8, 35, MURs 7304, 7331, *et al.*

MUR729100042

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 3 of 42

1    Corp./Democratic National Committee and William Derrough in his official capacity as treasurer

2    ("DNC") (collectively, the "Committees") contend that the disbursements at issue were properly

3    disclosed because Perkins Coie LLP hired Fusion GPS to support its provision of legal services

4    to them, and the Committees did not contract with or make payments to Fusion.[2]

5            The MUR 7449 Complaint contains additional allegations that Christopher Steele, a

6    foreign national whose firm was a subcontractor for Fusion, violated the foreign national

7    provisions of the Federal Election Campaign Act of 1971, as amended (the "Act"), and

8    Commission regulations in several respects:  by soliciting contributions from foreign nationals

9    when he sought information from other foreign nationals in conducting his research;[3] by making

10   a prohibited in-kind foreign national contribution by providing his research to Mother Jones, a

11   magazine that used it in an article critical of Clinton's general election opponent, Donald

12   Trump;[4] and by providing information to the Committees through intermediaries and, thereby,

13   indirectly participating in the Committees' decision-making processes concerning expenditures.[5]

14   The respondents generally contend that no contributions resulted from Steele's work because he

---

[2]      MUR 7291 Hillary for America Resp. at 2-8 (Dec. 14, 2017) ("MUR 7291 HFA Resp."); MUR 7291 DNC Services Corp./Democratic National Committee Resp. at 2-8 (Dec. 14, 2017) ("MUR 7291 DNC Resp."); MUR 7331 Hillary Victory Fund/Hillary for America/DNC Services Corp./Democratic National Committee Joint Resp. at 2, 4-5, 11-17 (June 4, 2018) ("MUR 7331 HFA/DNC Resp."); MUR 7449 Hillary for America/DNC Services Corp./Democratic National Committee/Perkins Coie LLP/Marc Elias Joint Resp. at 2-9 (Oct. 3, 2018) ("MUR 7449 HFA/DNC Resp.").

[3]      MUR 7449 Compl. at 16-21.  The MUR 7449 Complaint further alleges that Elias and HFA substantially assisted Steele in the solicitation of donations by foreign nationals because, while Elias was serving as general counsel to HFA, he hired Fusion, which in turn hired Steele's firm.  *Id.* at 18.

[4]      *Id.* at 18-20.

[5]      *Id.* at 20-21.

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 4 of 42

1    was paid for his services at a fair market rate,[6] the media exemption applies to Mother Jones,[7]

2    and Steele did not participate in the decision-making processes of the Committees by indirectly

3    providing them with information.[8]

4          For the reasons set forth below, we recommend that the Commission:  (1) find reason to

5    believe that HFA and the DNC violated 52 U.S.C. § 30104(b)(5)(A) by failing to properly report

6    Fusion as the payee with respect to certain disbursements; (2) take no action at this time with

7    respect to the purposes of such disbursements that were reported by the Committees; (3) dismiss

8    the allegations that Elias and Perkins Coie violated 52 U.S.C. § 30104(b)(5)(A) by allegedly

9    aiding and abetting the filing of inaccurate disclosure reports; (4) dismiss the allegations that

10   Steele violated 52 U.S.C. § 30121 and 11 C.F.R. §§ 110.20(b), (f), (g), and (i); (5) dismiss the

11   allegations that Elias and HFA violated 11 C.F.R. § 110.20(h)(1); and (6) dismiss the allegations

12   that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.  Additionally, we recommend

13   that the Commission authorize compulsory process.

14   **II.    FACTUAL BACKGROUND**

15         HFA is the authorized committee of Hillary Clinton's 2016 presidential campaign, and

16   the DNC is the national committee of the Democratic Party.[9]  Fusion is a research consulting

17   firm headquartered in Washington, DC.[10]  Glenn Simpson is the majority owner of Fusion and

---

[6]      MUR 7449 HFA/DNC Resp. at 10-11; Fusion GPS Resp. at 2 (Oct. 17, 2018) ("Fusion Resp.");
Christopher Steele Resp. at 6-12 (Oct. 11, 2018) ("Steele Resp.").

[7]      Steele Resp. at 12-16.

[8]      MUR 7449 HFA/DNC Resp. at 12; Steele Resp. at 16-19.

[9]      *See* Amended Statement of Organization, HFA (June 8, 2016); Amended Statement of Organization, DNC
(Sept. 17, 2018).

[10]     *See* http://www.fusiongps.com/.

MUR729100044

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 5 of 42

1   has testified under oath regarding the research conducted by Fusion for Clinton and the DNC.[11]

2   Christopher Steele is a British national who worked as a subcontractor to Fusion through his

3   investigative research firm, Orbis Business Intelligence.[12]  Perkins Coie is a law firm of which

4   Marc Elias is a partner.[13]  Elias's biography on Perkins Coie's website states that he "served as

5   general counsel to" HFA "in 2016."[14]  In their responses, the Committees acknowledge that

6   Perkins Coie served as General Counsel for HFA and the DNC during the 2016 election cycle.[15]

7        **A.     Reporting of Payments for Fusion's Services**

8            Perkins Coie was approached by Fusion in March 2016 and agreed to pay for the

9   continuation of research on then-candidate Donald J. Trump that Fusion had conducted on behalf

---

[11]        *See* U.S. House of Representatives Permanent Select Committee on Intelligence, Executive Session, Interview of Glenn Simpson, 5-6 (Nov. 14, 2017), http://docs.house.gov/meetings/IG/IG00/20180118/106796/HMTG-115-IG00-20180118-SD002.pdf ("Simpson House Interview") (noting that Simpson testified under oath); U.S. Senate Judiciary Committee, Interview of Glenn Simpson, 9-10, 14 (Aug. 22, 2017), https://www.feinstein.senate.gov/public/_cache/files/3/9/3974a291-ddbe-4525-9ed1-22bab43c05ae/934A3562824CACA7BB4D915E97709D2F.simpson-transcript-redacted.pdf ("Simpson Senate Interview") (providing that Simpson did not testify under oath but that he understood that making a false statement to Congress was a federal crime).  Fusion is the trade name of Bean LLC, which is a Delaware corporation registered in the District of Columbia.  *See* Simpson Senate Interview at 14-15; Simpson House Interview at 6; Delaware Dep't of State Div. of Corps., *General Information Name Search*, https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx (enter Entity Name:  Bean LLC or File No.: 4854128); D.C. Dep't of Consumer and Regulatory Affairs, *My D.C. Business Center Quick Search*, https://mybusiness.dc.gov/#/quicksearch (enter Business Name:  Bean or File No.:  L53032).

[12]        MUR 7449 Compl. at 2-3, 7-8 (citing Jane Mayer, *Christopher Steele, The Man Behind the Trump Dossier*, THE NEW YORKER (Mar. 12, 2018), https://www.newyorker.com/magazine/2018/03/12/christopher-steele-the-man-behind-the-trump-dossier ("New Yorker Article")).  Steele asserts in his response that the MUR 7449 "Complaint is full of inaccuracies," though he does not identify which facts are inaccurate.  Steele Resp. at 3 (arguing that even assuming the accuracy of all facts alleged in the Complaint, the Commission should not proceed against Steele).  According to the New Yorker Article, Steele co-founded Orbis, which is located in Mayfair, London, UK, in 2008.

[13]        *See Marc E. Elias*, Perkins Coie LLP, https://www.perkinscoie.com/en/professionals/marc-e-elias html; MUR 7291 DNC Resp. at 2.

[14]        *See Marc E. Elias*, Perkins Coie LLP, https://www.perkinscoie.com/en/professionals/marc-e-elias html.

[15]        MUR 7291 HFA Resp. at 2, 7; MUR 7291 DNC Resp. at 2, 7.

MUR729100045

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 6 of 42

1    of a Republican donor.[16]  Marc Elias and Perkins Coie reportedly formally retained Fusion in

2    April 2016.[17]  HFA and the DNC state that the research was for the purpose of supporting

3    Perkins Coie's representation of them.[18]  HFA campaign manager Robby Mook, when asked in a

4    televised interview whether HFA had paid for the "dossier," stated "I didn't know that we were

5    paying the contractor that created that document" but acknowledged that "I asked our lawyer and

6    I gave him a budget allocation to investigate" Trump's business dealings, "particularly the

7    international aspect," which Mook characterized as "this massive tree of LLCs and shell

8    companies" that left HFA "overwhelmed" and "out of our league."[19]  Simpson, when asked in

9    his congressional testimony whether he was aware, when Fusion was retained by Perkins Coie,

10   that Perkins Coie was working on behalf of the DNC, testified that "nobody gave me a document

[16]    MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp., Ex. 1; MUR 7291 Compl. ¶ 5 (citing Adam Entous, Devlin Barrett, and Rosalind Henderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017), https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html?utm_term=.e2c61bfdabee ("Post Article")).  Fusion had previously been paid by The Washington Free Beacon, which stopped paying in April or May 2016 once Trump appeared to secure the Republican nomination for President.  *See* Simpson House Interview at 11-12.

[17]    *See* MUR 7291 Compl. ¶ 5 (citing Post Article); *see also* MUR 7449 Compl. at 4; Simpson House Interview at 12-13.  The Post Article cites sources "familiar with the matter."  The information provided by HFA, the DNC, Perkins Coie, and Elias is largely drawn from a letter from Perkins Coie to the Zuckerman Spaeder LLP ("Zuckerman") law firm, counsel for Fusion, authorizing Zuckerman to disclose certain information regarding Perkins Coie's hiring of Fusion.  MUR 7291 HFA Resp. at 2, Ex. 1 (Letter from Matthew J. Gehringer, General Counsel, Perkins Coie, to William W. Taylor, III, Zuckerman (Oct. 24, 2017); MUR 7291 DNC Resp. at 2, Ex. 1 (same); MUR 7449 HFA/DNC Resp. at 3, Ex. 1 (same).

[18]    MUR 7291 HFA Resp. at 2; MUR 7291 DNC Resp. at 2; MUR 7331 HFA/DNC Resp. at 16-17; MUR 7449 HFA/DNC Resp. at 3.

[19]    *Anderson Cooper 360, Anderson Cooper Interview with Robby Mook* (CNN television broadcast Nov. 3, 2017) ("CNN Interview") (relevant portion begins at approximately 5:35) (copy of video available in VBM and available at https://www.cnn.com/videos/politics/2017/11/04/robby-mook-ac360-dnc-brazile-full-interview.cnn); *see also* New Yorker Article (stating that Mook approved Perkins Coie's budget request for opposition research, despite not knowing at the time who would be performing the work); Simpson Senate Interview at 139-40 (testifying that the "dossier" published online by Buzzfeed in January 2017, which was comprised of sixteen pre-election memoranda and one post-election memorandum, represents the "entire universe" of memoranda Steele and Orbis created for Fusion).

MUR729100046

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 8 of 46

USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 15 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 7 of 42

1    or informed me specifically of that" but also that he did not think Perkins Coie was engaging

2    Fusion for itself; Simpson further testified that "I have been in Washington for several decades,

3    and I spent a lot of time on Capitol Hill and it was well-known to me that Perkins Coie

4    represented the DNC."[20]  Fusion likely worked for Perkins Coie on a series of 30-day contracts,

5    and their relationship ended with the 2016 presidential election.[21]

6         Fusion reportedly stated that it was paid $1.02 million by Perkins Coie for fees and

7    expenses related to the research on Trump.[22]  Perkins Coie publicly acknowledged that it hired

8    Fusion on behalf of HFA and the DNC, and the Committees appear to have shared the costs

9    related to Fusion's work for Perkins Coie.[23]  In fact, the DNC reported making a $66,500

10   payment to Perkins Coie on August 16, 2016, for "Research Consulting," which the DNC

11   acknowledges was the first DNC payment for Perkins Coie's "legal consulting supported by the

---

[20]    Simpson House Interview at 19-21 (explaining further that "I knew it was the DNC that we were working for" because "I was generally aware that Perkins Coie represented the DNC"). Simpson did not address whether he knew that HFA was also a client, but he did deny having any "dealings" with Clinton. *Id.* at 106. Simpson also, however, testified that he had, over the years, fielded journalists' questions about the Clinton Foundation and Hillary Clinton, but that "at some point, you know, that became a conflict of interest." *Id.* at 150-51 (not specifying at which point he knew that became a conflict or how he knew).

[21]    MUR 7291 HFA Resp., Ex. 1; MUR 7291 DNC Resp., Ex. 1; *see* MUR 7449 HFA/DNC Resp., Ex.1; *see* Simpson House Interview at 8, 74 (explaining that Fusion's business practice was to engage with a client on a 30-day contract, provide a report to the client, and engage for another 30 days if the client chose to do so); Simpson Senate Interview at 289-90.

[22]    MUR 7449 Compl. at 5 (citing Mark Hosenball, *Ex-British Spy Paid $168,000 for Trump Dossier, U.S. Firm Discloses*, Reuters (Nov. 1, 2017), https://www.reuters.com/article/us-usa-trump-russia-dossier/ex-british-spy-paid-168000-for-trump-dossier-u-s-firm-discloses-idUSKBN1D15XH ("Reuters Article") (citing a public statement by Fusion)). The MUR 7331 Complaint alleges that HFA and the DNC paid $12 million "for an opposition research project to link Donald Trump to Russia" but provides no information supporting that figure. MUR 7331 Compl. at 2.

[23]    MUR 7449 Compl. at 4 (citing Kenneth P. Vogel, *Clinton Campaign and Democratic Party Helped Pay for Russia Trump Dossier*, The New York Times (Oct. 24, 2017), https://www.nytimes.com/2017/10/24/us/politics/clinton-dnc-russia-dossier.html ("Times Article"); MUR 7291 Compl. ¶ 5 (citing Post Article); *see also* MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp. at 3, Ex. 1.

MUR729100047

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 8 of 42

1    research efforts of Fusion."[24]  Overall, the DNC reported paying $5,267,642.67 to Perkins Coie

2    between March and December 2016.[25]  HFA reported paying a total of $4,941,201.09 to Perkins

3    Coie between March and December 2016.[26]  The reported $1.02 million figure representing

4    Perkins Coie's total payments to Fusion would comprise 8.4% of all the fees paid to Perkins

5    Coie by the Committees during the 2015-2016 election cycle.  HFA reported the purpose of all

6    amounts it paid Perkins Coie as "Legal Services."  The DNC, for the most part, reported that the

7    purpose of its Perkins Coie payments was "Legal and Compliance Consulting."  In addition,

8    other DNC payments to the law firm listed "Postage & Shipping," "Travel," "Data Services

9    Subscription," and "Printing & Copying."

10        HFA and the DNC assert that Perkins Coie retained Fusion to assist with its legal

11   representation of the Committees and that neither committee contracted directly with Fusion or

12   made any payments directly to Fusion.[27]  Therefore, HFA and the DNC contend, the

13   disbursements at issue were properly disclosed and the complaints should be dismissed.[28]

---

[24]    MUR 7291 DNC Resp. at 2 n.2, 8 (also stating that the August payment was "for legal services that had been subcontracted to Fusion"); MUR 7291 Compl. ¶ 9.

[25]    *See generally* DNC 2016 Disclosure Reports.  The DNC paid Perkins Coie $6,726,407.25 between January 1, 2015, and December 31, 2016, of which $6,466,711.46 was for "Legal and Compliance Consulting."  *See* MUR 7291 Compl. ¶ 9; *see generally* DNC 2015-16 Disclosure Reports.

[26]    *See generally* HFA 2016 Disclosure Reports.  HFA paid $5,631,421.02 to Perkins Coie between January 1, 2015, and December 31, 2016 for "Legal Services."  *See* MUR 7291 Compl. ¶ 8; *see generally* HFA 2015-16 Disclosure Reports.

[27]    MUR 7291 HFA Resp. at 2; MUR 7291 DNC Resp. at 2; MUR 7331 HFA/DNC Resp. at 2, 11; MUR 7449 HFA/DNC Resp. at 2-3.

[28]    MUR 7291 HFA Resp. at 2-8; MUR 7291 DNC Resp. at 2-8; MUR 7331 HFA/DNC Resp. at 11-17; MUR 7449 HFA/DNC Resp. at 2-9, 13.

MUR729100048

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 10 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 17 of 205
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 9 of 42

1    **B.    Orbis's Opposition Research**

2          After contracting with Perkins Coie, Fusion hired Steele's firm, Orbis, and paid it

3    $168,000 to assist in conducting opposition research on Trump.[29]  When first hired by Fusion,

4    Steele reportedly was not informed that the work was on behalf of HFA and the DNC.[30]  The

5    MUR 7449 Complaint alleges that Steele received information he included in the dossier from

6    Russian nationals, and that complaint thus contends that HFA thereby "collaborated with the

7    Russians in a desperate, and ultimately failed, attempt to steal the election."[31]  To gather

8    intelligence, Orbis, which specializes in human intelligence, reportedly "employs dozens of

9    confidential 'collectors' around the world, whom it pays as contract associates."[32]  The

10   "collectors" in turn "harvest intelligence from a much larger network of unpaid sources, some of

11   whom don't even realize they are being treated as informants."[33]  Steele referred generally to

---

[29]    MUR 7449 Compl. at 7-8; Reuters Article; New Yorker Article (reporting that Orbis "agreed to do opposition research on Trump's murky relationship with Russia" and that Mook "approved Perkins Coie's budget request for opposition research"); Simpson Senate Interview at 76-77, 82-86 (testifying that Fusion hired Steele's firm in May or June 2016 to focus on Trump's Russian business activities).

[30]    New Yorker Article; *see also* Simpson Senate Interview at 60-61, 92 (describing Fusion's practices generally, and specifically in the Trump-related work, in compartmentalizing its subcontractors, including by withholding the identity of Fusion's client unless there is a need to know, such as for due diligence or potential conflicts); Simpson House Interview at 77-78 (testifying that Simpson would have told Steele that the client was political and a Democrat, but that Steele did not know the identity of Fusion's client at the time Steele spoke with the FBI in July 2016).

[31]    MUR 7449 Compl. at 2; *see also* Simpson Senate Interview at 271-72 (describing Steele's methodology); Simpson House Interview at 27, 29-30, 55-56, 69-70 (providing examples of information Steele obtained and confirming that Steele said he does not pay sources for information).

[32]    New Yorker Article (noting that "collectors" can include private investigators at smaller firms, investigative reporters, and "highly placed experts in strategically useful jobs" and can be paid as much as $2,000 per day, depending on the task and length of engagement); *see also* Simpson Senate Interview at 271-72 (describing Simpson's understanding of field operations as follows:  "You commission people to gather information for you rather than sort of paying someone for a document or to sit for an interview"); Simpson House Interview at 56 (testifying that Steele "does not pay sources for information" but runs a source network in which he pays subcontractors to "circulate and gather information in conversations . . . essentially it's hiring people to go talk to their contacts . . . meeting people in bars, talking shop") .

[33]    New Yorker Article (explaining that the unpaid sources "occasionally receive favors . . . such as getting their children into Western schools" though money does not change hands because of legal concerns (*e.g.*, about

MUR729100049

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 11 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 18 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 10 of 42

1    sources in the dossier with descriptions indicating that they may have been foreign nationals

2    (*e.g.*, "'a former top-level Russian intelligence officer still active inside the Kremlin'").[34]

3        The MUR 7449 Complaint also alleges that Steele provided a copy of the dossier to

4    Fusion, which provided it to Perkins Coie, which then provided it to HFA and/or the DNC.[35]

5    Publicly available information, however, indicates that Fusion did not provide a written copy of

6    the dossier to Elias or Perkins Coie, although it did provide oral reports to Elias, who

7    summarized some of that information for HFA and the DNC.[36]  Steele reportedly provided a

8    copy of the dossier to the FBI and to a reporter at Mother Jones, which published an article about

9    it on October 31, 2016, which the MUR 7449 Complaint alleges was intended to influence the

---

insider trading or bribery laws with respect to government officials) and because payments may encourage sources to embellish)); *see also* Simpson Senate Interview at 175-76 (testifying, as to Simpson's inquiries about Steele's sources, "I was really careful throughout this process to not ask a lot of specific sourcing questions.  There are some things I know that I just don't feel comfortable sharing because obviously it's been in the news a lot lately that people who get in the way of the Russians tend to get hurt").

[34]    New Yorker Article (quoting Steele's dossier and stating that "Steele's specialty was gathering information from informed sources, many of them Russian"); *see also* Simpson Senate Interview at 87-88 (describing Steele as "the lead Russianist at MI6" but declining to discuss specific sources due to security concerns); Simpson House Interview at 164-65 (describing Steele's "specialty" as Russian intelligence and tradecraft.  Simpson described "a large diaspora of Russians around the world and people in Moscow that, you know, are talking to each other all the time" and noted that, in June 2016, "no one was really focused on sort of this question of whether Donald Trump had a relationship with the Kremlin.  So, you know, when Chris [Steele] started asking around in Moscow about this, the information was sitting there.  It wasn't a giant secret.  People were talking about it freely."  Simpson Senate Interview at 87-88 (noting also that "later," when Russia "became a subject of great controversy," "people clammed up").

[35]    MUR 7449 Compl. at 9 (alleging this fact, but without noting any source for the allegation); *see also* Simpson Senate Interview at 145, 267-69 (clarifying that "what people call the dossier is not really a dossier.  It's a collection of field memoranda, of field interviews, a collection that accumulates over a period of months" and stating that the "dossier" published on Buzzfeed represents the written work product Fusion received from Orbis); *but see* Simpson House Interview at 49-50, 81 (stating that Simpson kept Steele's dossier separate and did not incorporate it into his work product for Perkins Coie).

[36]    *See* New Yorker Article (reporting that Fusion briefed only Elias on the information in the dossier and did not send him copies of the memoranda prepared by Steele and also noting that "Elias broadly summarized some of the information to top campaign officials, including the campaign manager, Robby Mook").

MUR729100050

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 12 of

USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 19 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 11 of 42

1   outcome of the Presidential election.[37]  Fusion and Steele assert in response that foreign

2   nationals may work as campaign vendors if they are paid fair market value.[38]  Steele also

3   contends that the payments Fusion received from Perkins Coie and the payments it made to

4   Orbis were made at a fair market value rate.[39]

5        As stated above, the MUR 7449 Complaint also alleges that Elias and HFA violated

6   Commission regulations by substantially assisting Steele in the solicitation of contributions by

7   foreign nationals because Elias hired Fusion when he was working in an official capacity for

8   HFA as its general counsel.[40]  The Committees, Perkins Coie, and Elias assert that they did not

9   solicit, accept, or substantially assist with any contribution by a foreign national.[41]  They also

10   assert that the MUR 7449 Complaint fails to set forth any facts supporting the allegation that a

11   foreign national was involved in the decision-making of HFA or the DNC.[42]

---

[37]     MUR 7449 Compl. at 9-10 (citing David Corn, *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*, MOTHER JONES (Oct. 31, 2016), https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-operation-cultivate-donald-trump/ ("Mother Jones Article")); *but see* Simpson House Interview at 103-07, 110-11 (explaining that, when Simpson first directed Steele to speak with national security press in late September or early October 2016, he did so "under the assumption at that time that Hillary Clinton was going to win the election and so there was no urgency to it . . . that nothing would be published about any of this any time likely before the election" but that, in late October 2016, after what appeared, to Simpson, to be law enforcement attempts to influence the election, Simpson and Steele returned to the press, not to influence the election, but to blow the whistle and "expose a sinister plot by Vladimir Putin, a hostile foreign power, to attempt to alter the outcome of an American Presidential election"); Simpson Senate Interview at 160-67, 177; Simpson House Interview at 61-62, 101-02, 109, 123-24 (noting, generally, that Simpson directed Steele to speak with reporters in the fall of 2016 and that Simpson may have informed Perkins Coie of that in keeping with his practice to advise clients when he speaks with reporters); New Yorker Article (reporting that HFA chairman and campaign manager did not know about Steele until Mother Jones article appeared and did not read dossier until it was published online on Buzzfeed in early 2017).

[38]     Fusion Resp. at 2; Steele Resp. at 6-7.

[39]     Steele Resp. at 6-7.

[40]     MUR 7449 Compl. at 18.

[41]     MUR 7449 HFA/DNC Resp. at 2.

[42]     *Id.*

MUR729100051

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 12 of 42

1   **III.   LEGAL ANALYSIS**

2        **A.        Reporting Disbursements**

3        The Act and Commission regulations require political committees to report the name and

4   address of each person to whom they make expenditures or other disbursements aggregating

5   more than $200 per calendar year, or per election cycle for authorized committees, as well as the

6   date, amount, and purpose of such payments.[43]  The relevant reporting requirements under the

7   Act and Commission regulations are intended to ensure public disclosure of "where political

8   campaign money comes from and how it is spent."[44]  Disclosure requirements also "deter[] and

9   help[] expose violations" of the Act and Commission regulations.[45]

10        1.        Disclosure of Payees of Disbursements

11        Neither the Act nor Commission regulations address the concepts of ultimate payees,

12   vendors, agents, contractors, or subcontractors in this context.[46]  The Commission determined in

13   Advisory Opinion 1983-25 (Mondale) ("AO 1983-25") that in certain circumstances reporting

---

[43]     52 U.S.C. § 30104(b)(5), (6); 11 C.F.R. § 104.3(b)(3)(i), (ix) (political committees other than authorized committees); *id.* § 104.3(b)(4)(i), (vi) (authorized committees); *id.* § 104.9(a), (b) (all political committees).

[44]     *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *see also Citizens United v. FEC*, 558 U.S. 310, 369-71 (2010) (describing importance of disclosure requirements to serve informational interest, because "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages").

[45]     *SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc); *see also Buckley*, 424 U.S. at 67-68 (explaining that disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light" and that "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations" of the Act); *McConnell v. FEC*, 540 U.S. 93, 196 (2003) (concurring with the stated government interests in disclosure requirements described in Buckley — "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce" the Act and Commission regulations).

[46]     Advisory Op. 1983-25 (Mondale) at 2.  As discussed below, the Commission has since addressed the requirements of section 30104(b)(5) in certain situations not applicable to these facts.  *See* Reporting Ultimate Payees of Political Committee Disbursements, 78 Fed. Reg. 40,625, 40,626-27 (July 8, 2013) ("Ultimate Payee Interpretive Rule") (clarifying committees' obligation to report "ultimate payees" in three specific scenarios that are not vendor specific).

MUR729100052

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 14 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 21 of 205
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 13 of 42

1    committees are not required to separately report payments that the committee's vendors make to

2    subvendors when those payments are for services or goods used in the performance of the

3    vendor's contract with the committee.[47]  In that advisory opinion, a committee, Mondale for

4    President, Inc., planned to contract with a media consulting group for media related services,

5    including media production and the purchase of television and radio time.[48]  In reaching its

6    conclusion, the Commission found several facts to be significant in concluding that the

7    committee was not required to separately report or itemize payments to its vendor's subvendors:

8    (1) the vendor at issue had a legal existence as a corporation separate from the operations of the

9    committee; (2) the vendor's principals did not hold any staff positions with the committee;

10   (3) the committee conducted arm's length negotiations with the vendor that resulted in formation

11   of a final contract; (4) the vendor was not required to devote its "full efforts" to the contract and

12   expected to have contracts with other campaigns and entities; and (5) the committee had no

13   interest in the vendor's other contracts.[49]

14          The Commission has applied the analytical framework identified in AO 1983-25 when

15   considering whether a committee's reported payment to a vendor satisfies the reporting

16   requirements of section 30104(b)(5) in light of an allegation that the committee should have

17   reported the identity of a subvendor.  For example, in MUR 6510 (Kirk), the Commission found

18   no reason to believe that the respondent committee failed to adequately report disbursements in

---

[47]    AO 1983-25 (Mondale) at 3.

[48]    *Id.* at 1.

[49]    *Id.* at 3.

MUR729100053

Case 2:22-cv-14102-DMM    Document 237-2    Entered on FLSD Docket 08/04/2022    Page 15 of
      USCA11 Case: 22-13410    Document: 90-4    Date Filed: 06/16/2023    Page: 22 of 205
                                                    46

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 14 of 42

1    connection with payments to a media firm that subcontracted various media services.[50]

2    Applying the factors outlined in AO 1983-25, the Commission concluded that the committee did

3    not need to report the media vendor's payments to the subvendor.[51]  In MUR 6894 (Russell), the

4    respondents reported payments to a media consulting firm, which purchased media buys on

5    behalf of the respondents.[52]  The Commission found that the media consultant separately

6    contracted with the stations for air time and paid them accordingly, while also receiving

7    commissions from the respondents and concluded that the reporting did not violate the Act.[53]  As

8    in AO 1983-25, MUR 6510 and MUR 6894 both involved firms hiring subvendors that provided

9    the same type of services provided by the vendors.[54]

10        The Commission has, however, found reason to believe committees violated the Act's

11    reporting requirements in matters where the record suggests facts materially distinguishable from

12    those considered in AO 1983-25, such as when a committee reported a vendor that served merely

13    as a stand-in for payments to another particular recipient the committee avoided disclosing.  For

---

[50]    Factual & Legal Analysis at 12, MUR 6510 (Kirk for Senate, *et al.*); *cf.* Factual & Legal Analysis at 4-6, MUR 6818 (Allen Weh for Senate) (dismissing allegation that committee violated the Act by failing to itemize payments to a payroll company after committee quickly amended reports in response to RFAIs to include itemization and where committee allegedly intentionally hid said payments).

[51]    Factual & Legal Analysis at 12-13, MUR 6510 (Kirk for Senate, *et al.*); *see also United States v. Jesse Benton, John Tate, and Dimitrios Kesari*, 890 F.3d 697, 709 (8th Cir. May 11, 2018), *cert. denied*, 2019 WL 1231756 (Benton), 2019 WL 1231758 (Tate), 2019 WL 1231759 (Kesari) (Mar. 18, 2019) (noting that in AO 1983-25 and MUR 6510, "the Commission concluded that the vendors and subvendors had provided the services described by the campaign").

[52]    Factual & Legal Analysis at 1-2, MUR 6894 (Steve Russell for Congress); *see also* First Gen. Counsel's Rpt. at 3, MUR 6894 (Steve Russell for Congress) (noting that the payments in question were disbursements made by the media consultant "to a subvendor in connection with services the vendor provided to the Committee").

[53]    Factual & Legal Analysis at 1, MUR 6894 (Steve Russell for Congress).

[54]    AO 1983-25 at 1-2 (media firm planned to hire subvendors that would provide additional media services); MUR 6894 (Steve Russell for Congress) (media firm paid television stations for media buys); MUR 6510 (Kirk for Senate, *et al.*) (media vendor paid subvendor for media and communications consulting).

MUR729100054

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 16 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 23 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 15 of 42

1    instance, in MUR 4872 (Jenkins), a committee directly hired a vendor — Impact Mail — to

2    perform phone bank services on the committee's behalf.  When the committee discovered that

3    David Duke's name and phone number appeared on caller identification for calls placed by

4    Impact Mail's phone bank, the committee took measures to conceal its relationship with Impact

5    Mail by routing its payments to Impact Mail through a second vendor, Courtney

6    Communications, and reporting Courtney Communications as the payee on disclosure reports.[55]

7    Although Courtney Communications was a vendor that provided media services for the

8    committee during the period in question, Impact Mail was not a subvendor of Courtney

9    Communications because Courtney Communications "had no involvement whatsoever with the

10   services provided by Impact Mail."[56]  Its only role was "to serve as a conduit for payment to

11   Impact Mail so as to conceal the transaction with Impact Mail."[57]

12          Similarly, in MUR 3847 (Stockman), the Commission applied the framework laid out in

13   AO 1983-25, found the matter distinguishable, and found probable cause to believe that the

14   committee violated the reporting requirements of the Act by reporting payments to a vendor,

15   which was an unincorporated proprietorship run by two committee officials, for approximately

16   $470,000 in committee expenses for a variety of purposes, including the costs of at least one

17   "subvendor" who created communications pursuant to a direct contract between the subvendor

18   and the candidate and his committee.[58]  The Commission rested its determination on the facts

---

[55]     Conciliation Agreement at 2-4, MUR 4872 (Jenkins).

[56]     *Id.* at 3-4.

[57]     *Id.* at 4.

[58]     Amend. Certification, MUR 3847 (Stockman) (Dec. 8, 1997) (available at
https://www.fec.gov/files/legal/murs/3847.pdf at 1,539); Gen. Counsel's Brief at 33-37, MUR 3847 (Stockman)
(available at https://www.fec.gov/files/legal/murs/3847.pdf at 1,416).

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 16 of 42

1    that the reported vendor's principals held positions with the committee; the vendor was not

2    incorporated; there was no formal contract between the vendor and the committee; the vendor

3    was devoted largely to the committee, worked out of the committee's headquarters, and used its

4    facilities; and the principals of the vendor held themselves out to the public as officials of the

5    committee.[59]  The Commission concluded that these facts reflected that the reported vendor

6    served as merely an intermediary for payments to other payees (including the purported

7    "subvendor") and thus, under the Act, the committee was required to report the true purpose and

8    recipients of the payments made through the vendor.[60]

9          More recently, in MUR 6800 (Ron Paul 2012), committee officials directly hired Iowa

10    state senator Kent Sorenson and negotiated the terms of his compensation.[61]  Sorenson was

11    compensated through an intermediary — ICT, Inc. — so that the committee could conceal

12    payments made to him.[62]  Similarly, in MUR 6724 (Bachmann), Bachmann's committee and

13    Sorenson agreed that he would be paid by the committee through an intermediary — C&M —

14    that simply added Sorenson's monthly payments to the monthly fees it was already collecting

15    from the committee.[63]

---

[59]    Conciliation Agreement at 6-7, MUR 3847 (Stockman) (available at https://www.fec.gov/files/legal/murs/3847.pdf at 1,576).

[60]    Gen. Counsel's Brief at 37, MUR 3847 (Stockman); Conciliation Agreement at 7, MUR 3847 (Stockman).

[61]    Factual & Legal Analysis at 1-6, 10, MUR 6800 (Ron Paul 2012)

[62]    *Id.* at 4, 10; *see supra* note 51.

[63]    Factual & Legal Analysis at 2-3, MUR 6724 (Bachmann for President); *see* Conciliation Agreement at 2, MUR 6724 (Bachmann for President).

MUR729100056

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 18 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 25 of 205
46

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 17 of 42

1        The Commission has also addressed the requirements of section 30104(b)(5) in certain

2    situations not applicable to the facts presented here.[64]  In the Ultimate Payee Interpretive Rule,

3    the Commission clarified a committee's obligation to report "ultimate payees" in three specific

4    scenarios not articulated in the Act or Commission regulations:  (1) reimbursements to

5    individuals who advance personal funds to pay committee expenses; (2) payments to credit card

6    companies; and (3) candidates who use personal funds to pay committee expenses without

7    reimbursement.[65]  Although HFA and the DNC reference this rule in support of their claim that

8    they correctly reported the payments that were paid through Perkins Coie to Fusion,[66] the

9    Ultimate Payee Interpretive Rule clearly states that it does not apply to the issue of vendors and

10    subvendors:  "[T]he Commission is only addressing the three issues at hand and is not extending

11    the clarification to situations in which a vendor, acting as the committee's agent, purchases

12    goods and services on the committee's behalf from subvendors.  The relationship between

13    committees and its vendors raises different issues than the relationships that exist in these three

14    circumstances."[67]

15        HFA and the DNC also rely on MUR 6698 (United Ballot PAC), in which there was an

16    insufficient number of votes for the Commission to find reason to believe that a candidate

---

[64]    *See* Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,625.

[65]    Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,626.

[66]    MUR 7291 HFA Resp. at 4; MUR 7291 DNC Resp. at 4; MUR 7331 HFA/DNC Resp. at 13-14; MUR 7449 HFA/DNC Resp. at 5.

[67]    Ultimate Payee Interpretive Rule, 78 Fed. Reg. at 40,626.  The interpretive rule stemmed from a Directive 69 request that also addressed only those three factual scenarios, with no mention of broader applicability.  *See* Memorandum to the Commission from Patricia C. Orrock, Chief Compliance Officer, et al., Regarding Request for Guidance from the Commission, Pursuant to Directive 69, regarding Itemization of Ultimate Payee of Committee Disbursements (LRA #912, Itemization of Ultimate Payee), FEC (Oct. 12, 2012).

MUR729100057

Case 2:22-cv-14102-DMM    Document 237-2    Entered on FLSD Docket 08/04/2022    Page 19 of
USCA11 Case: 22-13410    Document: 90-5    Date Filed: 06/16/2023    Page: 26 of 205

1    committee violated the Act by failing to properly disclose a payment that was passed through

2    two intermediary entities before being used by a state-registered political organization, United

3    Ballot PAC, to pay for get-out-the-vote activity on the candidate's behalf.[68]  The First General

4    Counsel's Report in MUR 6698 analyzed the candidate committee's use of the intermediary

5    entities as distinguishable from the material facts of AO 1983-25, concluding that they were used

6    in an apparent attempt to conceal from the public the arrangement with United Ballot PAC.[69]  In

7    their Statement of Reasons, three Commissioners explained their position that the Ultimate

8    Payee Interpretive Rule does not address such a scenario and distinguished the matter from MUR

9    4872 (Jenkins) and MUR 3847 (Friends of Steve Stockman), stating that there were factual

10    differences between those MURs and MUR 6698.[70]

11         Here, though not as stark as the more recent examples in which the Commission or this

12    office has distinguished AO 1983-25, there is reason to believe that HFA and the DNC did not

13    report the appropriate payee with respect to Fusion.  The present transaction differs substantially

14    from the arrangement the Commission approved in AO 1983-25, and the record suggests that,

15    through their counsel, HFA and the DNC authorized the hiring of Fusion for research services

16    that should have been reported as payments to Fusion rather than as payments to Perkins Coie.

---

[68]    Certification, MUR 6698 (United Ballot PAC) (Feb. 25, 2016); First Gen. Counsel's Rpt. at 8-16, MUR 6698 (United Ballot PAC); *see* MUR 7291 HFA Resp. at 5; MUR 7291 DNC Resp. at 5; MUR 7331 HFA/DNC Resp. at 14-15; MUR 7449 HFA/DNC Resp. at 6.

[69]    First Gen. Counsel's Rpt. at 8-9, MUR 6698 (United Ballot PAC).

[70]    Statement of Reasons, Comm'rs. Petersen, Goodman, and Hunter at 3-4, MUR 6698 (United Ballot PAC). The Statement of Reasons did not enumerate the factual differences.

MUR729100058

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 20 of
USCA11 Case: 22-13410   Document: 90-4   Date Filed: 06/16/2023   Page: 27 of 205

1    Contrary to the arguments of HFA and the DNC,[71] this matter does not fit cleanly within

2    the facts the Commission considered in AO 1983-25.  As an initial matter, AO 1983-25 involved

3    a media firm that planned to serve as a vendor to the committee and hire subcontractors that

4    would provide additional media services.[72]  Here, a law firm acting on behalf of the Committees

5    hired a subcontractor to continue to conduct opposition research that it had previously been

6    conducting on behalf of another client.  HFA and the DNC contend that Perkins Coie hired

7    Fusion in furtherance of the legal services it was providing, and correctly point out that legal

8    services may require the use of a range of subvendors, such as private investigators, while still

9    remaining part of the provision of legal services.[73]  In interviews with the U.S. Senate Judiciary

10   Committee and the U.S. House of Representatives Permanent Select Committee on Intelligence,

11   Simpson himself identified an example of legal support services that Fusion has provided to

12   another law firm.[74]  While the principle HFA and the DNC assert is correct, its application may

13   fairly be questioned here, where the Committees have provided little explanation of how

14   Fusion's research was related to the firm's own provision of legal services.  The Committees

---

[71]    MUR 7291 HFA Resp. at 7; MUR 7291 DNC Resp. at 7; MUR 7331 HFA/DNC Resp. at 13, 16; MUR
7449 HFA/DNC Resp. at 8; *see* 52 U.S.C. § 30108(c) (persons engaging in transactions or activity that is
indistinguishable in all its material aspects from the transaction or activity approved in an advisory opinion and who
act in good faith in accordance with the provisions and findings of the advisory opinion cannot be sanctioned for
violating the Act as a result of their actions).

[72]    AO 1983-25 at 1-2.

[73]    *See, e.g.,* MUR 7291 HFA Resp. at 2-3, 7 (discussing, generally, law firms' use of subvendors and,
specifically, Perkins Coie's use of Fusion "to support its provision of legal services"); MUR 7291 DNC Resp. at 2-3,
7 (same).

[74]    *See* Simpson Senate Interview at 20 (describing Fusion's role as "a research, strategy, consulting firm" and
its clients as "corporations to law firms, various investment funds, people involved in litigation"); *id.* at 36
(testifying, with respect to litigation-related work for a different law firm, that "when you're a subcontractor to a law
firm, you know, you're sort of in a lane and, you know, my lane was research, discovery, [a witness's] business
practices, his activities in Russia, his history of avoiding taxes"); Simpson House Interview at 6-7 (noting that
Fusion does opposition research for campaigns from "time to time" but generally works for "corporate clients and
banks and large law firms").

MUR729100059

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 21 of
USCA11 Case: 22-13410   Document: 90-4   Date Filed: 06/16/2023   Page: 28 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 20 of 42

1   submitted four responses in the instant matters, providing multiple opportunities to explain the

2   circumstances of Perkins Coie's use of Fusion's research in connection with its legal work for

3   the Committees.[75]  But the responses are limited to repeated but conclusory statements that

4   Perkins Coie "retained Fusion GPS in order to support its provision of legal services"[76] and that

5   the law firm hired Fusion to "'assist in its representation of'" HFA and the DNC.[77]  These

6   assertions fail to address the available information undermining the Committees' position that

7   Fusion's services were "used in performance of" Perkins Coie's legal services contracts with

8   HFA and the DNC.[78]  That information includes the nature of Fusion's prior and current work on

9   this matter[79] and Fusion's seeking of a client such as the DNC rather than Perkins Coie's seeking

10  of services in support of a particular legal need.[80]  Although these circumstances do not foreclose

---

[75]     MUR 7291 HFA Resp. at 2, 7, Ex. 1; MUR 7291 DNC Resp. at 2, 7, Ex. 1; MUR 7331 HFA/DNC Resp. at
17; MUR 7449 HFA/DNC Resp. at 3, 8, Ex.1.  No response provides any explanation or example of Fusion's
support for, or assistance in, Perkins Coie's provision of legal services.  We recognize that attorney-client privilege
may constrain a full explanation of all such "support," but note that the responses did not provide even the most
basic connection between HFA's request, which may have been what Mook identified publicly in his CNN
Interview, for assistance to investigate Trump's business dealings, "particularly the international aspect" of "LLCs
and shell companies," and Perkins Coie's engagement of Fusion.  CNN Interview.

[76]     MUR 7291 HFA Resp. at 7; MUR 7291 DNC Resp. at 7; MUR 7449 HFA/DNC Resp. at 8.

[77]     MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7331 HFA/DNC Resp. at 16;
MUR 7449 HFA/DNC Resp. at 3, Ex. 1.

[78]     AO 1983-25 at 2 (proposed subvendor would provide additional media services "used in performance of"
the media firm vendor's contract with the committee); Factual & Legal Analysis at 10-11, MUR 6724 (Bachmann
for President) ("[T]here is no evidence that Sorenson's services as Iowa State Chair were 'used in performance of'
C&M's contract with the Committee."); *see also* Factual & Legal Analysis at 12, MUR 6510 (Kirk for Senate)
(citing AO 1983-25).

[79]     *See* Simpson House Interview at 13, 19 (when asked if Simpson had a second client interested in opposition
research on Trump, Simpson answers yes and states that Perkins Coie was that client); Steele Resp. at 3-4, 6-19 (not
specifically taking issue with the MUR 7449 Complaint's characterization of Steele's work for Fusion as opposition
research and instead arguing the absence of any violation even on assumed facts); supra note 29 (citing source
characterizing Orbis's work as opposition research).

[80]     *See* MUR 7291 HFA Resp. at 2, Ex. 1 (Letter from Matthew J. Gehringer, General Counsel, Perkins Coie,
to William W. Taylor, III, Zuckerman (Oct. 24, 2017) (stating that "Fusion GPS approached Perkins Coie in early
March of 2016")); MUR 7291 DNC Resp. at 2, Ex. 1 (same); MUR 7449 HFA/DNC Resp. at 3, Ex. 1 (same); New

MUR729100060

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 22 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 29 of 205

1   the possibility that Fusion's services supported Perkins Coie's legal representations of the

2   Committees, the current information raises a reasonable inference that Fusion's work was

3   principally opposition research that the Committees funded through their General Counsel and

4   was not in support of the firm's representations.

5          In addition, similar to MUR 3847 (Stockman), Elias's dual roles as a Perkins Coie partner

6   and a HFA official (General Counsel), as well as the firm's role as General Counsel,[81] is

7   distinguishable from a material fact on which the Commission determined, in AO 1983-25, that a

8   committee would not have to separately report subvendors, namely, that the vendor and

9   requesting committee had no overlapping staff.[82]  There is no question that Perkins Coie, a large

10  law firm with a variety of practice areas, is a separate legal entity from the Committees.  But the

11  degree of overlapping management here due to the nature of the role of General Counsel presents

12  the question as to whether Fusion was retained to work for Perkins Coie because Fusion would

13  be of assistance with Perkins Coie's legal work or because Fusion would be performing

14  opposition research services for HFA and the DNC (or, perhaps, both).  To the extent that Elias

15  and Perkins Coie, as General Counsel to the Committees, retained Fusion to perform opposition

16  research services for the Committees, this matter resembles those described above in which the

17  Commission found reason to believe committees violated the reporting requirements of the Act

18  by hiring vendors but reported only their payments to intermediaries.  For his part, Simpson has

19  explained that Fusion knew that Perkins Coie had a longstanding relationship with the DNC;

Yorker Article (reporting that Fusion persuaded Marc Elias, the general counsel for the Clinton campaign, to
subsidize the unfinished research on Trump).

[81]      MUR 7291 HFA Resp. at 2, 7; https://www.perkinscoie.com/en/professionals/marc-e-elias.html.

[82]      AO 1983-25 at 3.

MUR729100061

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 23 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 30 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 22 of 42

1   Perkins Coie has stated that it was approached by Fusion.[83]  These circumstances suggest that

2   Fusion approached Perkins Coie as a means of approaching the DNC.

3          Perkins Coie's representation of both HFA and the DNC further differs from the facts

4   identified in AO 1983-25, in which the reporting committee stated that it would have no interest

5   in its vendor's contracts with other entities.[84]  And the circumstances presented in AO 1983-25

6   appeared to concern a matter of administrative convenience, with no indication that the

7   motivation was to avoid public disclosure of the payments passed through the vendor to the

8   subvendor.  However, in the instant matter, the MURs 7331 and 7449 Complaints allege that

9   HFA and the DNC may have wanted to avoid disclosure of payments to an opposition research

10  firm during the 2016 Presidential campaign.[85]

11         In the responses filed with the Commission in MUR 7291, neither HFA nor the DNC

12  deny that they were aware that Perkins Coie was working specifically with Fusion.[86]  Further,

13  the public record indicates that HFA campaign manager Robby Mook provided the budget

14  authorization to Perkins Coie for research into Trump's businesses, and Mook has reportedly

15  acknowledged that the campaign was briefed on information likely generated from Fusion's

---

[83]    *See supra* note 20 and accompanying text; *supra* note 80.

[84]    *See* First Gen. Counsel's Rpt. at 29-30, MUR 7304, *et al.* (Hillary Victory Fund, *et al.*) (asserting that the available record in that matter indicates that HFA had authority over actions taken by the DNC during the 2016 Presidential election)

[85]    *See* MUR 7331 Compl. at 2; MUR 7449 Compl. at 1-2.

[86]    *See generally* MUR 7291 HFA Resp. at 1-8; MUR 7291 DNC Resp. at 1-8; MUR 7331 HFA/DNC Resp. at 11-17; MUR 7449 HFA/DNC Resp. at 1-8.  Simpson concedes that he did not talk to HFA campaign chairman John Podesta in 2015 or 2016.  Simpson House Interview at 107-08.  In addition, Simpson states that it would have been normal practice for Fusion to notify its client before discussing the opposition research with members of the media. Simpson House Interview at 101-02, 109, 123-24; Simpson Senate Interview at 204-07, 209-10, 277-78.  Simpson also states that he "was definitely aware that Perkins Coie represented the DNC and that they were the client." Simpson House Interview at 20; *see supra* section II.A, note 20 and accompanying text.

MUR729100062

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 24 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 31 of 205
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 23 of 42

1 research, though he states that he did not know the source of the material at that time.[87]

2 Although press accounts include that "Mook had approved Perkins Coie's budget request for

3 opposition research without knowing who was producing it," reports also indicate that Elias, as

4 General Counsel for HFA and representing Perkins Coie which was counsel to the DNC,

5 received briefings by Fusion's majority owner Glenn Simpson on Fusion's research and briefed

6 Mook on information received from Fusion.[88]  Simpson testified before Congress that he did not

7 "specifically remember" "the genesis" of how he ended up being retained by his "second client"

8 Perkins Coie and that he believed that the DNC was his ultimate client.[89]  In their MUR 7449

9 Response, HFA, the DNC, Elias, and Perkins Coie state that Perkins Coie "billed [the

10 Committees] for the work that it did in connection with conducting and managing the Fusion

11 GPS research."[90]  As stated above, the DNC described its initial August 2016 payment to Perkins

12 Coie for Perkins Coie's "legal consulting supported by the research efforts of Fusion" as having

13 the purpose of "Research Consulting."[91]  The record also shows that Perkins Coie provided

14 compliance consulting services to the DNC, which presumably involved the review or

---

[87]     *See* CNN Interview; New Yorker Article.

[88]     New Yorker Article; *see also* CNN Interview (Mook states that he gave HFA's attorney a "budget allocation to investigate" Trump).

[89]     Simpson House Interview at 13, 19-21 (also explaining that initial contact between Perkins Coie and Fusion was with Simpson's partner and not Simpson).

[90]     MUR 7449 HFA/DNC Resp. at 3.

[91]     *See supra* note 24 and accompanying text.  As noted above, the information provided by the Committees is largely based on the letter from Perkins Coie to Zuckerman, which states that Fusion approached Perkins Coie in March 2016 and suggested that Perkins Coie retain Fusion to continue opposition research on Trump and that Perkins Coie retained Fusion in April 2016 "to perform a variety of research services" and "[t]o assist in its representation of the DNC and [HFA]."  MUR 7291 HFA Resp. at 2, Ex. 1; MUR 7291 DNC Resp. at 2, Ex. 1; MUR 7449 HFA/DNC Resp. at 3, Ex. 1.  The assertions set forth in this letter have not been verified and would need to be examined further during our investigation.  Specifically, and as noted in this report, HFA, the DNC, Perkins Coie, and Elias have not provided details regarding how Fusion's opposition research assisted Perkins Coie in its representation of the Committees.

MUR729100063

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 25 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 32 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 24 of 42

1   production of disclosure reports filed with the Commission.  Accordingly, these circumstances

2   indicate awareness by the Committees of Fusion's opposition research role in connection with

3   the disbursements for services that were paid through Perkins Coie.

4            2.    <u>Disclosure of Purpose of Disbursements</u>

5       Commission regulations define "purpose" as a "brief statement or description of why the

6   disbursement was made."[92]  "The 'purpose of disbursement' entry, when considered along with

7   the identity of the disbursement recipient, must be sufficiently specific to make the purpose of

8   the disbursement clear."[93]  The Commission has determined that the description of purpose

9   should be sufficient to allow "a person not associated with the committee [to] easily discern why

10   the disbursement was made when reading the name of the recipient and the purpose."[94]

11   Examples of sufficient statements of purpose include, but are not limited to, dinner expenses,

12   media, salary, polling, travel, party fees, phone banks, travel expenses, travel expense

13   reimbursement, and catering costs.[95]  The Commission has concluded that "the description

14   'media' is considered as a satisfactory description for a payment that is, in fact, made for media,

15   such as the purchase of media time or media space."[96]  In addition to the non-exhaustive list of

16   examples included in the regulation, the Commission has provided guidance that a description of

17   purpose such as "Consultant-Legal" is sufficient for a disbursement to a consultant; the

---

[92]      11 C.F.R. § 104.3(b)(3)(i)(A), (B); *id.* § 104.3(b)(4)(i)(A).

[93]      *See* Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887 (Jan. 9, 2007) ("Purpose Statement of Policy") (citing 11 C.F.R. §§ 104.3(b)(3)(i)(B), (4)(i)(A)).

[94]      Purpose Statement of Policy, 72 Fed. Reg. at 888.

[95]      11 C.F.R. § 104.3(b)(3)(i)(B); *id.* § 104.3(b)(4)(i)(A).

[96]      AO 1983-25 at 2.

MUR729100064

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 26 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 33 of 205
46
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 25 of 42

1   sufficiency of the description is read in context with the name of the payee.[97]  Additional

2   guidance set forth on the Commission's website includes "Legal / Legal Fees / Legal Services"

3   as a sufficient description of purpose.[98]

4          During the 2016 election cycle, HFA disclosed $5.6 million in payments made to Perkins

5   Coie whose purpose was reported as "Legal Services."[99]  The DNC, during the same 2016 cycle,

6   disclosed more than $6.4 million in payments issued to Perkins Coie for the purpose of "Legal

7   and Compliance Consulting."[100]  In addition to these DNC legal expenses, the record indicates

8   that the DNC also reported one disbursement of $66,500 to Perkins Coie, for "legal consulting

9   supported by the research efforts of Fusion," with the purpose of "Research Consulting."[101]  The

10  DNC indicated in its response that this payment was "the first time it made a payment" for such

11  Fusion-supported services.[102]  And, according to Fusion's reported public statement, Perkins

12  Coie paid a total of $1.02 million to Fusion in 2016 for the purpose of conducting opposition

13  research on Trump using funds obtained from HFA and the DNC.[103]

---

[97]     Purpose Statement of Policy, 72 Fed. Reg. at 888; *see also* FEC Campaign Guide for Congressional Candidates at 103 (June 2014) (the description of purpose must be sufficiently specific such that it makes clear the reason for the disbursement when considered in conjunction with the payee's identity).

[98]     FEC, Purposes of Disbursement (last updated July 13, 2017), https://www.fec.gov/help-candidates-and-committees/purposes-disbursement; *see also* Purpose Statement of Policy, 72 Fed. Reg. at 888 (indicating that additional guidance will be posted at the URL in this footnote).

[99]     *See supra* note 26.

[100]    *See supra* note 25.

[101]    MUR 7291 DNC Resp. at 2 n.2; 8; MUR 7449 HFA/DNC Resp. at 8.

[102]    MUR 7291 DNC Resp. at 8; MUR 7449 HFA/DNC Resp. at 8.

[103]    *See* Reuters Article.

MUR729100065

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 26 of 42

1    HFA and the DNC maintain that the purpose was correctly reported as "legal services,"

2    again on the basis that Fusion was hired in connection with the legal services provided by

3    Perkins Coie.[104]  In addressing "purpose" reporting, like they did with "payee" reporting, the

4    Committees have not provided details on how Fusion's research supported Perkins Coie's legal

5    work.  The Committees claim that the Commission recognizes that legal services can include a

6    "range of diverse legal services" including litigating, advising on trademark issues and vetting

7    staff, but the responses never state that Fusion's research was used for those services.[105]  A

8    person reading the Committees' disclosure reports would not have been able to discern that the

9    Committees were disbursing funds for the purpose of what appears to have been opposition

10   research by reading the name of the recipient (*i.e.*, Perkins Coie) together with the reported

11   purpose (*i.e.*, legal services or legal or compliance consulting).[106]  The fact that the DNC's initial

12   payment to Perkins Coie for services supported by Fusion disclosed the purpose of "Research

13   Consulting," indicates that the DNC was aware that "research" was the specific purpose of this

14   and later disbursements to Perkins Coie for its work supported by Fusion.[107]  The DNC argues

15   that all subsequent payments made to Perkins Coie "for all of its legal services" disclosed a

---

[104]    MUR 7291 HFA Resp. at 2-3, 6-7; MUR 7291 DNC Resp. at 2-3, 6-7; MUR 7331 HFA/DNC Resp. at 12-13; MUR 7449 HFA/DNC Resp. at 3-4, 7-8.

[105]    MUR 7291 HFA Resp. at 6; MUR 7291 DNC Resp. at 6; MUR 7331 HFA/DNC Resp. at 15; MUR 7449 HFA/DNC Resp. at 6-7.

[106]    *See* Purpose Statement of Policy, 72 Fed. Reg. at 888.

[107]    MUR 7291 DNC Resp. at 8; MUR 7449 HFA/DNC Resp. at 8.  Further, Advisory Opinion 1983-25 (Mondale for President), which addresses disclosure of vendor payments to subvendors, provides that a committee would be required to report an adequate description of the purpose of its payments to its vendors.  AO 1983-25 at 2; *see supra* section III.A.1.  The committee in AO 1983-25 stated that it would disclose a specific description of purpose for each payment made to the vendor, such as media consulting fees, media photocopy expenses, or media buys, which the Commission noted when it determined that the committee would not have disclose vendor payments to subvendors.  AO 1983-25 at 2.

MUR729100066

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 28 of 46

USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 35 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 27 of 42

1   purpose of "Legal and Compliance Consulting," when, in fact, subsequent payments disclosed a

2   variety of purposes including, but not limited to, "Postage & Shipping," "Travel," "Data Services

3   Subscription," and "Printing & Copying."[108]

4        Thus, the available information suggests that HFA and the DNC did not properly disclose

5   the purpose of the disbursements to Perkins Coie, for what appears to have been opposition

6   research done by Fusion.  Where respondents disclosed inadequate or incorrect purposes, the

7   Commission has held the respondents accountable, finding reason to believe that they violated

8   the Act.[109]  Nonetheless, we recommend no action at this time with respect to the Committees'

---

[108]    *Compare* MUR 7291 DNC Resp. at 2 n.2 *with, e.g.,* DNC Services Corp./Dem. Nat'l Committee 2016 October Quarterly Report at 4,463-71 (Oct. 20, 2016) (disclosing purposes of "Legal and Compliance Consulting," "Travel," "Data Services Subscription," "Postage & Shipping," "Catering, Food & Beverage," and "Printing & Copying"); DNC Services Corp./Dem. Nat'l Committee 2016 Post-General Report at 15,294-96 (Dec. 8, 2016) (disclosing purposes of "Legal and Compliance Consulting," "Travel," "Data Services Subscription," "Postage & Shipping," and "Catering, Food & Beverage").  The DNC characterizes the payments for purposes other than "Legal and Compliance Consulting" and "Research Consulting" as payments for "expenses auxiliary to its legal services." MUR 7291 DNC Resp. at 2 n.2.

[109]    *See, e.g.*, Report of the Audit Division at 13-14 (Dallas County Republican Party) (Nov. 19, 2008) (respondent disclosed an inadequate or incorrect purpose for 50 disbursements totaling $215,261 where committee sometimes reported generic purposes such as professional fees and fundraising consultant, which did not allow a person to easily discern why the disbursements were made when reading the payee and purpose together); Factual & Legal Analysis at 2-3, MUR 6204 (Dallas County Republican Party) (finding reason to believe that committee violated, *inter alia*, 52 U.S.C. § 30104(b)(5) (formerly 2 U.S.C. § 434(b)(5)); Report of the Audit Division at 12-13 (Cranley for Congress) (Apr. 23, 2008) (sample review projected $1.4 million in disclosed disbursements lacked required information including, but not limited to, missing or inadequate purposes, for which a person could not easily discern why the disbursements were made when reading the payee and purpose together); Certification, MUR 6134 (Cranley for Congress) (Nov. 19, 2008) (approving the Report of the Audit Division dated April 23, 2008 as the Factual & Legal Analysis); Conciliation Agreement at 4, 6, MUR 5635 (Conservative Leadership Political Action Committee); Final Audit Report, Conservative Leadership Political Action Committee (Nov. 29, 2004) (committee failed to disclose a correct or adequate purpose for disbursements totaling over $1.6 million.  In cases involving a limited number of disbursements or small amount of money, the Commission has dismissed the matter or referred it to the Commission's Alternative Dispute Resolution Office ("ADRO").  *See, e.g.*, Certification at 3, MUR 6518 (Newt Gingrich, *et al.*) (June 24, 2015) (referring allegations to the ADRO that respondents failed to disclose an adequate purpose for one $47,005 disbursement); MUR 6638 (Todd Long for Congress) (dismissing allegation that respondent incorrectly described the purpose of two disbursements totaling $21,667 as "check" where respondent committee corrected description and terminated).  In addition, a recent decision by the United States Court of Appeals for the Eighth Circuit rejected an argument that identifying a purpose of "audio/visual expenses" for payments that were actually compensation for an endorsement did not cause a committee's disclosure reports to be false.  *See United States v. Jesse Benton, John Tate, and Dimitrios Kesari*, 890 F.3d 697 (8th Cir. May 11, 2018), *cert. denied*, 2019 WL 1231756 (Benton), 2019 WL 1231758 (Tate), 2019 WL 1231759 (Kesari) (Mar. 18, 2019) (affirming the convictions of three former Ron Paul 2012 campaign officials for, *inter alia*, violating the Act by

MUR729100067

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 28 of 42

1     reporting of the purpose of the disbursements, pending an investigation into whether the

2     Committees incorrectly identified Perkins Coie as the payee.

3             3.     <u>Alleged Aiding and Abetting of False Reporting</u>

4         The MUR 7449 Complaint alleges that Elias and Perkins Coie violated the Act by aiding

5     and abetting false reporting by HFA and the DNC by "funneling" disbursements to Fusion

6     through Perkins Coie.[110]  In support of this allegation, the MUR 7449 Complaint cites several

7     cases upholding convictions for aiding and abetting in *criminal* campaign finance cases but does

8     not provide support for an aiding and abetting violation under the Act in the *civil* enforcement

9     context.[111]  Elias and Perkins Coie state that these are not cognizable allegations before the

10    Commission.[112]  Moreover, the particular context here, in which Elias and Perkins Coie are also

11    the Committees' compliance counsel, presents an additional consideration counseling against an

12    aiding and abetting violation.  In light of these considerations, as well as the foregoing discussion

---

causing false campaign finance reports to be filed with the Commission) (Kesari was, and the Ron Paul 2012 Presidential Campaign Committee, Inc., is, a respondent in MUR 6800

[110]     MUR 7449 Compl. at 14-16.

[111]     *Id.* at 15-16; *see* Second Gen. Counsel's Rpt. at 6-7, MUR 6800 (Ron Paul 2012) (explaining that the Act does not have a provision akin to 18 U.S.C. § 2 that holds an individual liable for "willfully causing" reporting violations or for aiding and abetting or assisting a reporting violation)  *cf.* Factual and Legal Analysis at 2, MUR 5712 (Gov. Arnold Schwarzenegger) (finding no such liability in the context of aiding and abetting the solicitation of soft money donations); *FEC v. Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018) (striking the helping or assisting portion of the Commission's regulation codified at 11 C.F.R. § 110.4(b)(1)(iii)); Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings, 70 Fed. Reg. 3 (Jan. 3, 2005) (explaining that treasurers may, in certain matters, be notified in both their official and personal capacities and that, in such matters, the Commission will make findings as to the committee and the treasurer in both their official and personal capacities).

[112]     MUR 7449 HFA/DNC Resp. at 9-10.

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 29 of 42

1    of direct liability on the part of the Committees and their treasurers, we recommend that the

2    Commission dismiss these allegations.

3              4.    <u>Conclusion</u>

4        For the reasons set forth above, we recommend that the Commission find reason to

5    believe that HFA and the DNC violated 52 U.S.C. § 30104(b)(5)(A) by failing to accurately

6    disclose the payees of disbursements but take no action at this time as to whether the Committees

7    failed to accurately disclose the purpose of disbursements.  We also recommend that the

8    Commission dismiss the allegations that Elias and Perkins Coie violated 52 U.S.C.

9    § 30104(b)(5)(A) by allegedly aiding and abetting the filing of inaccurate disclosure reports.

10    **B.**    **Foreign National Activity**

11        The Act prohibits any "foreign national" from directly or indirectly making a contribution

12    or donation of money or other thing of value in connection with a federal, state, or local election,

13    making a contribution or donation to a committee of a political party, or making an

14    expenditure.[113]  The Act's definition of "foreign national" includes an individual who is not a

15    citizen or national of the United States and who is not lawfully admitted for permanent residence

16    as well as a "foreign principal" as defined in 22 U.S.C. § 611(b), which, in turn, includes a

17    "partnership, association, corporation, organization, or other combination of persons organized

18    under the laws of or having its principal place of business in a foreign country."[114]  Commission

19    regulations also prohibit any person from knowingly soliciting, accepting, or receiving a

---

[113]    52 U.S.C. § 30121(a)(1); *see also* 11 C.F.R. § 110.20(b), (c), (f).

[114]    52 U.S.C. § 30121(b)(2); 22 U.S.C. § 611(b)(3); *see also* 11 C.F.R. § 110.20(a)(3).

MUR729100069

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 31 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 38 of 205
46
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 30 of 42

1    contribution from a foreign national[115] and provide that "[n]o person shall knowingly provide

2    substantial assistance in the solicitation, making, acceptance, or receipt of a contribution or

3    donation prohibited by" 11 C.F.R. § 110.20(b)-(d) and (g).[116]

4          The Act defines "contribution" as "any gift, subscription, loan, advance, or deposit of

5    money or anything of value made by any person for the purpose of influencing any election for

6    Federal office."[117]  "[A]nything of value includes all in-kind contributions" such as "the

7    provision of any goods or services without charge or at a charge that is less than the usual and

8    normal charge."[118]  The Commission has recognized the "broad scope" of the foreign national

9    contribution prohibition and found that even where the value of a good "may be nominal or

10    difficult to ascertain," such contributions are nevertheless prohibited.[119]  Notwithstanding the

11    foreign national provisions, Commission regulations permit any person or company — foreign or

12    domestic — to provide goods or services to a political committee, without making a contribution,

---

[115]    11 C.F.R. § 110.20(g); *see also* 52 U.S.C. § 30121(a)(2) (not including the "knowingly" standard).  To solicit means "to ask, request, or recommend, explicitly or implicitly, that another person make a contribution, donation, transfer of funds, or otherwise provide anything of value."  11 C.F.R. § 110.20(a)(6) (citing 11 C.F.R. § 300.2(m)).

[116]    11 C.F.R. § 110.20(h)(1).

[117]    52 U.S.C. § 30101(8)(A)(i).

[118]    11 C.F.R. § 100.52(d)(1); *see also* 52 U.S.C. § 30101(8)(A)(i); Advisory Op. 2007-22 at 1, 5-6 (Hurysz) ("AO 2007-22") (concluding, *inter alia*, that a committee could not accept without charge election materials used in Canadian campaigns but could purchase such materials with campaign funds and the candidate's personal funds).

[119]    AO 2007-22 at 6 (citing Contribution Limitations and Prohibitions, 67 Fed. Reg. 69,928, 69,940 (Nov. 19, 2002)) ("As indicated by the title of section 303 of [the Bipartisan Campaign and Reform Act of 2002], "Strengthening Foreign Money Ban," Congress amended [52 U.S.C. § 30121] to further delineate and expand the ban on contributions, donations, and other things of value by foreign nationals.").

MUR729100070

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 32 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 39 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 31 of 42

1    if that person or company does so as a "commercial vendor," *i.e.*, in the ordinary course of

2    business, and at the usual and normal charge.[120]

3             Commission regulations implementing the Act's foreign national prohibition further

4    provide:

5             A foreign national shall not direct, dictate, control, or directly or indirectly
6             participate in the decision-making process of any person, such as a corporation,
7             labor organization, political committee, or political organization with regard to
8             such person's Federal or non-Federal election-related activities, such as decisions
9             concerning the making of contributions, donations, expenditures, or
10            disbursements . . . or decisions concerning the administration of a political
11            committee.[121]

12    The Commission has explained that this provision also bars foreign nationals from "involvement

13    in the management of a political committee."[122]

14             The MUR 7449 Complaint alleges that Steele, a foreign national, conducted work on

15    behalf of Fusion in a manner that caused him to solicit other foreign nationals for information

---

[120]    11 C.F.R. § 114.2(f)(1); *see* 11 C.F.R. § 116.1(c) (defining "commercial vendor" as "any persons providing goods or services to a candidate or political committee whose usual and normal business involves the sale, rental, lease or provision of those goods or services"); Factual and Legal Analysis at 4-6, MUR 5998 (Lord Jacob Rothschild) (no reason to believe that foreign national venue owners made or facilitated a contribution by renting venue to a committee for a fundraising event and charging the committee the "usual commercial rates"). Goods or services provided at the usual and normal charge do not constitute "anything of value" under the Act, and the person providing those goods or services does not thereby make a contribution. *See* 11 C.F.R. § 100.52(d)(2).

[121]    11 C.F.R. § 110.20(i); *see* Factual and Legal Analysis at 6, MUR 7122 (American Pacific Int'l Capital, Inc.) (finding reason to believe foreign nationals "violated 52 U.S.C. § 30121(a)(1)(A) by participating in decisions involving election-related activities").

[122]    Contribution Limits and Prohibitions, 67 Fed. Reg. 69,928, 69,946 (Nov. 19, 2002); *see also* Advisory Op. 2004-26 at 2-3 (Weller) (noting that foreign national prohibition at section 110.20(i) is broad and concluding that, while foreign national could participate in committees' activities as a volunteer without making a prohibited contribution, she "must not participate in [the candidate's] decisions regarding his campaign activities" and "must refrain from managing or participating in the decisions of the Committees"). A foreign national commercial vendor may be subject to section 110.20(i), notwithstanding exclusion from the definition of "contribution" of the vendor's provision of goods or services in the ordinary course of business at the usual and normal charge. *See* First Gen. Counsel's Rpt., MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al.*)

MUR729100071

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 33 of

USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 40 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 32 of 42

1   regarding Trump, including, but not limited to, files, records, recordings, and videos.[123]  The

2   MUR 7449 Complaint further alleges that Steele did so as an agent of Fusion, Perkins Coie, and

3   HFA.[124]  Therefore, according to the MUR 7449 Complaint, Steele's solicitation of "things of

4   value" from other foreign nationals may have constituted the solicitation of contributions to the

5   committees.[125]

6          The available information indicates that Steele worked for Fusion through Orbis, which

7   appears to be a company organized under the laws of or having its principal place of business in

8   the United Kingdom and, therefore, a foreign national.  Steele, through Orbis, which appears to

9   be in the business of intelligence-based research focusing on Russia, reportedly paid "collectors"

10  of intelligence who sought and received information from unpaid sources, some or all of whom

11  may have been foreign nationals.[126]  Steele obtained the information in what appears to be a

12  commercial operation where the collectors were paid, Orbis was paid, and Fusion was paid, and

13  the available record does not indicate or suggest that any of these persons was not paid fair

14  market value for their services.  The available information does not show that unpaid foreign

15  nationals who may have provided information (and from whom Steele may have indirectly

16  solicited such information) expended funds themselves or utilized their own or others' resources

17  to gather information passed to collectors (and from the collectors to Orbis and Steele); indeed,

18  the record indicates that people were "talking freely" in Russia and some of the sources may not

19  have known they were sources, let alone that they were providing information that was being

---

[123]     MUR 7449 Compl. at 17.

[124]     *Id.*

[125]     *Id.*

[126]     *See* New Yorker Article; *see also* MUR 7449 Compl. at 17.

MUR729100072
Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 34 of 46
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 41 of 205
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 33 of 42

1    gathered by Fusion.  As such, the record does not support a reasonable inference that unpaid

2    sources in Steele's intelligence gathering chain made (or were solicited to make) contributions in

3    the form of information for the purpose of influencing an election for federal office in violation

4    of 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(b).

5           Nor do Steele or Orbis appear to have solicited foreign national contributions as agents of

6    the DNC, HFA, or Fusion, as alleged in the MUR 7449 Complaint.  The Commission's

7    regulations define "agent" as "any person who has actual authority, either express or implied, . . .

8    [t]o solicit, direct, or receive any contribution, donation, or transfer of funds."[127]  Because we

9    conclude that the record does not support an inference that Steele himself solicited contributions

10   in the form of information for the purpose of influencing an election for federal office, we also

11   conclude that the record does not support an inference that Steele did so as an agent of the DNC,

12   HFA, or Fusion.  Accordingly, the available information fails to give rise to a reasonable

13   inference that Steele solicited in-kind foreign national contributions in violation of 52 U.S.C.

14   § 30121 and 11 C.F.R. § 110.20(g).[128]

---

[127]    11 C.F.R. § 300.2(b)(1)(i); Definitions of "Agent" for BCRA Regulations on Non-Federal Funds or Soft Money and Coordinated and Independent Expenditures, 71 Fed. Reg. 4975 (Jan. 31, 2006) (defining "agent" as "'any person who has actual authority, either express or implied' to perform certain actions.").  Although the Commission has not defined "agent" in the context of the ban on foreign national contributions, applying the definition set forth in the soft money rules appears appropriate given that the Commission has also referred to the meaning of "to solicit" at section 300.2(m) of the soft money rules when defining that term for purposes of section 110.20.  *See* 11 C.F.R. § 110.20(a)(6).

[128]    The available record in the instant matter differs from the record in MUR 7271 (DNC, *et al.*), in which we recommend that the Commission find reason to believe that the DNC, its contractor (Chalupa), and the contractor's firm (C&A) violated 52 U.S.C. § 30121(a)(2) and 11 C.F.R. § 110.20(g) on a record indicating that Chalupa, purportedly acting as an agent of the DNC, solicited in-kind contributions, in the form of information regarding Trump, from unpaid Ukrainian Embassy officials in 2016.  *See* First Gen. Counsel's Rpt. at 2-14, MUR 7271
       In MUR 7271, the record indicates that a Ukrainian Embassy employee reportedly "claimed that the embassy was 'coordinating an investigation' with Chalupa and 'the Hillary team'" and that the Ukrainian Embassy reportedly utilized its resources and expended funds for opposition research.  *Id*. at 5, 9 (citing Kenneth P. Vogel and David Stern, *Ukrainian Efforts to Sabotage Trump Backfire*, POLITICO (Jan. 11, 2017).

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 34 of 42

1     Similarly, because we conclude that the record does not support an inference that Steele

2     himself solicited contributions in the form of information for the purpose of influencing an

3     election for federal office, we also conclude that the record does not support an inference that

4     Elias and HFA violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(h)(1) by substantially

5     assisting Steele in such solicitations.[129]

6     To the extent that the MUR 7449 Complaint alleges that Fusion violated the Act or

7     Commission regulations, given that we conclude above that the record does not show that

8     foreign national sources made contributions to the Committees, we further conclude that the

9     record does not support an inference that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R.

10    § 110.20.

11    The MUR 7449 Complaint also alleges that Steele made a contribution or expenditure

12    prohibited by sections 110.20(b) and (f), respectively, by providing the dossier to a Mother Jones

13    journalist with the intent to influence the 2016 Presidential election.[130]  Although the MUR 7449

14    Complaint does not specify to whom Steele made the alleged contribution, and under what legal

15    theory, it alleges that Steele provided the dossier to Mother Jones to ensure that it was "widely

16    distributed" and, in doing so, to relieve HFA and the DNC of the costs of releasing the dossier

---

[129]     *See* MUR 7449 Compl. at 18.  Moreover, the available record does not indicate that Elias or Perkins Coie, as General Counsel of the Committees, knew the details of Orbis's or Steele's business practices in the collection of human intelligence.

[130]     MUR 7449 Compl. at 19, 21.  The MUR 7449 Complaint uses the word "donation" instead of "contribution," but, because the Complaint also specifies that Steele acted in connection with and for the purpose of influencing a federal election, this report analyzes this as an allegation of a foreign national "contribution."  *See id.* at 19, ¶ 73; 11 C.F.R. § 110.20(b) (prohibiting foreign national "contribution or donation … in connection with any Federal, State, or local election"); *compare* 11 C.F.R. § 110.20(a)(2) (defining "donation" for purposes of foreign national prohibitions by reference to 11 C.F.R. § 300.2(e)) *and* 11 C.F.R. § 300.2(e) (defining "donation" for purpose of soft money rules as a "payment, gift, subscription, loan, advance, deposit, or anything of value given to a person, but that does not include contributions") *with* 11 C.F.R. § 100.52(d)(1) (defining "contribution").

MUR729100074

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 36 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 43 of 205

1   themselves.[131]  Steele's Response cites the press exemption, which provides that, except in cases

2   where the news organization is owned or controlled by a candidate, committee, or political party,

3   any costs associated with covering a news story are not contributions or expenditures. [132]  Steele

4   contends that because the journalist could not have made a contribution, donation, or

5   expenditure, it follows that Steele did not either, even if he provided the information for the

6   purpose of influencing the Presidential election.[133]

7          To the extent that the MUR 7449 Complaint alleges Steele made an in-kind contribution

8   to the Committees by distributing the dossier via Mother Jones, thereby relieving the Committees

9   of the costs of distribution, the record does not support such a conclusion because Mother Jones

10  did not, in fact, distribute the dossier when it published its article on October 31, 2016; the

11  dossier was not publicly distributed until after the election.[134]  To the extent that the MUR 7449

12  Complaint alleges that Steele made an in-kind contribution to the Committees under a theory that

13  he made a coordinated expenditure or coordinated communication, the available information

14  does not support a conclusion that Steele coordinated with either of the Committees when he

---

[131]     MUR 7449 Compl. at 20.

[132]     Steele Resp. at 13.  *See* 52 U.S.C. § 30101(9)(B)(i) (excluding from definition of "expenditure" the cost incurred in covering or carrying a news story, commentary, or editorial by any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate); 11 C.F.R. § 100.132 (same, and including websites and internet publications); 11 C.F.R. § 100.73 (same, but excluding from definition of "contribution").

[133]     Steele Resp. at 14 (citing MUR 296 (76) (Penthouse Magazine) (finding no reason to believe that magazine violated the Act by publishing an advertisement advocating the defeat of Jimmy Carter "given the overriding protection of the First Amendment" in activities of the press and that the advertisement was an effort to sell more magazines)).

[134]     *See supra* notes 19, 35, and 37 (discussing publication of dossier online in January 2017); Mother Jones Article; *see also* New Yorker Article (describing Steele speaking to Mother Jones, and other press at the time, "on background").

MUR729100075

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 37 of
                USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 44 of 205
46

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 36 of 42

1    provided information to Mother Jones.[135]

2           To the extent that the MUR 7449 Complaint alleges that Steele made an indirect foreign

3    national contribution to the Committees because the Committees received a benefit or value from

4    the article Mother Jones published, we analyze whether Mother Jones's publication of the article

5    is itself a contribution or expenditure.[136]  We conclude that Mother Jones's costs incurred in

6    producing, promoting, and distributing the article appear to be exempt from the definitions of

7    "contribution" and "expenditure" under the media exemption.[137]  First, Mother Jones appears to

8    be a press entity that produces and disseminates, on a regular basis, news stories, editorials,

9    and/or commentary.[138]  Second, Mother Jones is not alleged, and does not appear, to be owned or

10   controlled by a political party, political committee, or candidate and appears to have been acting

11   within its legitimate press function when it published the relevant article because the materials

---

[135]      *See* MUR 7449 Compl. at 19 (alleging Steele provided the dossier to Mother Jones "in his personal capacity and not as an agent . . . or at the direction of, the DNC or HFA"); 11 C.F.R. §§ 109.20, 109.21 (treating coordinated expenditures and communications, respectively, as in-kind contributions); *see also* New Yorker Article (reporting that HFA chairman and campaign manager maintain that they did not know about Steele specifically until after Mother Jones article appeared).  Similarly, the Complaint does not allege and the record does not support a determination that Steele made a contribution by republishing HFA's "campaign materials."  *See* 11 C.F.R. § 109.23 (describing in-kind contribution for dissemination, distribution, or republication of materials "prepared by" a candidate or her committee).  The record shows that Fusion did not provide Steele's work product to the Committees such that they could be considered materials prepared by the campaign.  *See supra* note 36.

[136]      *Cf.* Factual and Legal Analysis at 7, MUR 6481 (RTTV America, Inc.) (dismissing allegation that domestic media company violated foreign national provisions of the Act in connection with a show aired on a Russian Federation-founded media outlet in light of facts showing U.S. citizen was "responsible for all editorial decisions relating to the content").  The record does not suggest that Steele had any direction or control over the content of the Mother Jones Article.

[137]      *See* Advisory Op. 2011-11 (Colbert) at 8-10 (describing scope of exemption with respect to different payments by press entity); Advisory Op. 2008-14 (Melothe) at 5-6 (same); Advisory Op. 2003-34 (Showtime) at 3 (same).

[138]      *See, e.g.,* Advisory Op. 2016-01 (Ethiq) at 2-3 (noting that Commission "applies a two-step analysis to determine whether this media exemption . . . applies" looking, in the first step, at "whether the entity engaging in the activity is a press entity within the meaning of the Act and Commission regulations"); Advisory Op. 2010-08 (Citizens United); Advisory Op. 2005-16 (Fired Up!); Advisory Op. 1996-16 (Bloomberg).

MUR729100076

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 38 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 45 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 37 of 42

1   were available to the general public and they were comparable to those ordinarily issued by

2   Mother Jones.[139]

3          As for Steele, we recommend that the Commission dismiss the allegations because it is

4   not clear in general that the scope of the prohibitions in sections 110.20(b) and (f) extend to a

5   foreign national source's provision of information to press entities to use in the production and

6   dissemination of news stories about federal elections that qualify for the media exemption.[140]  In

7   addition, the support cited in the Complaint regarding Steele's suggested liability here is not

8   persuasive — the advisory opinions cited all involve foreign national direct participation in

9   political campaigns and direct contributions to political committees, a provision which is

10  discussed further below.[141]  As such, the current record does not support a reasonable inference

11  that Steele made a contribution or expenditure in violation of 11 C.F.R. § 110.20(b) or (f) by

12  providing information to Mother Jones.

---

[139]      *See* Advisory Op. 2016-01 (Ethiq) (describing second step in Commission's two-step analysis, *i.e.,* whether
the press entity is owned or controlled by a political party, committee, or candidate and whether it acted in its
legitimate press function); *Reader's Digest Ass'n v. FEC*, 509 F. Supp. 1,210, 1,214-15 (S.D.N.Y. 1981).

[140]      *Cf.* Factual and Legal Analysis at 7, MUR 6080 (Clarion Fund, Inc.) (finding no reason to believe a section
501(c)(3) entity violated the Act when it produced and distributed, allegedly with the funding of foreign nationals, a
film, produced by a Canadian, concluding that "because the film distribution did not constitute an independent
expenditure or an electioneering communication, the prohibition against foreign nationals making expenditures does
not apply"); *but cf.* Factual and Legal Analysis at 6, 8, MUR 6982 (Project Veritas) (concluding that an individual
— described by respondents as a reporter engaged in undercover journalism — appeared to violate the foreign
national prohibition of the Act by knowingly providing substantial assistance to a foreign national in making a direct
contribution to a candidate as part of that "investigative" activity, but dismissing as a matter of prosecutorial
discretion); MUR 6982 Project Veritas Action Fund Resp. at 1 (Nov. 9, 2016) (characterizing the individual as a
"reporter" and her activity as "undercover journalism," but making no assertion any respondent was a press entity);
Advisory Op. 2005-19 (Inside Track) at 4 (concluding that statements by "a person calling into [a radio] program"
would be within the radio program's legitimate press function and, therefore, the radio program's press exemption);
*Reader's Digest Ass'n*, 509 F. Supp. at 1,215 ("No inquiry may be addressed to sources of information, research,
motivation, connection with the campaign, etc." until it is determined that the press exemption is inapplicable).

[141]      *See* MUR 7449 Compl. at 19.

MUR729100077

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 39 of
USCA11 Case: 22-13410   Document: 90-5   Date Filed: 06/16/2023   Page: 46 of 205
MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 38 of 42

1       Finally, the MUR 7449 Complaint alleges that Steele "indirectly participated in [the]

2    decision making processes [of HFA and the DNC] concerning expenditures" by providing the

3    dossier to the Committees (indirectly through Fusion and Perkins Coie) in violation of 11 C.F.R.

4    § 110.20(i).  The available information does not support this allegation.  Steele's firm Orbis's

5    usual and normal business appears to involve providing the services it was hired by Simpson to

6    provide in the spring of 2016 to assist Fusion with research regarding Trump.[142]  No specific

7    information indicates that Orbis charged less than its usual and normal rate for those services.[143]

8    Thus, as a commercial vendor, Orbis could provide services to a political committee so long as

9    foreign nationals did not participate directly or indirectly in the committee's decision-making

10    process with regard to election related activities.

11       Steele drafted a series of memoranda based on the information he gathered (*i.e.*, the

12    dossier) and provided the memoranda, intermittently, to Fusion, which in turn shared some of the

13    information therein, but not Steele's or Orbis's work product, with Perkins Coie, which in turn

14    shared some of the information with the Committees.  The record thus supports Steele's assertion

15    that he "had no involvement in [the Committees'] decisions about how to expend their resources

16    or how to use (or not use) the information he provided in the 2016 election campaign."[144]  In

17    addition, the record reflects that Steele provided research to Fusion without suggestions, advice,

---

[142]    *See* MUR 7449 Compl. at 7-8; New Yorker Article; Simpson Senate Interview at 76-77, 82-86; Simpson House Interview at 25-26, 66.

[143]    Steele Resp. at 3; MUR 7449 Compl. at 17.  To the extent he was compensated for his services, there does not appear to be any contribution related to the work that he performed in violation of 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.

[144]    Steele Resp. at 18-19.

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 39 of 42

1    or recommendations as to how the research could be used.[145]  In MUR 6959 (DNC), the

2    Commission found no reason to believe that Cindy Nava, a foreign national, participated in the

3    decision-making or management processes of the DNC by performing online research and

4    translation services for a political committee as a volunteer.[146]  As in MUR 6959, the available

5    record in the instant matter does not indicate that Steele "participated in the decision-making or

6    management processes" of HFA and the DNC.[147]  Instead, Steele provided information to

7    Fusion, which summarized some of that information, rather than forwarding Steele or Orbis's

8    work product, for the Committees' representatives.  Given these facts, the record does not

9    establish a reasonable inference that that foreign national "participated" in the Committees'

10    decision making in violation of the Act's foreign national prohibition.[148]

11           Accordingly, we recommend that the Commission dismiss the allegations that Steele

12    violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(b), (f), (g), and (i).  We also recommend that

---

[145]    Simpson House Interview at 49 (describing Steele's dossier as "raw field memoranda" taken "from interviews with his source network").

[146]    Factual and Legal Analysis at 1-2, MUR 6959 (DNC).

[147]    *Id*. at 4.  The facts in the instant matter are distinguishable from the facts in MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al*.), where foreign national employees of Cambridge Analytica were embedded in the committees themselves and directly provided strategic communications and targeting advice to the committees, as supported by internal documents supplied by a whistleblower, among other evidence.  *See* First Gen. Counsel's Rpt., MURs 7350, 7351, 7357, and 7382 (Cambridge Analytica LLC, *et al.*)

[148]    *See* 11 C.F.R. § 110.20(i); Factual and Legal Analysis at 4-6, MUR 5998 (Lord Jacob Rothschild) (finding no reason to believe that foreign national venue owners violated the Act by renting a venue to a political committee where, *inter alia*, the record showed that the owners did not participate in decision-making regarding the committee's fundraising event).

MUR729100079

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 41 of
USCA11 Case: 22-13410   Document: 90-4   Date Filed: 06/16/2023   Page: 48 of 205

MURs 7291, 7331, and 7449 (DNC, *et al.*)
First General Counsel's Report
Page 40 of 42

1   the Commission dismiss the allegation that Elias and HFA violated 11 C.F.R. § 110.20(h)(1) and

2   dismiss the allegation that Fusion violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.

## IV.   PROPOSED INVESTIGATION

4          In order to determine whether HFA and the DNC properly disclosed payments to Perkins

5   Coie for Fusion's work, we would investigate the relationship between the Committees and

6   Fusion.  This would include a determination of who decided to hire Fusion and why it was

7   decided that their research services would be provided to Perkins Coie.  Because HFA and the

8   DNC contend that Fusion's work was in furtherance of the services provided by Perkins Coie,

9   we will seek to determine the nature of the legal services for which HFA and the DNC retained

10  Perkins Coie, to include obtaining relevant invoices Perkins Coie prepared for the Committees,

11  while also being mindful of the attorney-client privilege.  In addition, given that Perkins Coie

12  was providing compliance consulting services to the DNC, we will seek information regarding

13  who reviewed and approved the Committees' respective disclosure reports filed with the

14  Commission as it relates to their knowledge of the payments to Fusion.  We will seek to conduct

15  our investigation through voluntary means but recommend that the Commission authorize the

16  use of compulsory process, including the issuance of appropriate interrogatories, document

17  subpoenas, and deposition subpoenas, as necessary.

## V.   RECOMMENDATIONS

19      **MURs 7291, 7331, and 7449**

20  1.   Find reason to believe that Hillary for America, Inc. and Elizabeth Jones in her
21       official capacity as treasurer and DNC Services Corp./Democratic National
22       Committee and William Q. Derrough in his official capacity as treasurer violated
23       52 U.S.C. § 30104(b)(5)(A) by misreporting the payee of funds paid to Fusion
24       GPS through Perkins Coie LLP;

25  2.   Take no action at this time with respect to the allegations that Hillary for
26       America, Inc. and Elizabeth Jones in her official capacity as treasurer and DNC

MUR729100080

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 42 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 49 of 205
46

1               Services Corp./Democratic National Committee and William Q. Derrough in his
2               official capacity as treasurer violated 52 U.S.C. § 30104(b)(5)(A) and (b)(6)(B)(v)
3               and 11 C.F.R. § 104.3(b)(3)(i) and (b)(4)(i) by misreporting the purpose of funds
4               paid to Fusion GPS through Perkins Coie LLP;

5     **MUR 7449**

6       3.      Dismiss the allegations that Marc Elias and Perkins Coie LLP violated 52 U.S.C.
7              § 30104(b)(5)(A);

8       4.      Dismiss the allegations that Christopher Steele violated 52 U.S.C. § 30121 and
9              11 C.F.R. § 110.20(b), (f), (g), and (i);

10      5.      Dismiss the allegations that Marc Elias and Hillary for America, Inc. and
11              Elizabeth Jones in her official capacity as treasurer violated 11 C.F.R.
12              § 110.20(h)(1);

13      6.      Dismiss the allegations that Fusion GPS violated 52 U.S.C. § 30121 and
14              11 C.F.R. § 110.20;

15     **MURs 7291, 7331, and 7449**

16      7.      Approve the attached Factual and Legal Analyses;

17      8.      Authorize compulsory process; and

MUR729100081

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 43 of
USCA11 Case: 22-13410   Document: 90-3   Date Filed: 06/16/2023   Page: 50 of 205
46

1        9.        Approve the appropriate letters.

2                                                           Lisa J. Stevenson
3                                                           Acting General Counsel
4
5
6    _____          _____
7    DATE                                                  Charles Kitcher
8                                                           Acting Associate General Counsel for
9                                                            Enforcement
10
11
12
13                                          _____
14                                                          Mark Allen
15                                                          Assistant General Counsel
16
17
18
19                                          _____
20                                                          Anne B. Robinson
21                                                          Attorney

22
23
24
25
26
27

2019 JUL 29   AM 11: 00

CELA

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | ) MURs 7291 and 7449 |
| DNC Services Corp./Democratic | ) |
| National Committee and William Q. | ) |
| Derrough in his official capacity as | ) |
| treasurer; Hillary for America and | ) |
| Elizabeth Jones in her official capacity as | ) |
| treasurer; Perkins Coie LLP; Marc Elias; | ) |
| Fusion GPS; Christopher Steele | ) |

## CERTIFICATION

I, Laura E. Sinram, recording secretary of the Federal Election Commission executive

session, do hereby certify that on July 23, 2019, the Commission took the following actions in

the above-captioned matter, subject to the Notice of Errata Memorandum dated April 15, 2019:

1. Failed by a vote of 2-2 to:

   a. Find reason to believe that Hillary for America, Inc. and Elizabeth
      Jones in her official capacity as treasurer and DNC Services
      Corp./Democratic National Committee and William Q. Derrough in
      his official capacity as treasurer violated 52 U.S.C. § 30104(b)(5)(A)
      by misreporting the payee of funds paid to Fusion GPS through
      Perkins Coie LLP.

   b. Find reason to believe that Hillary for America, Inc. and Elizabeth
      Jones in her official capacity as treasurer and DNC Services
      Corp./Democratic National Committee and William Q. Derrough in
      his official capacity as treasurer violated 52 U.S.C. § 30104(b)(5)(A)
      and (b)(6)(B)(v) and 11 C.F.R. § 104.3(b)(3)(i) and (b)(4)(i) by
      misreporting the purpose of funds paid to Fusion GPS through Perkins
      Coie LLP.

Federal Election Commission                                          Page 2
Certification for MURs 7291 and 7449
July 23, 2019

      Commissioners Walther and Weintraub voted affirmatively for the motion.

Commissioners Hunter and Petersen dissented.

2. Decided by a vote of 4-0 to:

    a. Find reason to believe that Hillary for America, Inc. and Elizabeth
       Jones in her official capacity as treasurer and DNC Services
       Corp./Democratic National Committee and William Q. Derrough in
       his official capacity as treasurer violated 52 U.S.C. § 30104(b)(5)(A)
       and (b)(6)(B)(v) and 11 C.F.R. § 104.3(b)(3)(i) and (b)(4)(i) by
       misreporting the purpose of funds paid to Fusion GPS through Perkins
       Coie LLP.

    b. Dismiss the allegations that Marc Elias and Perkins Coie LLP violated
       52 U.S.C. § 30104(b)(5)(A).

    c. Take no action at this time related to the allegations that Christopher
       Steele violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20(b), (f), (g),
       and (i).

    d. Take no action at this time as to the allegations that Marc Elias and
       Perkins Coie LLP and Hillary for America, Inc. and Elizabeth Jones in
       her official capacity as treasurer violated 52 U.S.C. § 30121 and 11
       C.F.R. § 110.20(b) and (h)(1).

    e. Take no action at this time as to the allegations that Fusion GPS
       violated 52 U.S.C. § 30121 and 11 C.F.R. § 110.20.

    f. Approve the Factual and Legal Analyses, as recommended in the First
       General Counsel's Report dated April 10, 2019, as last circulated by

       i. Vice Chairman Petersen's Office on July 21, 2019 with respect
         to the DNC Services Corp./Democratic National Committee
         and William Q. Derrough in his official capacity as treasurer,
         and by

       ii. Chair Weintraub's Office on July 22, 2019 with respect to
         Perkins Coie LLP, Marc Elias, and Hillary for America, Inc.
         and Elizabeth Jones in her official capacity as treasurer.

    g. Authorize compulsory process.

    h. Approve the appropriate letters.

MUR729100084

Case 2:22-cv-14102-DMM   Document 237-2   Entered on FLSD Docket 08/04/2022   Page 46 of
USCA11 Case: 22-13410      Document: 90-3   Date Filed: 06/16/2023      Page: 53 of 205
46

Federal Election Commission                                              Page 3
Certification for MURs 7291 and 7449
July 23, 2019

      Commissioners Hunter, Petersen, Walther, and Weintraub voted affirmatively for the

decision.

Attest:

7/26/19
_____                    _____
Date                                     Laura E. Sinram
                                         Acting Secretary and Clerk of the
                                         Commission

**TAB 267**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-14102-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

## <u>ORDER ON MOTIONS TO DISMISS</u>

THIS CAUSE comes before the Court on Defendants' various Motions to Dismiss. (DE 224; DE 225; DE 226; DE 227; DE 228; DE 256; DE 260). Plaintiff has responded to them all. (DE 237; DE 238; DE 239; DE 240; DE 241; DE 262; DE 265). Defendants replied. (DE 249; DE 250; DE 251; DE 252; DE 258). For the reasons explained below, the United States' Motions to Dismiss (DE 224; DE 256), Defendants Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.'s Motions to Dismiss (DE 225; DE 227; DE 260), and the Defendants' Joint Motion to Dismiss Under Rule 12(b)(6) (DE 226) are granted, and Plaintiff's Amended Complaint (DE 177) is dismissed in its entirety.

## I.      BACKGROUND

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 177, Am. Compl. ¶ 9). On this general premise, Plaintiff brings a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), predicated on the theft of trade secrets,

obstruction of justice, and wire fraud (Count I). He additionally brings claims for: injurious falsehood (Count III); malicious prosecution (Count V); violations of the Computer Fraud and Abuse Act ("CFAA") (Count VII); theft of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA") (Count VIII); and violations of the Stored Communications Act ("SCA") (Count IX). The Amended Complaint also contains counts for various conspiracy charges and theories of agency and vicarious liability. (Counts II, IV, VI, and X–XVI).

Plaintiff's theory of this case, set forth over 527 paragraphs in the first 118 pages of the Amended Complaint, is difficult to summarize in a concise and cohesive manner. It was certainly not presented that way. Nevertheless, I will attempt to distill it here.

The short version: Plaintiff alleges that the Defendants "[a]cting in concert . . . maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." (Am. Compl. ¶ 1). The Defendants effectuated this alleged conspiracy through two core efforts. "[O]n one front, Perkins Coie partner Mark Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump campaign and Russian operatives." (*Id.* ¶ 3). To that end, Defendant Hillary Clinton and her campaign, the Democratic National Committee, and lawyers for the Campaign and the Committee allegedly hired Defendant Fusion GPS to fabricate the Steele Dossier. (*Id.* ¶ 4). "[O]n a separate front, Perkins Coie partner Michael Sussman headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank." (*Id.*). Clinton and her operatives allegedly hired Defendant Rodney Joffe to exploit his access to Domain Name Systems ("DNS") data, via Defendant Neustar, to investigate and ultimately manufacture a suspicious pattern of activity between Trump-related servers and a Russian bank with ties to Vladimir Putin, Alfa Bank. (*Id.* ¶ 3). As a result of this "fraudulent

evidence," the Federal Bureau of Investigations ("FBI") commenced "several large-scale investigations," which were "prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice"—Defendants James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. (*Id.* ¶ 7). And while this was ongoing, the Defendants allegedly "seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy." (*Id.* ¶ 6). As a result of this "multi-pronged attack," Plaintiff claims to have amassed $24 million in damages.[1] (*Id.* ¶ 527).

Defendants now move to dismiss the Amended Complaint as "a series of disconnected political disputes that Plaintiff has alchemized into a sweeping conspiracy among the many individuals Plaintiff believes to have aggrieved him." (DE 226 at 1). They argue that dismissal is warranted because Plaintiff's claims are both "hopelessly stale"—that is, foreclosed by the applicable statutes of limitations—and because they fail on the merits "in multiple independent respects." (*Id.* at 2). As they view it, "[w]hatever the utilities of [the Amended Complaint] as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit." (*Id.*). I agree. In the discussion that follows, I first address the Amended Complaint's structural deficiencies. I then turn to subject matter jurisdiction and the personal jurisdiction arguments raised by certain Defendants. Finally, I assess the sufficiency of the allegations as to each of the substantive counts.

## II.    DISCUSSION

First, the pleading itself. A complaint filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1). Each allegation must be simple, concise, and direct. Each claim must be stated in numbered paragraphs,

---

[1] This figure includes fees amassed in bringing the present action. (Am. Compl. ¶ 527).

and each numbered paragraph limited as far as practicable to a single set of circumstances. Fed. R. Civ. P. 10.

Plaintiff's Amended Complaint is 193 pages in length, with 819 numbered paragraphs. It contains 14 counts, names 31 defendants, 10 "John Does" described as fictitious and unknown persons, and 10 "ABC Corporations" identified as fictitious and unknown entities. Plaintiff's Amended Complaint is neither short nor plain, and it certainly does not establish that Plaintiff is entitled to any relief.

More troubling, the claims presented in the Amended Complaint are not warranted under existing law. In fact, they are foreclosed by existing precedent, including decisions of the Supreme Court. To illustrate, I highlight here just two glaring problems with the Amended Complaint. There are many others. But these are emblematic of the audacity of Plaintiff's legal theories and the manner in which they clearly contravene binding case law. First, the Amended Complaint's answer to the Defendants' Motion to Dismiss the original Complaint, wherein Defendants noted the lack of predicate RICO offenses, was to add another predicate offense—wire fraud. The Amended Complaint alleges that the Defendants "engaged in a calculated scheme to defraud the news media, law enforcement, and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia." (Am. Compl. ¶ 577). Not only does Plaintiff lack standing to complain about an alleged scheme to defraud the news media, but his lawyers ignore the Supreme Court's holdings that the federal wire fraud statute prohibits only deceptive schemes to deprive the victim of money or property. It is necessary to show not only that a defendant engaged in deception, but that an object of the fraud was *property*. *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020); *Cleveland v. United States*, 531 U.S. 12, 26 (2000). Likewise, the Amended Complaint, like its predecessor, fails to account for the Supreme Court's requirement that to

obstruct justice there must be a nexus to a judicial or grand jury proceeding. *United States v. Aquilar*, 515 U.S. 593, 599 (1995); *see also United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

Many of the Amended Complaint's characterizations of events are implausible because they lack any specific allegations which might provide factual support for the conclusions reached. For instance, the contention that former FBI director James Comey, senior FBI officials, and Deputy Attorney General Rod Rosenstein "overzealously targeted" Plaintiff and conspired to harm him through appointment of special counsel are strikingly similar to the conclusory and formulaic allegations found deficient in the seminal Supreme Court case of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). What the Amended Complaint lacks in substance and legal support it seeks to substitute with length, hyperbole, and the settling of scores and grievances.

Plaintiff has annotated the Amended Complaint with 293 footnotes containing references to various public reports and findings. He is not required to annotate his Complaint; in fact, it is inconsistent with Rule 8's requirement of a short and plain statement of the claim. But if a party chooses to include such references, it is expected that they be presented in good faith and with evidentiary support. Unfortunately, that is not the case here.

Two examples illustrate this. Paragraph 3 of the Amended Complaint states in part: "[t]he scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign, and the DNC—including 'the candidate' herself—who attempted to shield her involvement behind a wall of third parties." To support that statement, footnote 1 cites the U.S. Department of Justice Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) ("Inspector General's Report" or "IG Report"). I went to page 96 of the Inspector General's Report looking for support for Plaintiff's conclusory

and argumentative statement but found none. The Inspector General's Report is referenced throughout the Amended Complaint (*see* Am. Compl. ¶¶ 426, 427, 465–69, fns. 155–56, 158–60, 246), in support of Plaintiff's claim that senior officials of the FBI and Department of Justice conspired to harm him through a baseless investigation. However, the Amended Complaint fails to acknowledge that the Inspector General's Report, while acknowledging deficiencies, reached the following ultimate conclusion:

> The decision to open the Crossfire Hurricane Investigation was made by the FBI's then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill" Priestap, and reflected consensus reached after multiple days of discussions and meetings among senior FBI officials. We conclude AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies, and we did not find documentary or testimonial evidence that political bias or improper motivations influenced his decision—we found that Crossfire Hurricane was opened for an authorized investigative purpose and with sufficient factual predicate.

IG Report at 410. Plaintiff and his lawyers are of course free to reject the conclusion of the Inspector General. But they cannot misrepresent it in a pleading.

Likewise, the Amended Complaint cites copiously to the indictment of Michael Sussmann and a substantial portion of the Amended Complaint contains its allegations. (*See* Am. Compl. fns. 58, 60, 66, 67, 69, 101, 107–11, 114, 120–21, 124–35, 138, 139, 206, 210, 214, 259). Exhibits and testimony from the trial are also included. (*See id.* ns.5, 17, 31, 59, 61, 64, 65, 67, 70, 75–77, 90–92, 98, 99, 101–06, 112, 115, 117–19, 122, 123, 136, 137, 140–47, 157, 171–82, 187–89, 215, 231, 267, 268). But nowhere does the Amended Complaint mention Mr. Sussmann's acquittal. *See United States v. Sussmann*, No. 21-cr-582 (D.D.C.) In presenting a pleading, an attorney certifies that it is not being presented for any improper purpose; that the claims are warranted under the law; and that the factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11. By filing the Amended Complaint, Plaintiff's lawyers certified to the Court that, to the best of their knowledge,

"the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and that "the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b)(2). I have serious doubts about whether that standard is met here.

The sprawling nature of the Amended Complaint and the number of defendants makes analysis difficult to organize. I will endeavor to examine each count, separately referencing individual defendants where appropriate.

### A.  The Pleading

#### 1.  Shotgun Pleading

As I have already alluded, Plaintiff's pleading contains glaring structural deficiencies. I would be remiss to not expound upon these further before I set out to evaluate the substantive viability of Plaintiff's claims.

Plaintiff's Amended Complaint is a quintessential shotgun pleading, and "[c]ourts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). Such pleadings waste judicial resources and are an unacceptable form of establishing a claim for relief. *Id.*; *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295–96 & ns. 9, 10 (11th Cir. 2002).

The Eleventh Circuit has generally identified four categories of shotgun pleadings: (1) one "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint[;]" (2) one that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action[;]" (3) "one that . . . [does] not separat[e] into a different count each cause of action or claim for relief[;]" and (4) one that "assert[s] multiple

7

claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (citations omitted).

To say that Plaintiff's 193-page, 819-paragraph Amended Complaint is excessive in length would be putting things mildly. And to make matters worse, the Amended Complaint commits the "mortal sin" of incorporating by reference into every count all the general allegations and all the allegations of the preceding counts. *See id.* at 1323; *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Such a format hopelessly complicates any effort to untangle what facts apply to which claims or defendants. For example, Count XIV, entitled "Respondeat Superior, Vicarious Liability" names Fusion GPS but realleges all of the 785 preceding paragraphs then, in conclusory fashion, the Amended Complaint contends that "[as] a direct and proximate result of the torturous [sic] actions by agents, servants, representatives, employees and/or contractors as alleged above, Fusion GPS is vicariously liable to plaintiff[.]" (Am. Compl. ¶ 796). By incorporating all preceding paragraphs by reference, "each count is replete with factual allegations that could not possibly be material to that specific count, and any allegations that are material are buried beneath innumerable pages of rambling irrelevancies." *See Magluta*, 256 F.3d at 1284; *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998) ("These general allegations [incorporated by reference into each count] operated as camouflage, obscuring the material allegations of [Plaintiff's] claims and necessarily implying that all the allegations were material to each claim.").

2. *Fictitious Defendants*

The Amended Complaint also contains impermissible fictitious-party pleading. "As a general matter, fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."). A limited exception exists: "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992)).

Plaintiff's Amended Complaint does not describe the fictitious defendants with the requisite specificity to proceed against them in this fashion. He describes the John Doe defendants as "journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (Am. Compl. ¶ 44). He describes the ABC corporations as "media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or other duly authorized corporate or governmental entities who caused or contributed to the incident or incidents for which the Plaintiff seeks damages[.]" (*Id.* ¶ 45). These descriptions do nothing to specifically identify the John Doe individuals or ABC corporations. *See Richardson*, 598 F.3d 734 (holding that "identif[ying] [a] defendant as 'John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute' . . . was insufficient to identify the defendant among the many guards employed at CCI. . ."). As a result, the fictitious individual and corporate defendants are dismissed without prejudice.

B.        **Subject Matter Jurisdiction (United States)**

I turn next to the United States' argument that this Court lacks subject matter jurisdiction over Plaintiff's claims against it, as "[i]t is axiomatic that a court may not proceed at all in a case unless it has jurisdiction." *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (11th Cir. 2001) (citing *Ex Parte McCardle*, 7 Wall. 506, 514 (1868)). "[A] federal district court may not dismiss a case on the merits by hypothesizing subject-matter jurisdiction." *Id.* "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by th[e] [Supreme Court] from the beginning." *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998).

The United States argues that this Court lacks subject matter jurisdiction over Plaintiff's claims against it under the doctrine of sovereign immunity. Fed. R. Civ. P. 12(b)(1). To invoke the limited waiver of sovereign immunity contained in the Federal Tort Claims Act ("FTCA"), a plaintiff must first administratively present his claim to the appropriate federal agency -- here, the FBI, the House of Representatives, and the Department of Justice. *See* 28 U.S.C. §§ 1346(b)(1), 2675(a). The United States argues that Plaintiff has not done so, and accordingly his claims are not administratively exhausted. (DE 224 at 2; DE 256 at 2). "Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, 'the terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citation omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

Plaintiff argues that the United States should not be substituted for Defendants James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Adam Schiff, and Rod

Rosenstein (collectively, the "Federal Defendants"), and that the exhaustion requirement in the FTCA is therefore inapplicable. He appears to concede that, in the event the United States is the proper party, Plaintiff has not exhausted his administrative remedies, and he suggests that I should dismiss without prejudice to allow Plaintiff to pursue those remedies. (DE 238 at 13).

Because a delegate of the Attorney General certified that the Federal Defendants were acting within the scope of their employment, the United States was substituted for them as an "automatic consequence" of the Westfall Act certification. *See S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990). The certification is not dispositive for purposes of substitution, but it constitutes *prima facie* evidence that the employees were acting within the scope of their employment. *See id.* Plaintiff bears "the burden of altering the status quo by proving that the employee acted outside the scope of employment[.]" *Id.* He must allege specific facts establishing that the Federal Defendants exceeded the scope of their employment. *Jacobs v. Vrobel*, 724 F.3d 220, 220 (D.C. Cir. 2013).

Plaintiff has not met that burden here, and the United States therefore remains the proper party to this litigation. *See Osborn v. Haley*, 549 U.S. 225, 252 (2007) (explaining that the United States remains the defendant "unless and until the district court determines that the federal officer originally named as defendant was acting outside the scope of his employment."). To determine whether a federal officer was acting within the scope of his or her employment, the FTCA instructs the district court to apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), not the law of the state where the alleged tort had its "operative effect," *Richards v. United States*, 369 U.S. 1, 10 (1962). Here, the Parties agree that Plaintiff's claims against the Federal Defendants involve actions related to Crossfire Hurricane and the FISA

application processes undertaken during that investigation, which took place in the District of Columbia. (*See* DE 224 at 7; DE 238 at 6).

Under District of Columbia law, an employee's conduct falls within the scope of his or her employment if: (1) "it is of the kind he [or she] is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; and (3) "it is actuated, at least in part, by a purpose to serve" the employer. *Jacobs*, 724 F.3d at 221 (internal quotation marks omitted). The Circuit Court for the District of Columbia "appl[ies] [this] test 'very expansively,' and, in essence, "ask[s] 'whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) (quoting *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)).

Beginning with the first prong, "[t]o qualify as conduct of the kind an employee was to perform, his or her actions must either have been of the same general nature as that authorized or incidental to the conduct authorized." *Allaithi*, 757 F.3d at 1332 (internal quotation, alteration marks, and emphasis omitted). The focus is on "the type of act" performed by the employee, not its "wrongful character." *Jacobs*, 724 F.3d at 221–22. The former FBI Federal Defendants and Defendant Rosenstein all satisfy this element because counterintelligence operations and FISA surveillance are all activities of the FBI and the Department of Justice. *See* E.O. 12333 § 1.14 (Dec. 4, 1981), *amended by* E.O. 13284 (Jan. 23, 2003), E.O. 13355 (Aug. 27, 2004), and E.O. 13470 (July 30, 2008) (assigning to the Director of the FBI, under the Attorney General, oversight and supervision for conducting and coordinating counterintelligence activities within the United States); *see also* 28 C.F.R. § 0.85(d) (same). The same is true of Defendant Schiff. Plaintiff's allegations pertain to Defendant Schiff's actions as a member and chair of the House Permanent Select Committee on Intelligence, which investigated whether Plaintiff or his campaign colluded

with the Russian government in the 2016 election. Defendant Schiff's statements relating to the investigation fell squarely within the scope of his employment. Speaking to the press about public policy concerns falls within the scope of the duties of a member of Congress. *See Wuterich v. Murtha*, 562 F. 3d 375 (D.C. Cir. 2009); *Council on American Islamic Relations v. Ballenger*, 444 F. 3d 659 (D.C. Cir. 2006). *Accord Does 1-10 v. Haaland*, 973 F. 3d 591 (6th Cir. 2020); *Williams v. United States*, 71 F. 3d 502 (5th Cir. 1995); *Operation Rescue Nat'l v. United States*, 147 F. 3d 68 (5th Cir. 1998).[2]

Next, the challenged conduct needs to be "substantially within the authorized time and space limits[.]" *Jacobs*, 774 F.3d at 221 (internal quotation omitted). Plaintiff's Amended Complaint contains no allegations that any of the Federal Defendants' actions occurred outside the "time and space limits" of their official government work. Because the Westfall Act certification provides *prima facie* evidence that the Federal Defendants were acting within the scope of their employment, and because Plaintiff has not alleged sufficient facts to rebut this evidence, this factor also favors substitution.

Finally, the actions taken by the Federal Defendants must be "actuated, at least in part, by a purpose to serve" the United States. *Jacobs*, 774 F.3d at 221. The Federal Defendants here acted in furtherance of an approved and authorized counterintelligence operation. *See* IG Report at 410 (concluding that "[t]he decision to open the Crossfire Hurricane Investigation was made by the FBI's then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill"

---

[2] In his Response, Plaintiff argues that Mr. Schiff's actions were outside the scope of his duties because his statements disclosed confidential information of the House Select Committee on Intelligence. However, the Amended Complaint does not plausibly allege or even suggest that Mr. Schiff disclosed any confidential information. But even if it were to be assumed Mr. Schiff divulged confidential information, that would not change the scope of employment determination here. *See Wilson v. Libby*, 535 F. 3d 697, 710 (D.C. Cir. 2008) (disclosure of identity of CIA agent was not outside scope of employment).

Priestap, and reflected consensus reached after multiple days of discussions and meetings among senior FBI officials" and that "AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies[.]"). Plaintiff's conclusory allegations to the contrary are belied by the material cited in his own Amended Complaint. As such, substitution of the United States for the Federal Defendants was proper under the Westfall Act.

Because the United States is the proper party to this action, Plaintiff was required to exhaust his administrative remedies before bringing his claim in this Court under the FTCA. He didn't, and he doesn't claim that he did. I therefore lack jurisdiction to consider Plaintiff's claims against the United States, and Plaintiff's claims against the United States are dismissed without prejudice.

### C.     Personal Jurisdiction

#### 1.   Legal Standard

In addition to challenging the sufficiency of Plaintiff's allegations to state substantive claims, three defendants, Charles Halliday Dolan, Jr., Rodney Joffe, and Orbis Business Intelligence, Ltd.[3] also challenge this Court's exercise of personal jurisdiction over them. Federal Rule of Civil Procedure 12(b)(2) permits dismissal when the court lacks personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts

---

[3] I note that Defendant Neustar, Inc. also filed a separate Motion to Dismiss, asserting not that this Court lacks personal jurisdiction over it but that it is not a proper party and should be dropped pursuant to Federal Rule of Civil Procedure 21. (DE 228). Its argument is based on transactions in late December 2021 through which TransUnion, LLC acquired Neustar, Inc.'s marketing, fraud, and communications solutions business and Neustar Security Services, LLC ("NSS") began operating as an independent security business. (*Id.* at 3–4). Neustar, Inc. contends that NSS is the proper party, and Plaintiff added NSS as a party in the Amended Complaint. Ultimately, though, I need not decide whether Neustar, Inc. or NSS is the proper party because none of Plaintiff's claims survive against either party.

to make out a *prima facie* case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)) (italics added). The Eleventh Circuit has described the standard for satisfying the *prima facie* case as the presentation of "enough evidence to withstand a motion for directed verdict." *See, e.g., Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

"When a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Mosseri*, 736 F.3d at 1350 (quoting *Madara*, 916 F.3d at 1514). At that stage, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (internal citation omitted). I must "accept[] as true all unchallenged facts in the plaintiff's complaint." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021). "To the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, [I] must construe all reasonable inferences in favor of the plaintiff.'" *Id.* at 1364 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010)). However, I need only consider "specific factual declarations within the affiant's personal knowledge," and not "statements . . . [which] are in substance legal conclusions." *Posner v. Essex Ins. Co. Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999) (per curiam).

To exercise personal jurisdiction over a defendant, "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015). "Only if both prongs of the analysis are satisfied may a

federal or state court exercise personal jurisdiction over a nonresident defendant." *Madara*, 916 F.2d at 1514 (citations omitted).

Florida's long-arm statute provides two ways in which a defendant can be subject to personal jurisdiction. *Carmouche*, 789 F.3d at 1203–04. "[F]irst, section 48.193(1)(a) lists acts that subject a defendant to specific personal jurisdiction--that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida." *Id*. at 1204 (citing Fla. Stat. § 48.193(1)(a)). "[S]econd, section 48.193(2) provides that Florida courts may exercise general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida." *Id*. (emphasis omitted) (quoting § 48.193(2)).

"If there is a basis for the assertion of personal jurisdiction under the state statute, [I] next determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Madara*, 916 F.2d at 1514 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (additional citations omitted). The minimum contacts sufficient to comport with Due Process differ when assessing the exercise of "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The general jurisdiction provision of Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010). Therefore, when assessing this Court's exercise of general jurisdiction, "[I] need only determine whether the . . . exercise of jurisdiction . . . would exceed constitutional bounds." *Id.*

### 2. Discussion

Plaintiff contends that this Court may constitutionally exercise personal jurisdiction over Defendants Dolan, Joffe, and Orbis for two reasons: first, because 18 U.S.C. § 1965(b) authorizes nationwide service of process for RICO claims, and second, even if it didn't, the Defendants had sufficient minimum contacts with the state of Florida for the exercise of personal jurisdiction over them. Because I have concluded that Plaintiff has failed to state a claim under RICO, as more fully set forth below, Plaintiff may not rely on § 1965(b) to establish personal jurisdiction over these Defendants. *See infra* section III(D)(1). I therefore need not address this argument further.

That leaves Plaintiff's minimum contacts argument. To exercise personal jurisdiction over Defendants, the exercise of jurisdiction must be both appropriate under Florida's long-arm statute—either because there is general jurisdiction over Defendants or because Plaintiff's claims arise out of or relate to their contacts with Florida—and in accordance with the Due Process Clause of the Fourteenth Amendment. Plaintiff does not argue that general jurisdiction exists over these Defendants, so I need not address that prong of the Florida statute. Instead, under both the Florida long-arm statute and the Due Process Clause, I must determine whether the Defendants had sufficient minimum contacts with the forum state. "The proper focus of the . . . inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 291 (2014) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

I outline Plaintiff's allegations as to each Defendants' contacts with the forum state— which are tellingly sparse—below. I then discuss the ways that Plaintiff misunderstands the applicable law with respect to the constitutional exercise of personal jurisdiction over non-resident defendants, which render Plaintiff's allegations insufficient for the exercise of personal jurisdiction over Defendants Dolan, Joffe, and Orbis.

17

### i. Dolan

Plaintiff argues that Defendant Dolan has sufficient contacts with Florida for this Court's exercise of personal jurisdiction over him because he "provid[ed] false information to Igor Danchenko, which information was subsequently used in the Steele [D]ossier" and "assisted his co-conspirators in creating a document which was published throughout the world," including the state of Florida. (DE 241 at 5). According to Plaintiff, this document "harmed both the Plaintiff, Donald J. Trump, and residents of the state of Florida" such that this Court may properly exercise jurisdiction over Defendant Dolan. (*Id.*).

### ii. Joffe

Next, Defendant Joffe. Plaintiff argues that this Court may exercise jurisdiction over Defendant Joffe because he "accessed information, which he should never have accessed, in an attempt to provide Sussmann with information to present to the FBI and to include with the dossier created by Christopher Steele" and that this information led to the publication of documents "read and published within the state of Florida." (DE 239 at 5).

### iii. Orbis

Finally, Orbis. Plaintiff contends that this Court may exercise personal jurisdiction over Defendant Orbis because Defendant Orbis's "conduct was targeted at many high-level U.S. based actors – including a presidential candidate and eventual sitting president, top-ranking federal law enforcement officials, and major U.S. media outlets – coupled with the pervasive, negative impact that Defendant's actions had upon the country as a whole." (DE 262 at 4). Plaintiff further argues that he has "sufficiently plead[] that Defendant [Orbis] participated in a RICO conspiracy with other co-conspirators that caused harm in the state of Florida" particularly "the DNC and Perkins

Coie [who] both maintain a continuous presence in the state of Florida, and [who] commissioned the creation of the Dossier." (DE 262 at 5).

### iv.  Analysis

To determine whether this Court may exercise personal jurisdiction over Defendants, I must consider whether Florida's long-arm statute provides for specific jurisdiction. Under Florida's long-arm statute, specific jurisdiction can only be exercised over a defendant in causes of action that "aris[e] from" a list of enumerated acts. § 48.193(1)(a). And Florida's long-arm statute is strictly construed. *Sculptchair, Inc., v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (applying Florida law). If the long-arm statute applies, I must then consider whether the exercise of specific jurisdiction over Defendants would comport with Due Process (as this constitutional standard is analyzed within the context of a specific jurisdiction analysis). *Carmouche*, 789 F.3d at 1203.

Plaintiff argues that "[i]t is irrelevant that [Defendants] [have] never traveled or conducted business in Florida" because the conduct "directly led to the dissemination of false information within Florida that harmed the Plaintiff." (DE 239; DE 241). According to Plaintiff, the fact that Defendants conveyed information that "led to the dissemination of false information within Florida" combined with the fact that they "knew that Florida is a state in the United States which was an important one" is sufficient to confer jurisdiction over Defendants under the "effects" test recognized in *Calder v. Jones*, 465 U.S. at 789. (*Id.* at 8). Plaintiff appears to rely on Florida Statute § 48.193(1)(a)(2), which provides for specific jurisdiction over a defendant for "committing a tortious act within the [s]tate." However, "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action." *PVC Windoors, Inc. v. Babbitbay Beach*

19

*Const., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260

(Fla. 2002)); *see also 8100 R.R. Ave. Realty Trust v. R.W. Tansill Constr. Co.*, 638 So.2d 149, 151

(Fla. 4th DCA 1994) ("Since the only support in the record for [Plaintiff's] argument is the

complaint, we must of necessity determine whether it states a cause of action in tort, in order to

determine jurisdiction."). This is because, for the Court to have jurisdiction over a defendant for a

tort committed in Florida, a plaintiff must have alleged sufficient facts to make out a claim that the

tort actually occurred. As set forth *infra* at Section D, none of the torts alleged in Plaintiff's

Complaint survive Rule 12(b)(6) scrutiny. And without these predicate torts, this Court does not

have jurisdiction over Defendants under § 49.193(1)(a)(2) of Florida's long-arm statute.

To the extent that Plaintiff is attempting to rely on some provision other than

§ 49.193(1)(a)(2) to confer personal jurisdiction over the Defendants, Plaintiff has still failed to

plead facts sufficient to do so. "It is undisputed that no part of [Defendants'] course of conduct

occurred in [Florida]." *Walden*, 571 U.S. at 288. Thus, Plaintiff's argument focuses on the

"effects" of Defendants' conduct to confer jurisdiction over them under *Calder*, which requires a

plaintiff to establish that a tort was: (1) intentional; (2) aimed at the forum state; and (3) caused

harm that the defendant should have anticipated would be suffered in the forum state. *Louis Vuitton*

*Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013). Here, Plaintiff has not alleged

that Defendants "aimed" any conduct at Florida or could reasonably have anticipated that Plaintiff

would be harmed in Florida, particularly in light of the fact that Plaintiff was a resident of New

York at the time of the occurrences giving rise to Plaintiff's claims. Knowledge that Florida is a

state in the United States does not equate to knowledge that Defendants' actions will have

consequences in Florida. If that were the case, there would be nationwide personal jurisdiction

over almost all claims arising in the United States. Such is clearly not contemplated by Florida's long-arm statute, and I therefore reject Plaintiff's argument.

Plaintiff's *Keaton* argument fairs no better. In *Keaton v. Hustler Magazine, Inc.*, the Supreme Court held that New Hampshire had jurisdiction over a magazine publisher in a libel action where the publisher sold "some 10 to 15,000 copies of [the magazine] in th[e] [forum state] each month." 465 U.S. 770, 772 (1984). Through these repeated and continuous sales of the magazine, the Court concluded that the defendant "ha[d] continuously and deliberately exploited the [forum state] market" and it was therefore reasonable for the defendant to "anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781 (citation omitted). There are no allegations in the Amended Complaint that outline any contacts with any Defendant that rise anywhere near this level. There are no allegations in the Amended Complaint of any repeated and continuous efforts by any Defendant to avail themselves of Florida or its laws.

For these reasons, I conclude that this Court may not exercise personal jurisdiction over Defendants Dolan, Joffe, or Orbis[4] consistent with the Florida long-arm statute. And because I have determined that no basis exists to assert specific jurisdiction over Defendants under Florida's long-arm statute, I need not consider whether the exercise of specific jurisdiction would satisfy the Due Process Clause. *See Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x. 852, 862, (11th Cir. 2013) ("Because the district court properly concluded there is no [statutory] basis for specific jurisdiction . . . we do not reach the second question of the personal jurisdiction analysis—whether such an exercise of personal jurisdiction would be constitutional."); *see also Madara*, 916 F.2d at

---

[4] Because I have concluded that this Court does not have personal jurisdiction over Defendant Orbis, I do not reach Defendant Orbis's arguments under Rule 12(b)(4) and 12(b)(5) for insufficient process and service of process.

21

1514 ("Only if both prongs of the analysis are satisfied may a federal . . . court exercise personal jurisdiction over a nonresident defendant."). Thus, these Defendants are dismissed from this lawsuit.

D.      **Failure to State a Claim**

Now for the allegations themselves. A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, courts are bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, "a complaint must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

At this stage, a court must construe the complaint in the light most favorable to the plaintiff and accept as true all the plaintiff's factual allegations. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004)). Federal Rule of Civil Procedure 8(a)(2) requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

*1.   RICO & RICO Conspiracy (Counts I and II)*

Defendants first assert that Plaintiff's RICO claims should be dismissed as both (1) barred by the statute of limitations and (2) inadequately pled and thus substantively deficient.

*i.   Statute of Limitations*

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation marks omitted). This essentially requires a plaintiff to plead himself out of the cause of action alleged in the complaint. *See Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (explaining that an action should only be dismissed on statute of limitations grounds at the motion to dismiss stage "if it appears beyond a doubt that Plaintiff[] can prove no set of facts that toll the statute.") (internal quotation omitted).

Defendants argue that Plaintiff has so pled himself out here. The statute of limitations for civil RICO actions and conspiracy to commit RICO violations is four years from when the injury was or should have been discovered. *See Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Plaintiff was therefore required to file his lawsuit no later than October 2021, according to Defendants. Defendants argue that Plaintiff's own tweets, of which they urge I take judicial notice, demonstrate that he was on notice of his purported claims, at the very latest, by October 2017. At least one circuit has concluded that a district court may take judicial notice of tweets. [5] *See Hawaii v. Trump*,

---

[5] Plaintiff's tweets included, *inter alia*, the following declarations that appear directly on point to his claims in the instant litigation:

It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…. Totally made up facts

859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017).[6] And at least one other circuit has held that it is proper to take judicial notice of a blogger's online blog posts. *See Mirlis v. Greer*, 952 F.3d 51, 63 n. 11 (2d Cir. 2020).

Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Paez v. Sec., Florida Dep't of Corrs.*, 947 F.3d 649, 651 (11th Cir. 2020). "A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding[.]" *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004) (citing Fed. R. Evid. 201(f)). But taking judicial notice of facts under Federal Rule of Evidence 201 is "a highly limited process" which

---

by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS! Russia says nothing exists. Probably… released by "Intelligence" even knowing there is no proof, and never will be. My people will have a full report on hacking within 90 days!

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017).

Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?) …. … the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia . . . . . . . "collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's . . . . . . are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!

Donald J. Trump (@realDonald Trump), Twitter (Oct. 29, 2017).

[6]At least two district courts have reached the same conclusion regarding tweets. *See Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020); *United States v. Flynn*, 507 F.Supp. 2d 116, 126 n.6 (D.D.C. 2020).

"bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

The Eleventh Circuit has not addressed the propriety of taking judicial notice of tweets or other social media, however it has taken judicial notice of some internet sources. *See Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1123 (11th Cir. 2022) (taking judicial notice of information on a website); *R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 Fed. App'x 853, 856 (11th Cir. 2013) (same). But other circuits that have considered the issue have found it appropriate. *See Hawaii v. Trump*, 859 F.3d at 773 n.14 (tweets); *Mirlis v. Greer*, 952 F.3d at 63 n.11 (blog posts).  Moreover, Plaintiff's tweets appear to fall within the category of information that this Circuit has recognized as appropriate for taking judicial notice: facts that are not subject to reasonable dispute from sources whose accuracy cannot reasonably be questioned. *See Paez*, 947 F.3d at 651. The Parties do not dispute that Plaintiff made the statements in the tweets, nor do they dispute that Twitter accurately depicts the tweets; indeed, both Parties have relied on tweets in this litigation—Plaintiff in his Amended Complaint, and Defendants in their Motion to Dismiss. Thus, taking judicial notice of Plaintiff's tweets—not for the truth of their contents but for what they reveal about Plaintiff's knowledge—appears consistent with Eleventh Circuit caselaw, and Plaintiff has not opposed Defendants' request. I therefore find it appropriate to take judicial notice of Plaintiff's tweets.

I note, though, that even without Plaintiff's tweets, the allegations in Plaintiff's Amended Complaint demonstrate that Plaintiff was aware of the basis of his claims since at least 2017. Although the tweets provide further support, they are not essential to my ruling on the RICO statute of limitations.

Plaintiff argues that his claims are timely and that, even if they aren't, they should be equitably tolled for the duration of his presidential term. I begin with the text of the Amended Complaint. The RICO predicates alleged to exist in the Amended Complaint—the creation and circulation of the Steele Dossier and initiation of the Crossfire Hurricane Investigation (obstruction of justice); the data mining of DNS data (theft of trade secrets), and false statements to law enforcement and the media (wire fraud)—are said to have commenced in the summer and fall of 2016. *See, e.g.*, Am. Compl. ¶¶ 140, 158, 218. The Steele Dossier is alleged to have been initially furnished in June 2016 and provided to the FBI between July and October 2016, then published by the media in January 2017. The Trump-Alfa Bank server information resulting from the data mining was widely circulated by the media and Clinton campaign in October 2016, and the statements identified as being misleading to law enforcement and the media occurred between September 2016 and October 2017. *See, e.g.*, Am. Compl. ¶¶ 150, 152, 154, 156, 158, 165, 166, 191, 192, 217, 227, 229, 268, 274, 292. These allegations compel only one logical conclusion: that Plaintiff was aware of the factual basis underlying his RICO claims since at least October 2017, if not earlier. It is not reasonable or plausible to conclude that, despite the allegations in the Amended Complaint that numerous prominent media outlets ran stories on the theory underlying Plaintiff's claims as early as 2016, which were shared by his political opponent in the 2016 presidential election, Plaintiff was not aware of his claims until the Sussmann indictment was returned in September 2021. And indeed, Plaintiff does not appear to meaningfully dispute that he knew of his claims since that time. Instead, he argues that the statute of limitations for his RICO claims should be tolled, either because he was President, under the Clayton Act, because of fraudulent concealment, or under the discovery rule. I address each argument in turn.

26

First, Plaintiff's equitable tolling argument. In short, Plaintiff argues that it is "in the interests of justice to accommodate . . . [his] right to assert a meritorious claim when equitable circumstances have prevented a timely filing." (DE 237 at 16, quoting *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559, 1561 (11th Cir. 1987)). He argues that his duties as President interfered with his ability to timely file the instant lawsuit. But, for the reasons discussed below, Plaintiff's claims are not meritorious, and most are completely lacking any evidentiary support as required by the Federal Rules. *See* Fed. R. Civ. P. 11. Moreover, Plaintiff's presidency evidently did not deter him from filing other lawsuits in his personal capacity during the duration of his term in elected office. *See, e.g., Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020) (suit brought by "[t]he President, acting in his personal capacity," to enjoin enforcement of a subpoena); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2028 (2020) (suit brought by "the President in his personal capacity" to challenge subpoenas); *Trump v. Comm. on Ways & Means*, 391 F. Supp. 3d 93, 95 (D.D.C. 2019) (suit brought by Plaintiff "in his personal capacity"). Plaintiff cites *Clinton v. Jones*, 520 U.S. 681 (1997) for support, but the Supreme Court in that case arrived at the opposite conclusion than that which Plaintiff urges: it *rejected* a stay of litigation during President Clinton's term and concluded that his engagement in civil litigation would *not* unduly interfere with his presidential duties. *See* 520 U.S. at 708–10. I therefore agree with Defendants that Plaintiff's conduct while in office "belies any claim that the equities require his novel theory of tolling," which Plaintiff is unable to support with any relevant legal authority.

Plaintiff next argues that his RICO and RICO conspiracy claims are timely under the Clayton Act, which provides for the tolling of private suits "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations *of any of the antitrust laws*[.]" 15 U.S.C. § 16(i) (emphasis added). Defendants contend that this provision is

inapplicable for two reasons: first, because this is not an antitrust action, and second, because Plaintiff has not identified any civil or criminal proceeding instituted by the United States to punish a RICO violation. It appears to be an open question whether the Clayton Act's tolling provision applies in RICO actions. Plaintiff cites a handful of out-of-circuit and non-binding district court cases holding as much, *see, e.g., Pension Fund Mid Jersey Trucking Indus. v. Omni Funding*, 687 F. Supp. 962, 965 (D.N.J. 1988), while Defendants argue that the RICO statute lacks any indication of an intent to include a specialized tolling provision *a la* the Clayton Act. I need not resolve the question though, because without any civil or criminal proceeding instituted by the United States to prevent, restrain, or punish a RICO violation, Plaintiff's claims would not be subject to tolling even if RICO did contain a provision analogous to the Clayton Act. None of the proceedings Plaintiff identifies in his Response were directed at a RICO violation. (*See* DE 237 at 9–12). Indeed, the Government has not instituted any proceedings to punish a RICO violation, nor any RICO predicate act relating to the circumstances giving rise to this litigation. Without any government proceeding initiated to prevent, restrain, or punish a RICO violation or RICO predicate act, there can be no statutory tolling under this theory.

Plaintiff also argues that the statute of limitations on his RICO claims should be tolled because the RICO Defendants attempted "to fraudulently conceal their wrongdoing." (DE 237 at 26). "Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff." *Fedance v. Harris*, 1 F. 4th 1278, 1283 (11th Cir. 2021). It requires that a plaintiff show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195–96 (1997). "The defendant must have actively concealed facts such that the plaintiff remained 'ignoran[t] of

a potential claim,' not 'merely ignoran[t] of evidence.'" *Fedance*, 1 F. 4th at 1287 (rejecting tolling).

Both the Amended Complaint and Plaintiff's tweets belie any argument that his claims should be equitably tolled under the doctrine of fraudulent concealment. To invoke this doctrine, Plaintiff must have been "ignoran[t]" of a potential claim because of the Defendants' efforts to conceal their activities from him. But, since at least 2017, Plaintiff has known about the facts underlying his claims—that the Steele Dossier was allegedly "put together by [his] political opponents and a failed spy afraid of being sued," "Clinton made," and connected to "the Comey fix" and "phony Trump/Russia . . . collusion." Plaintiff cannot in good faith claim to have had no knowledge of a claim that he broadcasted to his social media followers nearly five years ago. Plaintiff is not entitled to statutory tolling under this doctrine.

 Plaintiff's third attempt to avoid a statute of limitations bar is the discovery rule. Under this rule, "accrual is delayed until plaintiff has 'discovered'" his injury. *Fedance*, 1 F.4th at 1285 (citing *Gabelli v. SEC*, 568 U.S. 442, 449 (2013)). Plaintiff asserts that the Amended Complaint includes "three subsets of categories" of damages that reset the clock on his RICO Claim: (1) "attorneys' fees and costs of defense" related to "numerous federal investigations"; (2) "losses Plaintiff sustained to his business and political reputation"; and (3) "loss of trade secrets." (DE 237 at 16).

With respect to the first and second categories, Plaintiff asserts that his legal expenses and harm to his business and political reputation "were incurred between September 2017 and 2020, in connection with the Mueller Investigation" and that "the true extent of this portion of Plaintiff's injuries was not discoverable until April 2018 at the earliest," and that this renders his RICO claims timely. (DE 237 at 28). Plaintiff misunderstands the law. "[T]he statute of limitations commences

to run[] when the wrongful act or omission results in damages" and a "cause of action accrues *even though the full extent of the injury is not then known or predictable.*" *Wallace v. Kato,* 549 U.S. 384, 391 (emphasis added). Thus, Plaintiff's concession that he was damaged beginning in September 2017 means that the clock began ticking despite that Plaintiff did not yet appreciate the "true extent" of his injuries.

Plaintiff's third category of damages also fails to save these time barred claims. He argues that he "was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, 2017, when these 'revelations were exposed for the first time in the Sussman indictment and/or subsequent motions filed by Special Counsel John Durham.'" (DE 237 at 16 (citing Am. Compl. ¶ 146)). But the release of DNS information, as more fully explained below, on which Plaintiff's claims are predicated, was public in October 2016. (Am. Compl. ¶¶ 124–30, 253–77). I therefore find that Plaintiff's RICO claims are time barred.

### ii. Failure to State a Claim

But even if Plaintiff's RICO claims were timely, they still fail on the merits at every step of the analysis. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). "To recover, a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citation omitted). Further, the plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* (citation omitted). "[T]he RICO statute provides that its terms are to be liberally

construed to effectuate its remedial purposes." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted).

Defendants argue that Counts I and II of the Amended Complaint fail to satisfy any of these elements. I agree. While Plaintiff's failure to satisfy any one of the RICO elements is sufficient to grant Defendants' Motion, for the sake of completeness I address them all below.

a.   Predicate Acts

Plaintiff's RICO claims first fail because the Amended Complaint lacks allegations pertaining to any plausible predicate act, let alone two valid predicate acts. "[A]bsent any valid predicate acts, [the plaintiff] cannot state a claim for RICO violations." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1068 (11th Cir. 2007) (citation omitted). Plaintiff purports to identify three predicate acts: obstruction of justice, theft of trade secrets, and wire fraud. None survive judicial scrutiny.

i.   Obstruction of Justice

Obstruction of justice does not supply Plaintiff with a valid predicate act because Plaintiff does not identify any "official proceedings" that Defendants allegedly obstructed.

Perplexingly, Plaintiff appears to argue that the Defendants obstructed investigation Crossfire Hurricane *by contributing to the initiation* of Crossfire Hurricane. That Defendants could have obstructed a proceeding by initiating it defies logic. In any event, Crossfire Hurricane does not qualify as an "official proceeding" within the meaning of the statute, and Plaintiff does not point to any other "official proceeding" to satisfy this element of an obstruction of justice predicate act.

The federal witness tampering statute Plaintiff cites, 18 U.S.C. § 1512, provides for criminal penalties for "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record,

document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding." 18 U.S.C. § 1521(c). Under the statute, "official proceedings" are limited to federal judicial cases or proceedings before Congress or a federal agency. *Id.* § 1515(a). Investigations that do not result in charges are not "official proceedings" within the meaning of the statute.[7] *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation is insufficient); *United States v. Ermoian¸* 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).

Alternatively, Plaintiff argues that he has sufficiently pled obstruction of justice under § 1512(b)(3), which criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). Specifically, Plaintiff points to the following purported misrepresentations: (1) certain reports within the Steele Dossier, which Defendant Steele[8] allegedly provided to the FBI (Am. Compl. ¶¶ 158, 169); (2) Sussmann's statement to the FBI that he was not acting "on behalf of a client or company"[9] when he conveyed information suggesting a suspicious pattern of activity between Trump servers

---

[7] Plaintiff cites *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993), as supporting the contrary position: that an FBI investigation *is* sufficient to support an obstruction of justice charge. But that case doesn't say so, and it actually hurts Plaintiff's position. There, the Fourth Circuit held that "an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury; rather, what must additionally be proven is that the false statements given, in some way, *either obstructed or were intended to obstruct the due administration of justice*." (emphasis added). The Amended Complaint is wholly devoid of any allegation that the Defendants' purported actions, even accepting them as true, obstructed justice.

[8] I note that Defendant Steele is not a RICO Defendant.

[9] Plaintiff's heavy reliance on the Sussmann indictment throughout his Amended Complaint is curious given that Sussmann was acquitted by a unanimous jury of making a false statement to the FBI, a fact which Plaintiff fails even to acknowledge anywhere in the pleading.

and Alfa Bank (*Id.* ¶¶ 204–14), and (3) the "deceptive analysis" of the Trump-Alfa Bank activity supposedly contained in white papers Sussmann provided to the FBI (*Id.* ¶ 206). Notably absent from the Amended Complaint, though, is any allegation that any Defendant interfered with law enforcement with respect to the commission or possible commission of any federal offense. Plaintiff endeavors to significantly broaden this provision to criminalize the dissemination of *any* purportedly misleading information, regardless of any connection to some federal offense. (*See* DE 237 at 27–28). He argues that because Defendants "made numerous false and misleading statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records," they violated § 1512(b)(3), even though their statements did not concern a federal offense. (*Id.*). But that is not what the statute says, and Plaintiff may not misconstrue it in this way. Even accepting Plaintiff's allegations as true, perjury and falsifying documents are not RICO predicate acts. *See* 18 U.S.C. § 1961(1). Moreover, this obstruction provision proscribes engaging in misleading conduct toward another person to hinder, delay, or *prevent communication to a law enforcement officer*—not statements made *to* law enforcement officers themselves. For these reasons, Plaintiff cannot rely on obstruction of justice to supply a predicate act for his RICO claim.

### ii.   Theft of Trade Secrets

Plaintiff alleges that the RICO Defendants stole proprietary "internet data, records and/or information," including "DNS internet traffic data pertaining to Plaintiff, including data originating from" Plaintiff's servers. (Am. Compl. ¶¶ 544–57).

Before turning to the substance of this claim, a brief overview of DNS, or "Domain Name Service," is first necessary. DNS is a "distributed computing system" or "engine" comprised of "computing and communication entities that are geographically distributed throughout the world."

U.S. Dep't of Commerce, Nat'l Inst. Of Standards & Tech, *Secure Domain Name System (DNS) Deployment Guide*, iii, 2-1, 2-2 (Sept. 2013) (hereinafter "NIST Report");[10] *see Akamai Techs. Inc. v. Cable & Wireless Internet Svcs., Inc.*, 344 F.3d 1186, 1188 (Fed. Cir. 2003) ("The DNS is administered by a separate network of computers [or "servers"] distributed throughout, and connected to, the Internet"). DNS acts as a translator of domain names to IP addresses and vice versa. *See* NIST Report at iii, 2-1. Here's how it generally works: internet users access websites via domain names, such as flsd.uscourts.gov. NIST Report at 2-1. Computers speak in a different language—Internet Protocol ("IP") addresses. *Id.* When a user types in a domain name, the computer must "resolve" the domain name into an IP address. Paul Schmitt et. al., *Oblivious DNS: Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop 17 (2019).[11] The user's computer tells the DNS resolver the domain name the user wishes to visit, and this DNS server looks up the corresponding IP address and relays back that information. NIST Report at 2-1. Here, I use a website search as an example, but this same process occurs with any internet communication, including emails. *See* Paul Schmitt, *supra*, at 17.

---

[10] Defendants request that I take judicial notice of the NIST Report. Courts may take judicial notice of adjudicative facts that "[are] not subject to reasonable dispute" either because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A basic understanding of DNS is necessary to the resolution of this Motion, and the accuracy of this governmental resource cannot reasonably be questioned. *See Kremen v. Cohan*, 337 F.3d 1024, 1033 n.10 (9th Cir. 2003) (citing Federal Rule of Evidence 201(b) as supportive of the fact that the court may consider extra-record facts regarding DNS on a motion for summary judgment). Furthermore, I view this request as unopposed, given Plaintiff's failure to contest it or question the authenticity of this source. (*See generally* DE 237).

[11] Defendants additionally cite this source and thus implicitly request that I take judicial notice of certain facts contained therein. Again, Plaintiff does not contest the propriety of considering this source at this stage, (*See* DE 237 at 30–31), and I therefore view this lack of opposition as tacit agreement.

"DNS data is meant to be public." NIST Report at iii, 1.1, 2.3; *see also id.* at ES-1 ("Because [DNS] is an infrastructure system for the global internet . . . the data should be accessible to any entity."). Those who operate the DNS resolvers, generally internet service providers but also other third-parties, "can see all of the DNS queries that a user issues" and can associate DNS queries with the IP address of the computer that sent the query. Paul Schmitt, *supra*, at 17.

Turning now to Plaintiff's theft of trade secrets claim under DTSA, the following elements must be pled: "[1] the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; [2] the proprietary information must be a trade secret; [3] the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; [4] the defendant must intend or know that the offense would injure the owner of the trade secret; and [5] the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022) (citing 18 U.S.C § 1832(a)(1)).

For one, Plaintiff has not alleged facts that bring the DNS internet traffic at issue within the statutory definition of a "trade secret."[12] Plaintiff suggests that because DNS data could reveal a compilation of sensitive information about him, it is a trade secret.[13] (DE 237 at 31). That is

---

[12] I reject Plaintiff's suggestion that I may not consider at this stage whether certain information constitutes a trade secret. (DE 237 at 30). Although true that whether something constitutes a trade secret is generally a fact question, whether the Plaintiff bringing such a claim has sufficiently plead the existence of a trade secret, as that term is statutorily defined, is permissibly assessed at the motion to dismiss stage. *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021) (analyzing whether the plaintiff sufficiently plead a trade secret on review of a motion to dismiss, and noting that "information alleged to be a misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it"); *see also Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of trade secret claim in part for failure to allege economic value).

[13] It is also worth noting that the vast majority of allegedly sensitive information DNS data could or does reveal, according to Plaintiff, is not alleged to have been stolen by Defendants here. (*See*

incorrect. To constitute a "trade secret," as that term is statutorily defined, "the owner [must have] taken reasonable measures to keep such information secret" and the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. 1839(3). Critically, Plaintiff fails to allege that he or anyone else could or did derive *economic* value from information regarding the frequency with which his computers interacted with certain other computers. *See Kairam v. West Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019) (affirming dismissal of DTSA claim in part for failure to allege how the purported trade secret derives independent economic value from nondisclosure). He alleges that such data has *political* value and that Clinton, as his political rival, sought it for political purposes. (Am. Compl. ¶ 138). But this does not suffice to plausibly allege a trade secret, which must derive economic value from nondisclsoure.

Even if DNS data is a trade secret, Plaintiff has not plausibly alleged that he has a protectable interest in it. DNS data is public, *see* NIST Report at 2-1 to 2-2, a fact which Plaintiff does not contest. (*See* DE 237 at 31). Nevertheless, he suggests that because that data "*originat[ed]* from his servers" or that "DNS internet traffic data "*pertain[ed]* to him," it belongs to him.[14]  (*Id.*

---

Am. Compl. ¶ 548) (e.g., "client lists . . . techniques, patterns, methods, processes, and procedures"). Plaintiff does not, for example, allege that the DNS data revealed a proprietary client list that Defendants then stole. What DNS data *could* reveal as a theoretical matter is irrelevant for purposes of this motion. And the fact that Plaintiff alleges a list of boilerplate buzzwords is of no matter. My focus is, as it must be, on Plaintiff's non-conclusory allegations. The theory Plaintiff pled is that the theft of DNS internet traffic revealing interactions between his servers and other servers constitutes theft of trade secrets.

[14] Plaintiff's ownership theory is further flawed in that he alleges that he owns DNS data that was obtained from EOP servers (during a time in which Plaintiff was not even in office (*See* Am. Compl. ¶¶ 143–144)) and the Trump Organization, both of which are nonparties to this litigation. *See Vill. Of Alington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is injured by the challenged action of the defendant"); *Sierra v. City of*

¶ 544) (emphasis added). Recall that DNS is a distributed internet-based computing system comprised of geographically distributed infrastructure. Indeed, Plaintiff repeatedly describes DNS data as "internet data" or "internet traffic." (Am. Compl. ¶¶ 141–42, 491, 544–46, 708). It is thus implausible that Plaintiff owns "DNS internet data" just because it pertains to him or because his servers sent it into the DNS infrastructure. *See* 18 U.S.C. § 1839(4) (defining "owner" as "a person or entity in whom . . . rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4)). Nor does *Kremen v. Cohen* lend Plaintiff any support. Contrary to Plaintiff's contention (DE 237 at 31–32), *Kremen* did not address ownership rights in DNS data, it addressed ownership rights in a domain name, which is not at issue here. 337 F.3d 1024, 1030–31 (9th Cir. 2003). Plaintiff thus has not alleged that he owned DNS lookup data pertaining to him.

Nor does Plaintiff allege that Defendants "st[ole]" the DNS data from Plaintiff, or "t[ook] [it] without authorization, or obtain[ed] [it] by fraud or deception." *Smith*, 22 F.4th at 1243 (citing 18 U.S.C. § 1832(a)). To the contrary, Neustar allegedly provides DNS resolution services and Joffe had permission to access DNS data through Neustar. (Am. Compl. ¶¶ 126, 130, 142, 143–44, 491). Joffe allegedly obtained the DNS internet traffic pertaining to Plaintiff by "mining" the data sources he had authority to access, which does not equate to theft. (*Id.* ¶ 130, 134, 140–42, 491). For the foregoing reasons, Plaintiff has not stated a cognizable theft of trade secrets claim.

iii.   Wire Fraud

Plaintiff's Amended Complaint added a new purported predicate act: wire fraud. However, this predicate act also fails for at least two reasons. First, to plead fraud, Plaintiff must satisfy the heightened pleading requirements of Rule 9(b); that is, Plaintiff must specify with precision

---

*Hallandale Beach*, 996 F.3d 1110, 1124–25 (11th Cir. 2021) (Newsom, J., concurring) (explaining that a plaintiff may only sue for injury to the government in a *qui tam* action).

exactly why any allegedly fraudulent statements were false and how they mislead him. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019). Plaintiff has not done so. (*See* Am. Compl. ¶ 583(a)–(c),(j),(m)–(p)). Conclusory allegations that Plaintiff has suffered "loss of competitive position, . . . loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations" fall woefully short of Rule 9(b)'s particularity requirement. Plaintiff does not specify in what way he has lost any competitive position or goodwill attributable to Defendants' actions, and, as explained *supra* he has not explained how he has lost any trade secrets.

Second, Plaintiff's Amended Complaint fails to successfully allege wire fraud as a predicate act because Plaintiff does not allege that "an object of the[] dishonesty was to *obtain* . . . money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (emphasis added). The federal wire fraud statute prohibits "only deceptive schemes to deprive the victim of money or property"—not "all acts of dishonesty." *Id.* With this predicate act, Plaintiff tries to fit a square peg into a round hole. The alleged harm Plaintiff describes to his "political and/or business reputation" is not the type of harm the wire fraud statute remediates. *See United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). "Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)." *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (collecting cases).

Nor does "misreporting" payments to Fusion GPS in campaign finance reports qualify as wire fraud. Violations of federal campaign finance laws are not RICO predicate offenses. *See Ayres v. Gen. Motors Corp.*, 243 F.3d 514, 522 (11th Cir. 2000) (holding that violations of the federal Safety's Act disclosure requirements could not be prosecuted as wire fraud under the civil RICO

statute). Plaintiff's Amended Complaint is devoid of any allegation that Defendants obtained money or property or deprived anyone else of it. Thus, wire fraud is not a viable predicate act.

b.  Pattern

Plaintiff has also failed to plausibly allege a pattern of racketeering activity, and this further precludes him from stating a RICO claim. "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original) (citations omitted). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1265 (citation omitted).

For the reasons previously discussed, Plaintiff has failed to plausibly allege that Defendants committed any one predicate act, let alone two or more within a ten-year time span. But even if any of his predicate acts were viable, Plaintiff has not alleged any facts to plausibly suggest that they are either related to one another, or that the acts are of a continuing nature.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *Jackson*, 372 F.3d at 1265. Plaintiff has not done so here. The predicate acts he alleges occurred over an approximately six-month time period around the 2016 election: (1) the alleged theft of trade secrets between July 2016 and "early 2017," (Am. Compl. ¶¶ 134, 140, 298, 321); (2) the alleged witness tampering between September 2016 and February 2017, (*id.* ¶¶ 205, 218, 304, 561–65); and (3) the alleged wire fraud between May and October 2016, (*id.* ¶ 581(a)–(y)). The Eleventh Circuit has rejected allegations of closed-ended

continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits impose even stricter requirements. *See Jackson*, 372 F.3d at 1266 (collecting cases); *Halvorssen v. Simpson*, 807 F. App'x 26, 31 (2d Cir. 2020) (noting two-year "minimum" for closed-ended continuity). Thus, the activity Plaintiff alleges did not run long enough to satisfy the requirements for demonstrating closed-ended continuity.

Plaintiff's "pattern" allegations fail for another reason: there is no closed-ended continuity where "the RICO allegations concern only a single scheme with a discrete goal." *Jackson*, 372 F.3d at 1267; *see also Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009) ("[S]ingle schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity."). But that is exactly what Plaintiff alleges here: that the Defendants shared a single, time-limited objective "to vilify Donald J. Trump" in connection with his 2016 campaign and presidency. (Am. Compl. ¶ 2). Plaintiff even identified a "deadline" for this *singular* objective: "Election Day." (*Id.* ¶ 533).

The Amended Complaint is also devoid of any allegations that demonstrate open-ended continuity. To allege open-ended continuity, a plaintiff must show that "the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267 (quotation marks omitted). There are no such allegations in the Amended Complaint. That Plaintiff may run for office again in 2024 is not sufficient to suggest that Defendants will commit any predicate acts in the future; such a proposition is far too speculative and cannot be plausibly inferred from the allegations. Plaintiff argues that "[g]iven the RICO Defendants' history, there is a significant risk that they will resort to engaging in 'theft of trade secrets, obstruction of justice, and other unlawful tactics'" to oppose Plaintiff's future presidential bid. But, for the reasons explained above, there is no evidence, and Plaintiff has not

alleged any facts to support, that the Defendants committed any predicate acts in the past; thus, Plaintiff's attempt to rely on Defendants' "history" to establish open-ended continuity falls short.

### c. Enterprise

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle*, 556 U.S. at 947 (footnote and citation omitted); *see also id.* ("[I]f the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. . . . [E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (citation omitted)). In addition, a RICO enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 446 U.S. 938, 948 (2009). "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in *illegal activity*." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (emphasis added).

Defendants argue that the RICO Defendants "shared a purpose that was not only legitimate, but constitutionally protected: opposing Plaintiff, the Republic candidate, in the 2016 presidential election." (DE 226 at 8 (citing Am. Compl. ¶¶ 2, 9)). Plaintiff contends that this is not so, and that the Defendants' purpose was "corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating Plaintiff, the

Trump Campaign, and the Trump Administration as colluding with Russia." (DE 237 at 19 (citing Am. Compl. ¶ 531)). But Plaintiff's assertions that the Defendants acted "through deceptive, criminal, and fraudulent means" is a legal conclusion that is not entitled to the presumption of truth at the motion to dismiss stage. Plaintiff offers nothing plausible in support to suggest that Defendants had an *illegal* purpose or an intent to commit racketeering acts. These allegations fail for the same reasons the conclusory allegations of discrimination failed in *Iqbal*: they are "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Moreover, neither politically opposing Plaintiff, disliking Plaintiff, nor engaging in political speech about Plaintiff that casts him in a negative light is illegal. Without an illegal purpose plausibly alleged in the Amended Complaint, Plaintiff has failed to allege a RICO enterprise.

### d.   RICO Standing

Finally, Defendants argue that Plaintiff has failed to adequately allege RICO standing—an injury directly caused by a predicate racketeering act. To state a claim for RICO, a plaintiff must allege both an injury to the plaintiff's business or property and "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* Similarly, that an injury was "foreseeable" is not enough; instead, "the injury must be direct." *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349 (11th Cir. 2016).

Plaintiff contends that he has alleged RICO standing because the Amended Complaint points to "at least nine independent and distinct harms to his business and property," which include: (i) "loss of political []reputation"; (ii) "loss of business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and

(ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." (Am. Compl. ¶¶ 615–16). Missing from the Amended Complaint, though, is any allegation directly connecting Defendants' conduct to any of these harms. Plaintiff has not alleged facts of any specific business opportunities, revenue, or goodwill lost because of Defendants' actions. Without any such allegations, Plaintiff has not, and cannot, show that any of these harms were the direct result of any racketeering activity. For this reason, I agree that Plaintiff has failed to allege facts that establish RICO standing.

## 2. *Injurious Falsehood & Conspiracy to Commit Injurious Falsehood (Counts III and IV)*

As with Plaintiff's RICO claims, Defendants argue the Plaintiff's injurious falsehood claims should be dismissed as both barred by the applicable statute of limitations and as substantively failing on the merits. I agree on both grounds.

The statute of limitations for injurious falsehood under Florida law is two years from publication. *See Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanigan*, 629 So.2d 113, 114–115 (Fla. 1993); Fla. Stat. § 95.11(4)(g). And the statute of limitations for conspiracy to commit injurious falsehood is four years from the date of injury. *See Davis v. Monahan*, 832 So.3d 708, 709 (Fla. 2002). The statute of limitations on most of the statements Plaintiff identifies ran long ago. (*See, e.g.*, Am. Compl. ¶¶ 268–69) (Clinton's tweets dated October 31, 2016); (*id.* ¶ 265) (Sullivan's campaign statement dated October 31, 2016); (*id.* ¶ 503) (Wasserman Schultz's MSNBC interview on May 10, 2019).

Since the initial Complaint was filed in this court on March 24, 2022, the two-year statute would have expired on March 24, 2020. (DE 1). The statement attributed to Defendant Sullivan is alleged to have occurred on October 31, 2016. (Am. Compl. ¶ 265). Defendant Podesta's statement

was made October 11, 2016 (*Id.* ¶ 276) and October of 2017 (*Id.* ¶ 496).[15] Defendant Sussmann is alleged to have met with a New York Times reporter on September 1, 2016 (*Id.* ¶ 191), the FBI on September 19, 2016 (*Id.* ¶ 205), and employees of the CIA on February 9, 2017 (*Id.* ¶ 304). While Defendant Danchenko is named in Count III, the Amended Complaint does not attribute any statement to him about Plaintiff, injurious or otherwise. The Amended Complaint alleges that Defendant Danchenko was an analyst for the Steele Dossier and provided information to him from May 16 through December 2016 (*Id.* ¶¶ 109-110), had meetings and communications during that time with Defendant Dolan (*Id.* ¶¶ 111, 112, 114, 118, 119, 120), and was interviewed by the FBI from January 2017 through November 2017 (*Id.* ¶¶ 330–337).

Defendant Steele, a resident of the United Kingdom, is alleged to have drafted a dossier about Plaintiff, the first report of which was furnished June 20, 2016. (*Id.* ¶¶ 110, 147). Defendant Steele, described in the Amended Complaint as a paid FBI informant, began sending the dossier to the FBI on July 5, 2016 (*Id.* ¶ 158), and September 19, 2016 (*Id.* ¶ 226), met with members of the news media on September 21, 2016, FBI agents and a State Department official on October 3 and October 11, 2016 (*Id.* ¶¶ 233-234), and a reporter for Mother Jones on October 31, 2016 (*Id.* ¶ 272). A copy of Defendant Steele's dossier was then provided to Senator John McCain in early 2016, who provided a copy to Defendant FBI director Comey on December 9, 2016. (*Id.* ¶¶ 290, 291). Copies of the dossier were leaked to the press, and it was published in full by Buzzfeed on January 10, 2017 (*Id.* ¶¶ 292, 294, 295). Despite all of these references to Defendant Steele scattered throughout the Amended Complaint, none specifically attribute any false statement about

---

[15] Mr. Podesta is not named in Count III but is named in Count IV, the conspiracy to commit injurious falsehood claim.

Plaintiff to him. All of these activities are alleged to have occurred well outside the statute of limitations for injurious falsehood.

The Amended Complaint does allege statements by Defendants Clinton and Schiff that would fall within the two-year statute of limitations. With respect to Defendant Clinton, the Amended Complaint attributes the following statements made on June 16, 2021: (1) "We don't have Trump as spokesperson for Putin anymore"; and (2) "After [a] disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected of course." (*Id.* ¶ 520). [16] And as to Defendant Schiff, Plaintiff points to: (1) a March 24, 2019 episode of ABC's This Week where Defendant Schiff "called it congresses [sic] duty to expose e [sic] Trump's relationship with Russia"; (2) CNN's State of the Union on May 9, 2020, where Defendant Schiff "claimed . . . there was 'more than circumstantial evidence' that Donald Trump's 2016 presidential campaign colluded with Russia"; and (3) on April 16, 2021 on MSNBC's The Last Word, Defendant Schiff stated that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent" and "[n]ot just any Russian intelligence, but the same ones that tried to help [Plaintiff] win the 2016 election, what most people would call collusion." (*Id.* ¶¶ 511, 513, 514). But while perhaps not barred by the statute of limitations, these statements by Defendants Clinton and Schiff nevertheless do not constitute injurious falsehood for the reasons explained below.

---

[16] In the multitude of paragraphs preceding Count III, the Amended Complaint references two other statements by Defendant Clinton. (Am. Compl. at ¶¶ 521–22). In the February 16, 2022 tweet, she is responding to a statement by Plaintiff directed at her campaign, which is discussed in the Vanity Fair article she attaches. In the quotation from the Financial Times article, she does not reference Plaintiff and is answering a question about the direction of the Democratic Party. These do not appear to relate to the Russia allegations, and they are therefore not relevant to the claims in Plaintiff's Amended Complaint.

Under Florida law, "[a] group of torts recognized under the collective title of 'injurious falsehood' . . . 'is the intentional interference with another's economic relations.'" *Salit v. Ruden McCloskey, Smith Schuster & Russel, P.A.*, 742 So.2d 381, 386 (Fla. 4th DCA 1999) (quoting *Procacci v. Zacco*, 422 So.2d 425, 426 (Fla. 4th DCA 1981)). A claim for injurious falsehood involves the publication of a false statement that is "harmful to the interests" of others and results in their "pecuniary loss." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1153 (11th Cir. 2011) (quoting Restatement (Second) of Torts, § 623A (1977)). The Eleventh Circuit has explained that the fundamental difference between a claim for defamation and one for injurious falsehood is that the former protects the reputation of an injured party, while the latter protects that party's *property interests*. *Id.* at 1154.

The elements of the tort of injurious falsehood are: (1) a falsehood, (2) published or communicated to a third party, (3) the defendant knew that the falsehood would likely induce others not to deal with the plaintiff, (4) the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff, and (5) special damages. *Bothmann v. Harrington,* 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). Damages for injurious falsehood are "restricted to [loss] which results directly and immediately from the falsehoods' effect on the conduct of third persons and the expenses incurred to counteract the publication." *Id.* at 1170 (citing Restatement (Second) of Torts Section 633 (1977)). Damages recognizable are also limited to a plaintiff's realized pecuniary losses. *Salit,* 742 So.2d at 387; *Collier County Pub. Co., Inc. v. Chapman,* 318 So 2d. 492, 495 (Fla. 2d DCA 1975). Special damages pled must be foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses. In addition, under Federal Rule 9(g), "[i]f an item of special damages is

46

claimed, it must be specifically stated." *See Browning v. Clinton,* 292 F.3d 235, 245 (D.C. Cir. 2002); *Erick Bowman Remedy Co. v. Jersen Salsbery Labs,* 17 F.2d 255, 261 (8th Cir. 1926).

Plaintiff expressly disclaims any recovery for reputational damage. (Am. Compl. ¶ 656). Instead, he "seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities . . . ." (*Id.* ¶ 666). He says he has been injured in his business and property and has "incurred and will[] incur significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." (*Id.* ¶ 654). Finally, he claims to have been forced to incur expenses in excess of $24,000,000 in the form of defense costs, legal fees, and related expenses incurred "in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings that arose therefrom." (*Id.* ¶ 655).

While Plaintiff's decision to forego a claim for damage to personal reputation is perhaps understandable, the choice of injurious falsehood as a cause of action, with its focus on property interests, is a poor fit. The Supreme Court has held that political office is not a property or contract right. *Taylor v. Beckham,* 178 U.S. 548, 577 (1900) ("[P]ublic offices are mere agencies or trusts, and not property as such . . . [T]he nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."); *see also Snowden v. Hughes,* 321 U.S. 1, (1944) ("More than forty years ago this Court determined that an unlawful denial . . . of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."). Because Plaintiff does not have a property or contract right to political office, attacks on his fitness for such a role do not constitute trade libel. And even if they did, Plaintiff does not

47

plausibly allege that any supposed falsehoods actually damaged his political career: as Plaintiff knows, he—not Defendant Clinton—won the 2016 presidential election.

The allegations of the Amended Complaint also fall far short of stating a claim for injurious falsehood in other respects. First, apart from boilerplate conclusory language that Plaintiff "suffer[ed] economic losses" and "has been injured in his business and property," it is not alleged that any statement was made for the purpose of interference with Plaintiff's property or economic interests. (*See* Am. Compl. ¶¶ 653–54). The crux of Plaintiff's grievances is that Defendants allegedly conspired "to cripple Trump's initial bid for presidency and tarnish his electability for future elections[.]" (*Id.* at ¶ 2). But opposing Plaintiff's presidential campaign does not amount to a realized pecuniary loss. Statements to law enforcement or comments made in a political campaign are not intended to induce others not to deal with Plaintiff or his business, or to cause direct or immediate financial loss. The damages sought are not recoverable and there is a lack of any allegation tying Plaintiff's claim for attorneys' fees "directly or immediately" to any alleged falsehood.

The Amended Complaint also fails to allege falsity,[17] that any falsehood impacted third parties' desire to deal with him or resulted in pecuniary loss, or special damages. "The special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Salit*, 742 So.2d at 388. It requires proof that the pecuniary loss is directly attributed to defendants' conduct and not some other factor. *See Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*, 955 So.2d 1241, 1246 (Fla. 4th DCA 2007). And

---

[17] Plaintiff's conclusory allegations that "Defendants . . . made, disseminated and/or published false and damaging statements concerning Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin" are not sufficient under *Twombly* absent some allegations explaining the basis for Plaintiff's falsity claim.

special damages must be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g). The Amended

Complaint lacks this "crucial element." *Salit*, 742 So.2d at 388.

Moreover, many of the statements that Plaintiff characterizes as injurious falsehoods

qualify as speech plainly protected by the First Amendment. Some are statements of opinion based

upon Plaintiff's four years in office.[18] *See From v. Tallahassee Democrat, Inc.*, 400 So.3d 52, 57

(Fla. 1st DCA 1981). Others are "part of the conventional give-and-take in our economic and

political controversies[.]" *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,

418 U.S. 264, 284 (1974); *see also Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).

Because Plaintiff has failed to allege the essential elements of an injurious falsehood claim,

this count must be dismissed. And as for Count IV, the conspiracy allegations are formulaic,

conclusory, and implausible. Moreover, "the gist of a civil action for conspiracy is not conspir[ing]

itself but the civil wrong which is done pursuant to the conspiracy and which results in damage to

the plaintiff." *Balcor Property Mgmt. v. Ahronovitz*, 634 So.2d 277, 279 (Fla. 4th DCA) (quoting

*Berger v. Levin,* 231 So.2d 875, 877 (Fla. 3d DCA 1970)). Without the underlying injurious

falsehood claim, there can be no conspiracy to commit injurious falsehood.

---

[18]  In paragraphs 647 and 648 of the Amended Complaint, Plaintiff alleges that Defendant
Wasserman-Schultz published numerous false and damaging statements about Plaintiff and his
alleged collusion with Russia. "For example, she told CNN's Erin Burnett on 'Out Front' that
reported contacts between President Donald J. Trump's campaign aides and Russia amounted to
collusion." Defendant Wasserman-Schultz told the reporter: "[W]ith every passing day, it gets more
and more disturbing and more and more evidence that there was collusion" and "Donald Trump
should be the first person asking for one but since I think he was likely part of it, it's not surprising
that hasn't happened." No date is provided, and from the context it appears the interview probably
occurred before the appointment of Special Counsel Robert Mueller in May 2017, and outside the
statute of limitations. In any event, for the reasons stated above concerning the necessary elements
of injurious falsehood, the Amended Complaint does not state a claim against Defendant
Wasserman-Schultz.

3.   *Malicious Prosecution & Conspiracy to Commit Malicious Prosecution (Count V and VI)*

In Count V, Plaintiff sues: his own Deputy Attorney General, Rod Rosenstein; former Director at the FBI, James Comey; former Deputy Director of the FBI, Andrew McCabe; lawyers for the FBI, Kevin Clinesmith and Lisa Page; an official with the Department of Justice, Bruce Ohr, and his wife Nellie Ohr; and an FBI agent, Peter Stzok, for malicious prosecution. But Plaintiff was never prosecuted.[19]

In order to prevail in a malicious prosecution action, a plaintiff must establish (1) an original criminal or civil judicial proceeding against the plaintiff was commenced or continued; (2) the defendant was the legal cause of the proceeding against the plaintiff; (3) the termination of the proceeding constituted a *bona fide* termination in favor of the plaintiff; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of the defendant, and (6) the plaintiff suffered damage as a result of the proceeding. *Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1354 (Fla 1994); *see also DeMartini v Town of Gulf Stream,* 942 F.3d 1277, 1309 (11th Cir. 2019) (listing elements). "The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." *Alamo*, 632 So.2d at 1354.

The Amended Complaint fails to allege that any criminal or civil complaint has been commenced against Plaintiff, that the Defendants were the legal cause of such a proceeding, or that there has been a *bona fide* termination in his favor. Plaintiff appears to be basing this claim on his allegations that Defendants "induced or conspired to induce the Crossfire Hurricane investigation," as well as certain "extrajudicial surveillance," "the Mueller investigation," and "other related investigations regarding the Trump-Russia Connection." (*See* Am. Compl. ¶¶ 669–

---

[19] Because there was no prosecution from which the statute of limitations could accrue, I do not address a statute of limitations argument with respect to this claim.

71, 680–82, 674). But the tort is for malicious prosecution, not malicious investigation. These investigations, therefore, do not amount to a "judicial proceeding" because none is a civil or criminal lawsuit, and "[a]n action for malicious prosecution . . . [can] never occur outside the context of *litigation*." *Fischer v. Debrincat*, 169 So.3d 1204, 1209 (Fla. 4th DCA 2015) (emphasis added). Plaintiff attempts to argue otherwise, but his argument lacks support. He cites *Caplan v. Johnson*, 414 F.2d 615, 618 (5th Cir. 1969), but that case did not hold that there exists a cause of action for malicious prosecution absent some criminal or civil proceeding. Instead, it held that "[a]rrest is not an essential element for malicious prosecution under Florida law"—but a judicial proceeding still is. *Id.* at 618.

In addition to failing to identify any judicial proceeding that satisfies the first element of a malicious prosecution action, the Amended Complaint also fails to allege the second and fourth elements—namely, that Defendants were the legal cause of the judicial proceeding and that the alleged proceeding suffered from an absence of probable cause. Indeed, the Inspector General report cited by Plaintiff compels the opposite conclusion; in it, the Department of Justice Inspector General concluded that the FBI operated Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication" that had nothing to do with any Defendant. *See* IG Report at 347. Further, the Inspector General Report specifically explained that the investigation was not predicated on DNC information or the Steele Dossier, but on a tip from a friendly foreign government. *Id*. Of course, Plaintiff is free to disagree with the conclusions of the Inspector General's Report. But, as I have already cautioned, he may not misrepresent it in a pleading, and he certainly may not misconstrue it in an attempt to offer support for this ill-fated claim.

The Amended Complaint also fails to satisfy the third element of a malicious prosecution claim. "That element is satisfied by either a favorable decision on the merits or a *bona fide*

termination of the proceedings," that is, "a good faith nollo prosequi or declination to prosecute." *Union Oil of Cal. V. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985). Plaintiff does not, and cannot, allege that Crossfire Hurricane or the Mueller investigation were terminated in his favor. While it is true that the Report states that it does not affirmatively conclude Plaintiff committed a crime, it also "does not exonerate him." Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (citing Am. Compl. ¶ 460). This conclusion was neither "on the merits" nor "favorable" toward Plaintiff. *See Union Oil of Cal. v. Watson*, 468 So.2d 349, 353 & n.3 (Fla. 3d DCA 1985).

For these reasons, Count V is dismissed with prejudice. And for the reasons discussed *supra* section III(D)(2), the conspiracy claim, Count VI, must also be dismissed. *See Balcor,* 634 So.2d at 279. An allegation of conspiracy to commit malicious prosecution is properly dismissed where the underlying claim for malicious prosecution is not actionable. *Buchanan v. Miami Herald Publishing Co.*, 206 So.2d 465 (3d DCA 1968). Count VI is also dismissed with prejudice.

### 4. Computer Fraud and Abuse Act (Count VII)

The CFAA is a criminal anti-hacking statute with a civil cause of action. *See* 18 U.S.C. § 1030(g). Plaintiff alleges that Neustar and Joffe, conspiring with other Defendants, accessed "internet data" and "DNS records" from computers belonging to the Executive Office of the President ("EOP") and the Trump Organization, and did so with a "nefarious purpose." (Am. Compl. ¶¶ 694–700). The CFAA claim is not only time barred, but it fails to state a substantive claim for relief.

The statute of limitations on a civil CFAA claim is "2 years [from] the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). Based on Plaintiff's allegations, the limitations period commenced on October 31, 2016 or, at the latest, early November 2016.

Plaintiff alleges the following: on October 31, 2016, "eight days before the 2016 Presidential Election," *Slate* published an article on the Trump-Alfa Bank connection based on DNS lookup data, titled: "Was a Trump Server Communicating with Russia?" (Am. Compl. ¶ 261 & n.185). On the same date, Sullivan published a written campaign statement reiterating the contents of the Trump-Alfa Bank server story, attributing the "discovery [to] the work of independent experts—'computer scientists'" and noting that "'federal authorities' were investigating 'this direct connection between Trump and Russia.'" (*Id.* ¶ 265). Also on the same date, Clinton published two tweets relaying that a "covert server" linking Trump and Alfa Bank was discovered by "computer scientists." (*Id.* ¶¶ 268–269). Moreover, the Trump-Alfa Bank server connection allegedly continued to receive public attention; Plaintiff alleges that on October 8, 2018, a *New Yorker* article profiled Joffe's DNS lookup information. (*Id.* ¶¶ 324–26). Per Plaintiff's allegations, the information about the DNS lookup data purportedly connecting Plaintiff to Alfa Bank was circulating publicly, including by Clinton and her campaign, mere days before the presidential election. Plaintiff's conclusory allegation that the offense was not discoverable until September 2021 would require me to infer that Plaintiff lacked knowledge of the Trump-Alfa Bank server story not just when the press and his political rival publicized it mere days before the presidential election, but throughout his presidency. (Am. Compl. ¶¶ 146, 704). That is implausible, and it is belied by his more specific factual allegations, as above-described.

The Second Circuit addressed and rejected the argument Plaintiff raises—that his claim did not begin to accrue until he discovered the identity of the offender. (DE 237 at 17–18). Holding that a CFAA claim begins to accrue when the Plaintiff learns of the alleged violation even if the offender's identity is unknown, the Second Circuit explained: "if a plaintiff cannot discover the hacker's identity within two years of the date []he discovers the damage or violation, [his] claims

under the CFAA . . . will be untimely." *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).[20] That Plaintiff did not know the name of the "computer scientist" or "computer expert" who allegedly obtained the DNS data does not excuse his failure to investigate and identify the offender during the limitations period. *See id.* The CFAA claim is thus time barred.

But even if timely filed, this claim would still be subject to dismissal. The Amended Complaint suffers from at least two fundamental substantive flaws, which I address in turn.

First, Plaintiff has not alleged unlawful access to a computer within the meaning of the CFAA. All of the subsections alleged in the Amended Complaint, §§ 1030(a)(2), (a)(3) and (a)(4),[21] require the alleged perpetrator to have accessed a protected computer "without authorization." Subsections (a)(2) and (a)(4) also prohibit accessing a protected computer by "exceed[ing] authorized access." A computer user "without authorization" is one who accesses a computer the user has no permission to access whatsoever—an "outside hacker[]." *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain information in the computer that the access is not entitled so to obtain." § 1030(e)(6). Meaning, a computer user who "exceeds authorized access" has permission to access the computer, but "exceed[s] the parameters of authorized access by entering an area of the computer . . . such as files, folders, or databases . . . to

---

[20] Plaintiff puzzlingly cites to *Sewell* with respect to his statute of limitations argument for the SCA, despite that *Sewell* contradicts his argument with respect to his CFAA claim (and also with respect to his SCA claim, as addressed further below). (DE 237 at 17). Perhaps Plaintiff failed to recognize the Second Circuit's statute of limitations analysis applied to the CFAA as well as the SCA. Whatever the reason, all Parties cite *Sewell* as persuasive authority. (DE 226 at 7; DE 237 at 17).

[21] Subsection (a)(6), which Plaintiff also cites, proscribes trafficking in "passwords or similar information through which [certain] computer[s] may be accessed without authorization." (Am. Compl. ¶ 696). A claim under § 1030(a)(6) fails for the additional reason that Plaintiff alleges no trafficking of passwords or anything of the like.

which [that] authorization does not extend"—an "inside hacker[]." *Van Buren*, 141 S. Ct. at 1658 (citation and internal quotation marks omitted). Neither type of unauthorized access is alleged.

Plaintiff does not plausibly allege that any EOP or Trump Organization computer was hacked. Plaintiff argues that because he *alleged* that the access was unlawful, his CFAA claim "is viable on this basis alone." (DE 237 at 54). That is simply incorrect. Labeling access as "unlawful" or as "hacking" are legal conclusions which are not entitled to the presumption of truth at the motion to dismiss stage. *Ashcroft*, 556 U.S. at 678–79. Looking to Plaintiff's factual allegations for support of this legal conclusion, I find none. Plaintiff alleges that Joffe and Neustar "exploited" their permissions to gain access to DNS data, which is "internet data," using their own computers and other data sources they had permission to access, but did so with "nefarious purposes." (*E.g., id.* ¶¶ 125, 130, 142) ("Joffe had access to numerous data sources through his various positions with Neustar," including to "domain name system (DNS) internet traffic," which the Defendants "exploited for their nefarious purposes"); (*id.* ¶ 144) ("Joffe and Neustar exploited this arrangement [to provide DNS resolution services to the EOP] by . . . mining EOP's DNS traffic for the purpose of gathering derogatory information on [Plaintiff].")"; (*see also id.* ¶¶ 125–130, 134, 142–45, 240, 212, 327, 491). There is no external hacking alleged, and so a "without authorization" theory necessarily fails.

An "exceeds authorized access" theory fares no better. Plaintiff's theory of violation—that Defendants accessed information they were entitled to access but did so with a nefarious purpose (*id.* ¶¶ 134, 140–46)—is squarely foreclosed by *Van Buren*. *See* 141 S. Ct. at 1662 (holding that a user does not "exceed authorized access" when he accesses a database with authorization but does so "for an improper purpose"). Plaintiff points to his allegations that Defendants obtained information that was "off limits" to them, but he misreads *Van Buren*. What must be "off limits"

is the area of the computer from which the information was obtained, not the information itself. *Id.* Post-*Van Buren*, misuse of a computer system that a user is entitled to access is not an actionable CFAA claim.

Second, Plaintiff does not allege any recoverable "loss." *See* 18 U.S.C. § 1030((4)(A)(i)(I), (g). The CFAA defines "loss" to include: (1) "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense" and (2) "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11); *see Brown Jordan*, 846 F.3d at 1174 (finding that either or both categories may suffice). Furthermore, the "loss" must amount to at least $5,000 in a one-year period. 18 U.S.C. § 1030(c)(a)(4)(A)(i)(I).

Here, Plaintiff primarily alleges losses incurred as a result of what he contends is improper use of the information obtained. (Am. Compl. ¶¶ 703, 705) (claiming losses for "defense costs" and "legal fees" related to "the various federal investigations and/or official proceedings that arose therefrom" and "harm to his business, and loss of trade secrets and/or other proprietary" data). But the CFAA does not provide for recovery of legal expenses, lost profits or other consequential damages untethered to a service interruption or restoration and/or response effort. *See* 18 U.S.C. 1030(e)(11). That makes sense, given that the CFAA prohibits unauthorized *access* to a computer, not misuse of information obtained therefrom. *See Van Buren*, 141 S. Ct. at 1659–60. Plaintiff's single reference to "the cost of investigating and responding to the unauthorized access" is conclusory and unsupported by factual allegations. (*See* Am. Compl. ¶ 705). Absent recoverable damages, there can be no CFAA claim.

The remaining CFAA Defendants—the DNC, the Clinton Campaign, Clinton, Perkins Coie and Susmann—are alleged to have conspired with Joffe and Neustar in violation of 18 U.S.C.

§ 1030(b). (Am. Compl. ¶ 701). Because Plaintiff states no cognizable CFAA claim against Joffe or Neustar, he likewise states no claim against the remaining Defendants.

### 5. *Theft of Trade Secrets (Count VIII)*

Plaintiff fails to state a cognizable trade secrets claim under the DTSA, as explained *supra*. This claim is also untimely. The statute of limitations for a civil DTSA claim is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). As previously explained, Plaintiff alleges that the DNS traffic data pertaining to him was made public, and circulated by his political rival, on October 31, 2016—eight days before the presidential election. (Am. Compl. ¶¶ 261–69). Any allegation that Plaintiff was unaware that the DNS traffic had been allegedly stolen at or around that time is implausible and contradicted by the above-cited allegations. At a bare minimum, "by the exercise of reasonable diligence" Plaintiff should have discovered the alleged offense by late October or early November 2016. The limitations period on Plaintiff's civil DTSA claim ran on October 31, 2019 or at the latest, early November 2019.

### 6. *Stored Communications Act (Count IX)*

So too is Plaintiff's claim under the Stored Communications Act ("SCA") time barred. The limitations period for a SCA claim is two years "after the date upon which the claimant first discovered or had reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). As this claim is also premised on the DNS lookup data (*See* Am. Compl. ¶¶ 728–30), Plaintiff had more than a "reasonable opportunity to discover the violation" in late October to early November 2016. The Second Circuit's opinion in *Sewell*, which Plaintiff cites as persuasive authority (DE 237 at 17), is again helpful here, but not for the reason Plaintiff contends. "If a plaintiff cannot discover the hacker's identity within two years of the date [he] discovers the damage or violation, [his]

claims under the . . . SCA will be untimely." *Sewell*, 795 F.3d at 342. The statute of limitations therefore expired on October 31, 2018, or at the latest, early November 2018.

Even notwithstanding the timeliness issue, Plaintiff's SCA claim would still be subject to dismissal.  The wrong Plaintiff alleges here does not fit neatly, if at all, within the SCA. This is a statute typically applied to protect electronic communications, like emails, stored by network or internet service providers in remote centralized facilities, or by similar entities storing communications by similar means. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 609 (9th Cir. 2020); *see Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012) ("telephone companies, Internet or e-mail service providers, and bulletin board services."). Congress recognized that neither the Fourth Amendment nor existing federal statutes adequately protected individual privacy rights in electronic communications stored in such a manner, and thus "the [SCA] [protects] intrusions into individual privacy arising from illicit access to  . . . 'remote computing operations and large data banks that store e-mails.'" *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019); *see In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 145 (3d Cir. 2015); *Garcia*, 702 F.3d at 791.

With that background in mind, the SCA states that "[a]nyone who 'intentionally accesses without authorization a facility through which an electronic communication service is provided; or . . .  intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system' is liable[.]" *Brown Jordan*, 846 F.3d at 1175 (quoting 18 U.S.C. § 2701(a)). The elements of a SCA claim are thus: (1) access "without authorization" or "exceed[ing] an authorization" to access (2) a "facility" (3) that provides an "electronic communication service" (4) thereby obtaining a "wire or electronic communication" (5) while the communication is in "electronic storage." *Id.*; 18 U.S.C. § 2701(a).

At bottom, the SCA prohibits "'hacking' into electronic communication facilities," *Walker v. Coffey*, 956 F.3d 163, 169 (3d Cir. 2020), and in that respect it bears similarities both to the text and congressional goals of the CFAA. *United States v. Cioni*, 649 F.3d 276, 282 (4th Cir. 2011).

One notable difference, though, is that the SCA prohibits unauthorized access specifically to a "facility through which an electronic communication service is provided[.]" *Id.* (quoting 18 U.S.C. § 2701(a)). An "electronic communication service" is "any service which provides users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Although not statutorily defined, "facility" has been interpreted in this Circuit to include "the physical means or equipment for doing something." *Brown Jordan*, 846 F.3d at 1177 n.4 (citation and internal quotation marks omitted). Numerous courts of appeal have interpreted this to mean equipment and structures of internet service providers and similar entities providing communications services, and not personal devices. *See In re Google Inc.*, 806 F.3d at 147 ("In this context, 'facility' is a term of art denoting where network service providers store private communications"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (finding that the SCA does not apply to "hacking" into a personal computer because the computer did not "maintain[] any 'electronic communication service,'" but could apply to "information stored with [the complaining party's] Internet service provider" (citing 18 U.S.C. § 2510(15)); *Garcia*, 702 F.3d at 792 ("[T]he relevant 'facilities' that the [SCA] is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." (citation and internal quotation marks omitted) (emphasis in original)).

Plaintiff alleges that here, such facilities include the "computers, networks and/or servers" of his personal residence, the EOP, and Trump Organization. (Am. Compl. ¶ 729). Based on the

foregoing, Plaintiff's personal devices are not a qualifying facility. *See, e.g.*, *Garcia*, 702 F.3d at 793. Nor can I plausibly infer from the overbroad invocation of "computers, networks and/or servers" that such devices of the EOP and Trump Organization are equipment through which electronic communication services are provided, akin to a centralized remote data bank operated by an internet service provider or the like. In fact, Plaintiff's allegations indicate that the servers/computers at issue, i.e., the computers from which the DNS queries originated, are "computers that *enable* the use of an electronic communication service," which are not covered by the SCA, and not "facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." *See Garcia*, 702 F.3d at 792 (citation and internal quotation marks omitted) (emphasis in original). Plaintiff is correct that cloud-based email programs, like Microsoft 365, could be a "facility," *Brown Jordan*, 846 F.3d at 1177 n.4, but that is of no help to him; Plaintiff does not allege that any Defendant accessed his emails through a cloud-based email program.

The SCA claim further fails on the "electronic storage" element. There are no nonconclusory allegations that the electronic communications at issue were in "electronic storage" in such "facilities" when accessed. (*See* Am. Compl. ¶ 730). "[E]lectronic storage" is defined as "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Temporary storage incidental to transmission means storing communications "temporarily pending delivery." *Garcia*, 702 F.3d at 793. Storage for backup purposes would be, for example, the storage by a communications provider of an unread email, at least until the recipient receives it and opens it on a local device. *Vista Marketing, LLC v. Burkett*, 812 F.3d 954, 964 (11th Cir.

2016). Plaintiff does not include any non-conclusory allegations that the "electronic communications" (i.e., DNS internet traffic) were in "electronic storage" in a "facility" (i.e., the computers/networks/servers of the Trump Organization and EOP) *at all*, let alone temporarily pending or incidental to delivery or for backup purposes. *See In re Facebook, Inc.*, 956 F.3d at 608–09 (finding that URLs are not in electronic storage when a search is being processed). Plaintiff's boilerplate language mentioning the statutory phrase "electronic storage" does not suffice. (Am. Compl. ¶ 730).

Defendants raise two additional points: first, they contend DNS lookup data is not an "electronic communication," *see* 18 U.S.C. § 2511(12), and second, electronic communications that are "readily accessible to the general public" are exempt from liability, *Id.* § 2511(2)(g)(i). Plaintiff does not dispute the public nature of this data, and it would appear difficult to maintain an SCA claim based on public internet data. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (2022) ("Congress wanted to protect electronic communications that are configured to be private." (citation omitted)). Most often though, the communications at issue in SCA claims are emails. *See, e.g.*, *Vista Mktg.*, 812 F.3d at 963–64; *Brown Jordan*, 846 F.3d at 1175. But novel claims have been brought, albeit perhaps not successfully, based on other purported communications. *See In re Facebook Inc.*, 956 F.3d at 608–09 (rejecting an SCA claim premised on URL searches and noting that such an application "would stretch [the SCA's] application beyond its [congressionally-intended] limits"). The instant claim premised on DNS internet traffic is certainly novel. Cognizant of the stage of this proceeding, and given that the SCA claim is dismissible on several other grounds, I decline to reach these further questions.

7.  *Agency and Respondeat Superior (Counts X, XI, XII, XIII, XIV, XV, and XVI)*

Count X, entitled "Agency," purports to state a claim against Defendant Clinton. Following 172 pages and 734 numbered paragraphs, Plaintiff claims "Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit." (Am. Compl. ¶ 757).

There is no free-standing independent cause of action in Florida for agency. *See, e.g., Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009). Agency can be a theory of liability. But in order for a principal to be held liable for the actions of an agent, a plaintiff must allege an independent wrong. Under Florida law, ultimate facts that establish either actual or apparent agency for the wrong of another must be pled. *Goldschmidt v. Holman*, 571 So.2d 422, 423 (Fla. 1990). Count X reflects the high-water mark of shotgun pleading and is accordingly dismissed. And it is dismissed with prejudice, as none of the underlying claims survive for which, even if properly plead, Defendant Clinton could be held liable under an agency theory.

Counts XI through XVI purport to state claims against Perkins Coie, the DNC, the Clinton Campaign, Fusion GPS, Orbis Business Intelligence, Ltd., Neustar, Inc., and/or Neustar Security Services for Respondeat Superior/Vicarious Liability. But under Florida law, respondeat superior, like agency, is a doctrine of liability, not itself a cause of action. *See Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1243, 1244 (Fla. 1st DCA 1995). Therefore no independent cause of action exists against any of the named Defendants.

In any event, each of these Defendants has also been named in the counts along with their employees or agents. In an action against an employer for the actions of the employee based on the theory of vicarious liability or respondeat superior, the plaintiff must show liability on the part of the employee. If the employee is not liable, the employer is not either. *Mallory v. O'Neil*, 69

So.2d 313, 315 (Fla. 1954); *see also Tsuji v. Fleet*, 326 So.3d 143, 148 (Fla. 1st DCA 2021) (explaining that "a plaintiff may not hold an employer liable until the employee is found to be liable."). Since the Amended Complaint fails to state a claim against the employees or alleged agents of the entities named in Counts XI–XVI, the claims brought pursuant to this doctrine fail on this basis too.

### E.    Amendment

Finally, a note about amendment. Plaintiff requests that, in the event I "find[] the Complaint inadequate in any respect," I grant him leave to amend pursuant to Federal Rule of Civil Procedure 15(a).[22] Defendants argue that "[a]ny further amendment would be futile and serve only to give Plaintiff a platform for rehashing tired rivalries from the 2016 election." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

It is true that under Rule 15 "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But a district court need not allow amendment "where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). It is not simply that I find the Amended Complaint "inadequate in any respect"; it is inadequate in nearly *every* respect. Defendants presented substantively identical arguments in support of dismissal in the earlier round of briefing on Plaintiff's original Complaint. (*See* DEs 52, 124, 139, 141, 143, 144, 145, 146, 147, 149, 157, 159, 160, 163, 165). But despite this briefing, Plaintiff's Amended Complaint failed to

---

[22] As an initial matter, Plaintiff's request is procedurally improper and, on that basis alone, I need not consider it. "Filing a motion is the proper method to request leave to amend a complaint." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (citing Fed. R. Civ. P. 7(b)(1)). In addition, a motion for leave to amend must attach or set forth the substance of the proposed amendment. *Id.* "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999)) (internal quotation marks omitted).

cure any of the deficiencies. Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency of his claims. The inadequacies with Plaintiff's Amended Complaint are not "merely issues of technical pleading," as Plaintiff contends, but fatal substantive defects that preclude Plaintiff from proceeding under any of the theories he has presented. At its core, the problem with Plaintiff's Amended Complaint is that Plaintiff is not attempting to seek redress for any legal harm; instead, he is seeking to flaunt a two-hundred-page political manifesto outlining his grievances against those that have opposed him, and this Court is not the appropriate forum.

Fundamentally, Plaintiff cannot state a RICO claim without two predicate acts, and, after two attempts, he has failed to plausibly allege even one. Plaintiff cannot state an injurious falsehood claim without allegations of harm to his property interests. And Plaintiff cannot state a malicious prosecution claim without a judicial proceeding, but he unsuccessfully attempts to misconstrue, misstate, and misapply the law to do so anyway. Moreover, Plaintiff's statutory claims premised on the DNS data rest on a misconstruction of the conduct those laws proscribe and the harms they remediate. Because Plaintiff was unable to cure his Complaint even with all its shortcomings clearly laid out for him, and because most of Plaintiff's claims are not only unsupported by any legal authority but plainly foreclosed by binding precedent as set forth by the Supreme Court and the Eleventh Circuit, I find that amendment would be futile and that this case should be dismissed with prejudice as to the Defendants that have raised merits arguments.

III. **CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

(1) The United States' Motions to Dismiss Under Federal Rule 12(b)(1) (DE 224; DE 256) are **GRANTED**.

(2) Defendants Charles Halliday Dolan, Jr. and Rodney Joffe's Motions to Dismiss for Lack of Personal Jurisdiction (DE 225; DE 227) are **GRANTED**.

(3) Defendant Orbis Business Intelligence, Ltd.'s Motion to Dismiss (DE 260) is **GRANTED**.

(4) Defendants Hillary Clinton, HFACC, Inc., John Podesta, Robert Mook, Jake Sullivan, DNC, DNC Services Corporation, Debbie Wasserman Schultz, Perkins Coie LLP, Marc Elias, Michael Sussman, Charlies Halliday Dolan, Jr., Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Igor Danchenko, Rodney Joffe, Neustar Security Services, and Neustar, Inc.'s Joint Motion to Dismiss Under Federal Rule 12(b)(6) (DE 226) is **GRANTED**.

(5) Plaintiff's Motions to Set Aside the Government's Certification (DE 238; DE 265) are **DENIED**.

(6) Plaintiff's Amended Complaint (DE 177) is **DISMISSED WITH PREJUDICE** as to the Non-Federal Defendants under Rule 12(b)(6) and **WITHOUT PREJUDICE** as to the United States under Rule 12(b)(1).

(7) I reserve jurisdiction to adjudicate issues pertaining to sanctions.

**SIGNED** in Chambers at West Palm Beach, Florida, this 8th day of September, 2022.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record

**TAB 272**

FILED BY _____ MB _____ D.C.

Oct 11, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTP

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

                    Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION,
PERKINS COIE, LLC, MICHAEL
SUSSMANN, MARC ELIAS, DEBBIE
WASSERMAN SCHULTZ, CHARLES
HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN
PODESTA, ROBERT E. MOOK, PHILLIPE
REINES, FUSION GPS, GLENN SIMPSON,
PETER FRITSCH, NELLIE OHR, BRUCE
OHR, DEFENDANT BUSINESS
INTELLIGENCE, LTD., CHRISTOPHER
STEELE, IGOR DANCHENKO, NEUSTAR,
INC., NEUSTAR SECURITY SERVICES,
RODNEY JOFFE, JAMES COMEY, PETER
STRZOK, LISA PAGE, KEVIN
CLINESMITH, ANDREW MCCABE,
ROD ROSENSTEIN, JOHN DOES 1
THROUGH 10 (said names being fictitious
and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10
(said names being fictitious and unknown
entities),

                    Defendants.

CASE NO. 2:22-cv-14102-DMM

## NOTICE OF CIVIL APPEAL

Notice is hereby given that the plaintiff, Donald J. Trump, appeals to the United States Court of Appeals for the Eleventh Circuit from the Order of the Hon. Donald M. Middlebrooks entered on September 8, 2022 (ECF No. 267) in the instant action.

USCA11 Case: 22-13410     Document: 90-3     Date Filed: 06/16/2023     Page: 122 of 205

Dated: October 11, 2022                    Respectfully submitted,


                                           /s/ Jared Roberts
                                           Jared J. Roberts (FL Bar #1036550)
                                           BINNALL LAW GROUP, PLLC
                                           717 King Street, Suite 200
                                           Alexandria, VA 22314
                                           Tel: (703) 888-1943
                                           Fax: (703) 888-1930
                                           jared@binnall.com

                                           *Counsel for Donald J. Trump*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, a true copy of the foregoing was sent via first class, postage prepaid, to all attorneys of record as listed on the Court's CM/ECF for this matter.

Dated: October 11, 2022                              /s/ Jared Roberts
                                                     Jared J. Roberts

                                                     *Counsel for Donald J. Trump*

Page: 124 of 205    Date Filed: 06/16/2023    Document: 90-3    USCA11 Case: 22-13410

**Check appears upside down intentionally**

Cut along this line ✂

# How to use this check

**Need help?** Visit eChecks.com or call 877-333-6964

| Step 1 Print the check | Step 2 Validate it printed correctly | Step 3 Deposit like normal |
|---|---|---|
| ✔ **Any printer works**<br>✔ **Black or color ink**<br>✔ **Basic white paper** | ✔ **Correct if bank numbers are:**<br>Centered in white space<br>Parallel to edge of the page<br>Clearly printed in dark black ink<br>✖ **Reprint if bank numbers are:**<br>Cut off, skewed, or off-center<br>Smudged or wrinkled<br>Too light to read | 1. **Cut on the dotted line above**<br>2. **Endorse the back**<br>3. **Deposit like normal:**<br>In-person at a bank or credit union<br>Using an ATM<br>Via smartphone mobile deposit<br>With an office check scanner |

**Does your financial institution have questions about this check?**
- This check was printed from an authorized check record. It is not a Check 21 Image Replacement Document.
- To confirm this check was issued by the account holder and details (pay to, amount, routing/account number) remain unmodified, the item's authenticity can be verified using the Deluxe Inc. Check Verification service at https://echecks.com/verify.

## Questions? Visit **eChecks.com** or call 877-333-6964

# For your records

**Issued date:** 2022-10-11
**Check number:** VV174
**From:** Elizabeth McIntyre-Williams
**Amount:** $505.00
**Payable to:** CLERK, US DISTRICT COURT ...
**Delivery email:** None
**Memo:** filing fee

Are you a business? To save time, money, and resources, make payments using Deluxe Payment Exchange. Call 877-333-6964 to get started today!



# U.S. District Court

## Florida Southern - Fort Pierce

Receipt Date: Oct 11, 2022 2:20PM

Elizabeth McIntyre-Williams
Paradise Process & Pro-Se Services, LLC
3340 SE Federal Highway
Unit 291
Stuart, FL 34997

Rcpt. No: 3042                    Trans. Date: Oct 11, 2022 2:20PM                    Cashier ID: #MB

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|---|---|---|---|---|---|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 505.00 | 505.00 |

| CD | Tender | | | Amt |
|---|---|---|---|---|
| CH | Check | #VV174 | 10/11/2022 | $505.00 |
| | | | Total Due: | $505.00 |
| | | | Total Tendered: | $505.00 |
| | | | Total Cash Received: | $0.00 |
| | | | Cash Change Amount: | $0.00 |

**Comments**: Donald Trump v. Hillary Clinton et al 2:22-cv-14102-DMM

Checks and drafts are accepted subject to collection and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.

**TAB 284**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE No. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

## ORDER GRANTING MOTION FOR SANCTIONS

Defendant Charles Dolan has moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  Upon review of the motion (DE 268), Plaintiff's response (DE 270) and Defendant's reply (DE 276), and for the reasons explained below, the motion is granted. Accordingly, sanctions shall be awarded jointly and severally against Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group.

## I. BACKGROUND

The Complaint.  In March 2022, Charles Dolan was among 29 defendants initially sued by Mr. Trump.  (DE 1).  He was identified as a former chairman of the DNC, a senior official in the Clinton Campaign, and a close associate of and advisor to Hillary Clinton.  The Complaint alleged that in April 2016, Mr. Dolan participated in discussions about the creation of a "dossier" to smear Mr. Trump and disseminate false accusations to the media (Compl. ¶ 79), and at the direction of Ms. Clinton assisted in preparation of the dossier (Compl. ¶ 81).  According to the Complaint, an allegation contained within the dossier that Mr. Trump engaged in salacious sexual activity in a

Moscow hotel was derived from Mr. Dolan.  (Compl. ¶ 91).  Mr. Dolan was sued for RICO conspiracy (Count II), conspiracy to commit injurious falsehood (Count IV), and conspiracy to commit malicious prosecution (Count VI).

_The Warning Letter._  On May 31, 2022, counsel for Mr. Dolan wrote the attorneys for Mr. Trump.  They warned:

1. That Mr. Dolan had no role in any conspiracy related to the Steele dossier.

2. That Mr. Dolan was not a source for the allegations of sexual activity.

3. That Mr. Dolan had not been in contact with any defendant other than Igor Danchenko, and that Mr. Dolan's contacts with Mr. Danchenko involved business interests and help for a conference in Moscow.

4. That Mr. Dolan had never been chairman of the DNC.

5. That Ms. Clinton was on record through a spokesperson as stating she had no recollection of Mr. Dolan.

(DE 268-1).

The letter requested that Mr. Dolan not be named as a defendant in any forthcoming Amended Complaint.  The letter further warned that if he were to be named, or if he was not dropped from the original Complaint, Rule 11 sanctions would be sought.

_The Amended Complaint._  On June 21, 2022, Plaintiff filed an Amended Complaint, as had been expected.  It ballooned to 193 pages, 819 paragraphs and 31 defendants.  With respect to Mr. Dolan, the allegations remained essentially the same.  But in the Amended Complaint, Mr. Dolan was identified somewhat more vaguely as the former chairman of a "national Democratic political organization." (Am. Compl. ¶ 96).  Elsewhere, he was described as a "senior Clinton Campaign Official." (Am. Compl. ¶ 4).  Moreover, and somewhat inexplicably, Mr. Dolan was identified in the Amended Complaint as a citizen and resident of New York, despite a declaration that Mr. Dolan had provided to Plaintiff's lawyers explaining that Mr. Dolan was a resident of

Virginia.  (Am. Compl. ¶ 20; DE 268-2).

        The Sanctions Motion and Memorandum.  On July 15, 2022, Mr. Dolan served on Mr.

Trump's lawyers a motion seeking sanctions pursuant to Rule 11.  The motion pointed out that the

change in Mr. Dolan's purported title from "former chairman of the DNC" in the original

Complaint to "former chairman of a national Democratic political organization," in the Amended

Complaint did not solve the problems identified in the warning letter because Mr. Dolan had *never*

been the chairman of *any* such organization.  The motion further explained that Mr. Dolan's role

in the Clinton Campaign was limited to knocking on doors as a volunteer.  The motion also stated

that Mr. Dolan had never been a resident of New York, that Mr. Dolan had told Plaintiff's lawyers

so, and that the allegations of the Amended Complaint to that effect demonstrated a lack of

diligence over something easily checked.

        Mr. Dolan's motion for sanctions went on to place the Trump lawyers on notice of a critical

failure in their claims, warning them that the Danchenko Indictment referenced throughout the

Amended Complaint not only failed to support their allegations against Mr. Dolan but contradicted

them.  That warning continues to be unheeded.

## II. ANALYSIS

Rule 11 of the Federal Rules of Civil Procedure states in pertinent part:

> (b) *Representations to the Court*. By presenting to the court a
> pleading, written motion, or other paper – whether by signing, filing,
> submitting, or later advocating it – an attorney or unrepresented
> party certifies that to the best of the person's knowledge,
> information, and belief formed after an inquiry reasonable under the
> circumstances:
>         (1) it is not being presented for any improper purpose such
> as to harass, cause unnecessary delay, or needlessly increase the
> costs of litigation;
>         (2) the claims, defenses, and other legal contentions are
> warranted by existing law or by a non-frivolous argument for
> extending, modifying, or reversing existing law or for establishing

new law;

(3) the factual contentions have evidentiary support or, if
specifically so identified, will likely have evidentiary support after
a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(1)-(3).

"Rule 11 deters attorneys and litigants from clogging federal courts with frivolous filings.
It also rewards litigants who admit their mistakes within a 21-day safe harbor period—and
penalizes those who refuse." *Huggins v. Lueder, Larkin & Hunter, LLC*, 39 F. 4th 1342, 1344
(11th Cir. 2022). The Eleventh Circuit requires a "two-step inquiry as to (1) whether the party's
claims are objectively frivolous; and (2) whether the person who signed the pleadings should have
been aware they were frivolous." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998).

Rule 11 sanctions are properly assessed (1) when a party files a pleading that has no
reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has
no reasonable chance of success and that cannot be advanced as a reasonable argument to change
existing law; or (3) when the party files a pleading in bad faith for an improper purpose.
*Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (citing *Worldwide Primates, Inc. v.
McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)).

Here, all three are true. In Section A of this Order, I explain why the Amended Complaint
lacked a reasonable factual basis as to the allegations against Defendant Dolan. Then, in Section
B, I explain why Plaintiff's legal arguments contained no reasonable chance of success. I have
already done so, at great length and in great detail, in my Order granting Defendants' Motion to
Dismiss. But I reiterate those fatal flaws here as relevant to the distinct Rule 11 inquiry. Finally,
in Section C, I find that Plaintiff filed his pleadings for an improper purpose.

A.      **Factual Contentions**

I will start with the factual contentions. "'Rule 11 stresses the need for some prefiling

4

inquiry.'" *Mike Ousley Prods, Inc. v. WJBF-TV*, 952 F.2d 380, 382 (11th Cir. 1992).  As such, it "imposes 'an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing,' and 'the applicable standard is one of reasonableness under the circumstances.'"  *Walther v. McIntosh*, 572 F. App'x 881, 883 (11th Cir. 2014) (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enter., Inc.*, 498 U.S. 533, 551 (1991)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ("Rule 11 . . . imposes an objective standard of reasonable inquiry . . . . ");  *Turner v. Sungard Bus. Sys., Inc*., 91 F.3d 1418, 1422 (11th Cir. 1996) ("'[A] litigant's obligations with respect to the contents . . . [of pleadings or motions] . . . are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.'"  (quoting Fed. R. Civ. P. 11(b)-(c), advisory committee's note to 1993 amendment)).  The Rule "is 'aimed at curbing abuses of the judicial system.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990).

The pleadings in this case contained factual allegations that were either knowingly false or made in reckless disregard for the truth. The following examples are indicative.

When suing someone it helps to know where they live, as this can have subject matter or personal jurisdiction significance.  In this case for instance, Mr. Dolan argued that he engaged in no activities in Florida that made him susceptible to suit here.  He filed an affidavit stating under oath that he lived in Virginia.  His lawyers advised Mr. Trump's lawyers of that.  Moreover, the summons in this case indicated an Arlington, Virginia address (DE 27) and the return of service indicated he was served there (DE 27-1)  Yet the Amended Complaint alleged that Mr. Dolan was a resident of New York.  The Trump lawyers' answer:

> [I]t must be noted that Charles Dolan is an incredibly common name, and Plaintiff's counsel's traditional search methods identified

> countless individuals with said name across the country, many of
> whom reside in New York.

(DE 270 at 10).  While alone not of great significance, this response reflects the cavalier attitude

towards facts demonstrated throughout the case.  Plaintiff's narrative centered around the idea that

Ms. Clinton orchestrated "a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his

political career and rigging the 2016 Presidential Election . . . . "  (Compl. ¶ 9).  To advance this

narrative, Plaintiff first described Mr. Dolan as chairman of the DNC (Compl. ¶ 78), then chairman

of a national Democratic political organization (Am. Compl. ¶ 96), a senior Clinton Campaign

official (*Id.* ¶ 4), and "an individual with intimate ties to the Clinton Campaign and one of its close

associates." (*Id.* ¶ 96).  The Amended Complaint alleges that Mr. Dolan engaged in a course of

racketeering activity involving theft of trade secrets, obstruction of justice, and wire fraud (*Id.* ¶

621); conspired to make false statements about Mr. Trump (*Id.* ¶ 658); and conspired to induce the

FBI and DOJ to maliciously prosecute him (*Id.* ¶¶ 680-82).

Mr. Dolan's lawyers advised the Trump team that Mr. Dolan had never been the chairman

of the DNC, or any other national Democratic political organization, was never a senior Clinton

Campaign official, that Ms. Clinton had indicated she did not know him, and that his involvement

in the campaign was limited to serving as a volunteer, knocking on doors in New Hampshire in

the last week of the campaign.  But Plaintiff's narrative remained unchanged.

Mr. Trump's lawyers claim "nearly all" of the allegations against Mr. Dolan were sourced

directly from the Indictment brought against Igor Danchenko by special counsel John Durham.

(DE 270-2 at 6).  But this is simply not so.  As was the practice throughout the Amended

Complaint, Plaintiff cherry-picked portions which supported his narrative while ignoring those

that undermined or contradicted it.[1]  Mr. Trump's lawyers persisted in this misrepresentation after being warned by the sanctions motion, and they doubled down on this falsehood in their response to the motion.

I routinely tell juries that an indictment brought by the government is only an accusation, nothing more.  It is not proof of guilt or anything else.  *See* Eleventh Circuit Pattern Jury Instructions, Preliminary Instruction – Criminal Cases (2022).  Here, Mr. Dolan was not the subject of the Indictment, but a fact witness.  The allegations pertaining to his involvement with Mr. Danchenko should have been the starting point for a pre-suit investigation by Plaintiff, not the end.

Even more telling are the portions of the Indictment ignored by Plaintiff.  The Indictment alleges that Mr. Dolan and others were planning a business conference to be held in Moscow on behalf of businessmen seeking to explore investments in Russia.  (DE 270-2 ¶ 21).  Mr. Danchenko was introduced to Mr. Dolan in connection with business activities.  (*Id.* ¶ 18).

Significantly the Indictment alleges two other facts relevant to and, if true, fatal to Plaintiff's claim of conspiracy.

> According to [Mr. Dolan], individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with Danchenko and other Russian nationals.
>
> ***
>
> According to [Mr. Dolan], he [Mr. Dolan] was not aware at the time of the specifics of Danchenko's 'project against Trump,' or that Danchenko's reporting would be provided to the FBI.

---

[1] The "sourced directly" claim is untrue.  For example, the Indictment says: "In or about April 2016, Danchenko and [Mr. Dolan] engaged in discussions regarding potential business collaboration between PR Firm-1 and UK Investigative Firm-1 on issues related to Russia." (DE 270-2 ¶ 23).  The Amended Complaint, however, states: "In late April 2016 Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a 'dossier' to smear Donald J. Trump and to disseminate the false accusations to the media." (Am. Compl. ¶ 96(c)).

(*Id*. ¶¶ 36, 52).

And with regard to the allegation about sexual activity, the Indictment alleges that Mr. Dolan and another individual were given a tour of a Moscow hotel in June 2016, told that Mr. Trump had previously stayed in the Presidential suite, and according to both Mr. Dolan and the other individual, the staff member who gave the tour did not mention any sexual or salacious activity.  (*Id*. ¶¶ 60-61).  The Indictment does <u>not</u> allege that the information concerning sexual activity was provided by Mr. Dolan.

The May 31, 2022 warning letter told the Trump lawyers that Mr. Dolan had been questioned by the FBI on multiple occasions, that the Danchenko Indictment detailed his contacts with Mr. Danchenko but did not indicate he "discussed any sexual rumors with Mr. Danchenko -- because he did not."  (DE 268-1 at 2).  The Indictment confirms that Mr. Dolan spoke to the FBI, and not only was he not charged with any falsehood, but his statements are included within the Indictment.  The Indictment contradicts rather than supports Plaintiff's allegations against Mr. Dolan.  Far from being "sourced directly" and cited "word-for-word," (DE 270 at 5), Plaintiff's use of the Indictment is nothing short of a deliberate disregard of the truth or falsity of their claims.  This is a textbook example of sanctionable conduct under Rule 11.

Rather than express any regret, Plaintiff doubled down on his claims: "Plaintiff's allegation that Defendant was the source of the salacious sexual activity rumor has a legitimate factual basis and is based upon a well-reasoned theory that may well be proven correct during the [Office of Special Counsel's] upcoming trial of Danchenko."  (DE 270 at 10).

It was never to be.  In the Danchenko trial, Mr. Dolan was called as a witness by the government about matters unrelated to the Ritz Carlton rumors.  The government never alleged that Mr. Dolan was a source for the Ritz Carlton story.  *See* Order, *United States v. Igor Y.*

8

*Danchenko*, Case No. 21-cr-00245-AJT at 5 (Oct. 4, 2022). And Mr. Danchenko was ultimately acquitted by the jury.

In short, I find that Mr. Trump's lawyers were warned about the lack of foundation for their factual contentions, turned a blind eye towards information in their possession, and misrepresented the Danchenko Indictment they claim as their primary support. The lawyers failed to conduct a pre-filing inquiry into the allegations against Mr. Dolan and have continued to advance Plaintiff's false claims based upon nothing but conjecture, speculation, and guesswork. This is precisely the conduct Rule 11 is intended to deter. *See Cooter & Gell*, 496 U.S. at 393.

## B.    Legal Theories

Rule 11 sanctions are also warranted when a plaintiff's legal theories have no reasonable chance of success and cannot be advanced as a reasonable argument to change existing law. *Massengale*, 267 F.3d at 1301. Plaintiff's Amended Complaint is 193 pages in length, with 819 numbered paragraphs, 14 counts, and it names 31 defendants including Charles Dolan. As I stated in my Order entered September 8, 2022 (DE 267), none of these counts stated a claim upon which relief could be granted. Additionally, several of the defendants were not subject to personal jurisdiction, and there was not subject matter jurisdiction over the Federal Defendants. The Amended Complaint was, in its entirety, frivolous. Multiple substantive defects precluded Plaintiff from proceeding on any of the theories he advanced. Mr. Dolan was named in three counts: RICO conspiracy (Count II); Conspiracy to Commit Injurious Falsehood (Count IV); and Conspiracy to Commit Malicious Prosecution (Count VI).

Starting with Count II, the RICO conspiracy: "RICO" is the acronym for the Racketeer Influenced and Corrupt Organizations Act, codified as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961-68. Congress described RICO as "an act designed to prevent

known mobsters from infiltrating legitimate businesses."[2]   In addition to criminal provisions, RICO includes a civil remedy which, distilled to its essence, requires a plaintiff to prove (1) a violation of a § 1962 prohibited act; (2) injury to business or property, and (3) that the defendant's violation caused the injury.  *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 325 (2016).

In the RICO count of the Amended Complaint, Plaintiff realleged the previous 619 paragraphs, and it was a mystery who he intended to sue.  In the caption to Count II, he named 22 defendants but in the prayer for relief for that count 28 were named.  Added were HF ACC, Inc., the DNC Services Corporations, James Comey, Peter Strzok, Lisa Page, and Andrew McCabe. (Am. Compl. ¶ 633).  Whoever he intended to sue, Plaintiff alleged that each of them "knew about and agreed to facilitate the Enterprise's scheme to harm the Plaintiff's political career, tarnish his electability, and undermine his ability to effectively govern as the President of the United States . . . . " (Am. Compl. ¶ 627).

The RICO conspiracy claims were entirely conclusory.  Moreover, there is no standing to bring a RICO conspiracy claim unless injury resulted from violation of a substantive provision of RICO.  *See Beck v. Prupis*, 529 U.S. 494, 495 (2000); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011).  Here Plaintiff could not state a RICO claim without two predicate acts, and he failed to plausibly allege even one.  He also failed to adequately allege standing, a pattern of racketeering activity, or the existence of an enterprise.  Moreover, the claims were barred by the statute of limitations.  In short, Plaintiff's RICO claim failed at every step of analysis.  (*See* DE 267 at 23-43).

Two Eleventh Circuit decisions are particularly relevant.  Both involve the frivolous use of

---

[2] Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and Strategy, § 1.01, at 1-4 (2000 ed.).

civil RICO.  In *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991),[3] the Court of Appeals reversed

the denial of a Rule 11 sanctions motion in a civil RICO case.  Analyzing in detail the amended

complaint in that case, the Court of Appeals concluded that the plaintiff failed to establish any of

the required predicate acts, to show any continuing relationship or pattern of acts, or any injury

flowing from those acts.  *Id.* at 1496-1500.  Concluding that each of the counts in the amended

complaint were objectively frivolous when filed, the court found it apparent that the case was

brought to harass the defendants.

> Our conclusion is buttressed by the manner in which [plaintiff] pled
> his case in the district court and briefed it on appeal . . . . [These] are
> quintessential 'shotgun' pleadings, replete with factual allegations
> that could not possibly be material to any of the causes of action they
> assert. Each count incorporates all of these factual allegations and
> states, further, that it is based on the conduct in the complaint
> attributable to [defendant] and 'those acting in concert with him.'
> Anyone schooled in the law who read these complaints, however,
> would know that many of the facts alleged could not possibly be
> material to all of the counts.

*Pelletier,* 921 F.2d at 1518.  The appellate court found the amended complaint was conclusory,

baseless and without any merit.  In deciding that the claim was prosecuted in bad faith, the court

rejected the thought that it might have been the "product of incompetent lawyering, and thus

excusable, rather than" a tool of harassment, because the plaintiff was skilled in the law and had

been warned he was likely to run afoul of Rule 11.  *Id.* at 1519.  The Court concluded:

> We think that imposing sanctions in this case would serve the dual

---

[3] *Pelletier* and *Byrne* (cited in the next paragraph) were abrogated on other grounds by
*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding "plaintiff asserting a
RICO claim predicated on mail fraud need not show, either as an element of its claim or as a
prerequisite to establishing proximate causation, that it relied on the defendant's alleged
misrepresentations.").  I do not rely on *Pelletier* and *Byrne* as they relate to mail fraud.  *See Jackson
v. Bank of Am., N.A.*, 898 F.3d 1348, 1358, 1360 (11th Cir. 2018) (citing *Pelletier* and *Byrne* as
good law for purposes of sanctions resulting from improper pleading).  A more detailed analysis
of why Plaintiff lacked standing to bring his RICO claim is set forth in my Order granting
Defendants' Motion to Dismiss.  (DE 267 at 42-43).

> purpose of deterring the filing of frivolous claims and defenses
> while not chilling attorneys' legitimate enthusiasm and creativity in
> advancing legal and factual theories.  At a time when the federal
> courts -- which are a scarce dispute resolution resource, indeed --
> are straining under the pressure of an ever-increasing caseload, we
> simply cannot tolerate this type of litigation.  Particularly with
> regard to civil RICO claims, plaintiffs must *stop and think* before
> filing them.

*Id*. at 1522 (emphasis in original).[4]

Similarly in *Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001), the Court analyzed the

elements of a RICO claim and the plaintiff's standing to raise the claim:

> Our review of the district court's award of sanctions necessarily
> begins with an analysis of the complaint, here the amended
> complaint.  We note that if the facts as pled failed to state a claim
> for relief, it was irrelevant whether [plaintiff's counsel] conducted
> the requisite Rule 11 pre-filing factual investigation.

*Id*. at 1107.  The court affirmed a $400,000 sanction against counsel, finding that the expansion of

a simple "garden variety medical malpractice" case to include RICO and other baseless claims was

frivolous from the outset and doomed to fail.  *Id*. at 1115.

Aside from RICO, Plaintiff advanced other baseless claims against Mr. Dolan. In Count

IV, the Amended Complaint alleged conspiracy to commit injurious falsehood.  Once again, while

the caption named 22 defendants, the prayer for relief named 24, adding HFACC, Inc., the DNC

Services Corporation, and Debbie Wasserman Schultz.  This count realleged the previous 656

paragraphs of the Amended Complaint and stated:

> Each of the Defendants executed one or more acts in furtherance of
> the conspiracy . . . and committed overt acts to harm the Plaintiff in
> furtherance of the conspiracy. In this regard, the Defendants
> conspired to create a false narrative that Plaintiff was colluding with

---

[4] In *Pelletier*, the Court not only reversed the district court's denial of Rule 11 sanctions and remanded for a determination of an appropriate amount, but also determined that the appeal was frivolous on the merits and awarded double costs and a reasonable attorney's fee pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

Russia through their dissemination of false and damaging statements.

(Am. Compl. ¶¶ 660-61).

I sifted through all of the paragraphs of the Amended Complaint searching for an injurious falsehood. Almost all of the statements were barred by Florida's two-year statute of limitations. Moreover, none of the elements of the tort of injurious falsehood, which involves the intentional interference with property interests, were alleged. Special damages were not alleged, and the damages sought were not recoverable. And without an underlying injurious falsehood claim, a civil action for conspiracy to commit injurious falsehood does not exist. (*See* DE 267 at 43-49).

Count VI was similarly flawed. There, Plaintiff alleged that Mr. Dolan, Ms. Clinton and others conspired with the Director of the FBI, James Comey; Deputy Director McCabe; Mr. Trump's Deputy Attorney General, Rod Rosenstein; two lawyers for the FBI, Kevin Clinesmith and Lisa Page; and an FBI agent, Peter Strzok to maliciously prosecute Mr. Trump. Mr. Trump, however, was never prosecuted. He could not state a malicious prosecution claim without a judicial proceeding and a termination in his favor. The Amended Complaint misconstrued the law and misrepresented both the Mueller Report and the Department of Justice Inspector General's Report. Without an underlying malicious prosecution claim, a conspiracy to commit malicious prosecution cannot be brought. (*See* DE 267 at 50-52).

The foregoing is not an exhaustive list of the problems with Plaintiff's legal theories, but they amply demonstrate how unreasonable and meritless the claims were as they pertained to Mr. Dolan. None of the claims against him—or any other defendant for that matter—had any chance of success, and this weighs strongly in favor of imposing Rule 11 sanctions.

13

### C.  Improper Purpose

Not just initiated by a shotgun pleading, this was a shotgun lawsuit.  Thirty-one individuals and organizations were summoned to court, forced to hire lawyers to defend against frivolous claims.  The only common thread against them was Mr. Trump's animus.

Plaintiff deliberately misrepresented public documents by selectively using some portions while omitting other information including findings and conclusions that contradicted his narrative.  This occurred with the Danchenko Indictment, the Department of Justice Inspector General's Report for Operation Hurricane, and the Mueller Report.  It was too frequent to be accidental.

Every claim was frivolous, most barred by settled, well-established existing law.  These were political grievances masquerading as legal claims.  This cannot be attributed to incompetent lawyering.  It was a deliberate use of the judicial system to pursue a political agenda.

But the courts are not intended for performative litigation for purposes of fundraising and political statements.  *See Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989).[5]  It is harmful to the rule of law, portrays judges as partisans, and diverts resources that should be directed to real harms and legitimate legal claims.  The judiciary should not countenance this behavior and it should be deterred by significant sanctions.

### D.  Remedy

Federal Rule of Civil Procedure Rule 11(c) provides:

---

[5] In *Saltany*, Libyan citizens sued President Reagan, Prime Minister Thatcher and others for injuries, death and property loss sustained in a United States air strike.  The district court denied sanctions finding that although plaintiff's counsel "surely knew" the case offered no hope of success, sanctions should be denied to keep the courthouse door open to suits brought as a public statement of protest.  The D.C. Circuit reversed and directed sanctions to be imposed stating: "We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."  *Saltany*, 886 F.2d at 439.

14

(1) *In General*. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions* . . . If warranted, the court may award the prevailing party, the reasonable expenses, including attorney's fees, incurred for the motion.

*** 

(4) *Nature of a Sanction*. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.  The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c).

The central purpose of Rule 11 "is to deter baseless filings in the [d]istrict [c]ourt," and "any interpretation" of the rule "must give effect to the rule's central goal of deterrence."  *Cooter & Gell*, 496 U.S. at 393.  The Advisory Committee Notes and Commentary ("Commentary") to the rule also emphasizes this focus: "Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty."  Fed. R. Civ. P. 11(b)-(c), advisory committee's note to 1993 amendment.

However, the Commentary goes on to state that under unusual circumstances, particularly where an improper purpose is found, deterrence may be ineffective unless the sanction not only requires a monetary payment but also directs some portion to be made to those injured by the violation including, if requested by motion, attorney's fees and costs directly and unavoidably

15

caused by the violation.

Factors to be considered in determining an appropriate sanction include:

- Whether the conduct was willful or negligent.

- Whether it was part of a pattern or an isolated event.

- Whether it affected the entire pleading, or only one particular count or defense.

- Whether the person engaged in similar conduct in other litigation.

- Whether it was intended to injure.

- What effect it had on the litigation process in time or expense.

- Whether the responsible person was trained in the law.

- What amount, given the resources of the person, would be required to deter that person from repetition.

- What amount is needed to deter similar activity by other litigants.

*Id*.

Any sanction should be no more severe than reasonably necessary to deter repetition of the conduct or comparable conduct by similarly situated persons. A sanction should not be hollow and must not amount to mere gesture; its bite must be real. That said, sanctions orders must not involve amounts that are so large that they fly in the face of common sense. A sanction that a party "cannot pay does not vindicate the court's authority," nor provide deterrence. *See Martin v. Automobili Lamborghini Exclusive Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002) (affirming but remanding joint and several sanction of one and a half million dollars for a determination of each person's liability, taking into consideration ability to pay).

The Eleventh Circuit has said that "[i]mposing a financial penalty often will be the most effective and fair means of enforcing Rule 11 and deterring baseless suits." *Donaldson v. Clark*,

819 F.2d 1551, 1557 (11th Cir. 1987) (*en banc*).[6]

Here I find that both a financial penalty and payment of attorney's fees and costs to Mr. Dolan are necessary.

The conduct was willful, not simply negligent. Each of the prongs of Rule 11 are met. Thirty-one defendants were sued and forced to hire counsel, incurring substantial fees. Moreover, it was necessary for the United States to be substituted for the Federal Defendants and represented by the Department of Justice and U.S. Attorney's Office at taxpayer expense. The entire pleading, each of the 14 counts, was affected.

The failings of the original Complaint were basic and obvious. And when those failings were identified in motions to dismiss, the Amended Complaint simply added arguments in an attempt to skirt the RICO statute of limitations, and two more defendants were named—Mr. Trump's former deputy Attorney General, and also a California Congressman whom Mr. Trump delights in insulting. The choice of defendants, combined with the lack of any viable legal theories of liability, reflect an intention to injure rather than to redress legal harm.

Undeterred by Mr. Dolan's Rule 11 warning letter and motion, two rounds of briefing by multiple defendants, and my detailed Order identifying the deficiencies of the Amended Complaint, Ms. Habba appeared on Fox News Hannity and continued to advance Plaintiff's claims:

---

[6] In *Byrne v. Nezhat*, *supra*, a monetary sanction totaling $191,439.11 was affirmed against counsel for the inclusion of a meritless multi-count RICO claim in what should have been a simple medical malpractice claim. 261 F.3d at 1099 n.54; *see also, Ortho Pharmaceutical Corp. v. Sona Distributors*, 847 F.2d 1512, 1519 (11th Cir. 1988) (affirming monetary sanction of $35,851.55 against counsel for filing groundless motion to dismiss); *Johnson v. 27th Ave. Caraf., Inc.*, 9 F.4th 1300, 1316-18 (11th Cir. 2021) (affirming sanctions against a party including $6,000 financial penalty, reduced from $59,900 based on financial consideration, 50 hours of community service per year for three years, and an injunction against filing ADA complaints without permission from the court.).

> [W]hen you have a Clinton judge, as we did here, Judge
> Middlebrooks, who I had asked to recuse himself but insisted that
> he didn't need to, he was going to be impartial, and then he proceeds
> to write a 65-page scathing order where he basically ignored every
> factual basis which was backed up by indictments, by investigations,
> the Mueller Report, et cetera, et cetera, et cetera, not to mention
> [Special Counsel John] Durham and all the testimony we heard
> there, we get dismissed.

Transcript from FOX: Hannity, WLNR 28709447, Sept. 10, 2022.

Ms. Habba then emphasized her own role:

> I have to share with you a story, Sean, that I have not shared with
> anybody . . . The former President looked at me and he told me:
> 'You know what, Alina, you're not going to win, you can't win, just
> get rid of it, don't do the case.' And I said 'no, we have to fight, it's
> not right what happened.' And you know, he was right, and it's a
> sad day for me personally, because I fought him on it and I should
> have listened, but I don't want to lose hope in our system, I don't.
> So, you know, I'm deciding whether we're going to appeal it.

*Id.*

So who is responsible for this case and others like it? The rule of law is undermined by the toxic combination of political fundraising with legal fees paid by political action committees, reckless and factually untrue statements by lawyers at rallies and in the media, and efforts to advance a political narrative through lawsuits without factual basis or any cognizable legal theory. Lawyers are enabling this behavior and I am pessimistic that Rule 11 alone can effectively stem this abuse. Aspects may be beyond the purview of the judiciary, requiring attention of the Bar and disciplinary authorities. Additional sanctions may be appropriate. (DE 280). But legal filings like those at issue here should be sanctioned under Rule 11, both to penalize this conduct and deter similar conduct by these lawyers and others.

## CONCLUSION

For the forgoing reasons, and having carefully considered the record, the written

submissions of the Parties, and applicable law, it is hereby **ORDERED AND ADJUDGED**

that:

1. Defendant Charles Dolan's Motion for Rule 11 Sanctions (DE 268) is **GRANTED.**

2. Plaintiff's counsel Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group, shall jointly and severally pay a monetary sanction of $50,000 into the registry of the Court.[7]

3. Plaintiff's counsel Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group, shall jointly and severally pay to Charles Dolan fees and costs totaling $16,274.23.

**SIGNED** in chambers at West Palm Beach, Florida this 10th day of November, 2022.

Donald M. Middlebrooks
United States District Judge

cc:    counsel of record

---

[7] "[S]anctions must never be hollow gestures: their bite must be real." *Martin v. Automobile Lamborghini Exclusive, Inc.*, 307 F. 3d 1332, 1336 (11th Cir. 2002). But for the bite to be real it must be an amount a person can pay. *Id.* I believe the monetary sanctions imposed here are well within these lawyers' ability to pay, and therefore I have not thought it necessary to conduct an intrusive inquiry into their finances. However, should any lawyer or law firm believe that the amount would seriously jeopardize their financial status, *see, e.g., Baker v Alderman*, 158 F. 3d 516 (11th Cir. 1998), that individual or firm should file within ten (10) days of this Order, under seal, a verified statement of net worth which includes assets and liabilities. In the event of such a filing, the obligation of that lawyer or law firm will be tolled until further order of the court.

**TAB 291**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DONALD J. TRUMP,<br><br>                 Plaintiff,<br><br>v.<br><br>HILLARY R. CLINTON, HFACC, INC., DEMOCRATIC NATIONAL COMMITTEE, DNC SERVICES CORPORATION, PERKINS COIE, LLC, MICHAEL SUSSMANN, MARC ELIAS, DEBBIE WASSERMAN SCHULTZ, CHARLES HALLIDAY DOLAN, JR., JAKE SULLIVAN, ADAM SCHIFF, JOHN PODESTA, ROBERT E. MOOK, PHILLIPE REINES, FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR, BRUCE OHR, DEFENDANT BUSINESS INTELLIGENCE, LTD., CHRISTOPHER STEELE, IGOR DANCHENKO, NEUSTAR, INC., NEUSTAR SECURITY SERVICES, RODNEY JOFFE, JAMES COMEY, PETER STRZOK, LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE, ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10 (said names being fictitious and unknown persons), and ABC CORPORATIONS 1 THROUGH 10 (said names being fictitious and unknown entities),<br><br>                 Defendants. | CASE NO. 2:22-cv-14102-DMM<br><br><u>NOTICE OF CIVIL APPEAL</u> |

Notice is hereby given that Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group appeal to the United States Court of Appeals for the Eleventh Circuit from the Order of the

Hon. Donald M. Middlebrooks entered on November 10, 2022 (ECF No. 284) against

them in the instant action.

Dated: December 9, 2022                    Respectfully submitted,

                                           /s/ Jared Roberts
                                           Jared J. Roberts (FL Bar #1036550)
                                           BINNALL LAW GROUP, PLLC
                                           717 King Street, Suite 200
                                           Alexandria, VA 22314
                                           Tel: (703) 888-1943
                                           Fax: (703) 888-1930
                                           jared@binnall.com

                                           *Counsel for Alina Habba, Michael T.
                                           Madaio, Habba Madaio & Associates,
                                           Peter Ticktin, Jamie Alan Sasson, and
                                           The Ticktin Law Group*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2022, a true copy of the foregoing was filed

with the Clerk of Court using the Court's CM/ECF system, which will send a copy to

all counsel of record.


Dated: December 9, 2022                    /s/ Jared Roberts
                                           Jared J. Roberts

                                           *Counsel for Alina Habba, Michael T.*
                                           *Madaio, Habba Madaio & Associates,*
                                           *Peter Ticktin, Jamie Alan Sasson, and*
                                           *The Ticktin Law Group*

3

**TAB 302**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE No. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

## ORDER ON SANCTIONS

This case should never have been brought.  Its inadequacy as a legal claim was evident from the start.  No reasonable lawyer would have filed it.  Intended for a political purpose, none of the counts of the amended complaint stated a cognizable legal claim.

Thirty-one individuals and entities were needlessly harmed in order to dishonestly advance a political narrative.  A continuing pattern of misuse of the courts by Mr. Trump and his lawyers undermines the rule of law, portrays judges as partisans, and diverts resources from those who have suffered actual legal harm.

I previously granted Defendant Charles Dolan's motion for sanctions, brought pursuant to Federal Rule of Civil Procedure 11.  (DE 284).  Now before me is a motion seeking sanctions brought by eighteen other Defendants.  Upon consideration of the Motion (DE 280), Response (DE 285) and Reply (DE 287), for the reasons that follow and also for those stated in my previous Order, sanctions are awarded.

## I.    BACKGROUND

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hope of destroying his life, his political career, and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 1 ¶ 9).

The next day, Alina Habba, Mr. Trump's lead counsel told Fox News' Sean Hannity:

> You can't make this up. You literally cannot make a story like this up . . . and President Trump is just not going to take it anymore. If you are going to make up lies, if you are going to try to take him down, he is going to fight you back. And that is what this is, this is the beginning of all that.[1]

She then explained on Newsmax:

> What the real goal [of the suit] is, is democracy, is continuing to make sure that our elections, continuing to make sure our justice system is not obstructed by political enemies. That cannot happen. And that's exactly what happened. They obstructed justice. They continued the false narrative . . . This grand scheme, that you could not make up, to take down an opponent. That is un-American.[2]

On April 20, 2022, less than a month after the Complaint was filed, Hillary Clinton moved for dismissal with prejudice. Her motion identified substantial and fundamental factual and legal flaws. Each of the other Defendants followed suit, pointing to specific problems with the claims against them. The problems in the Complaint were obvious from the start. They were identified by the Defendants not once but twice, and Mr. Trump persisted anyway.

Despite this briefing and the promise "to cure any deficiencies," Plaintiff's counsel filed the Amended Complaint on June 21, 2022. (DE 177). The Amended Complaint failed to cure any of the defects. *See* DE 267, Order of Dismissal (September 8, 2022). Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency

---

[1] Fox News, *Trump Sues Clinton, Steele for 'False Narrative' About Russian Collusion* (March 25, 2022), https://www.foxnews.com/video/6301845469001.

[2] Newsmax, *Trump Suing Hillary Clinton Over Russia Hoax*, Habba Madaio & Associates LLP – News (March 31, 2022), https://habbalaw.com/news/trump-suing-hillary-clinton-over-russia-hoax.

of his claims.  (DE 267 at 64).  The Amended Complaint is 193 pages in length, with 819 numbered

paragraphs, and contains 14 counts, names 31 defendants, 10 John Does described as fictitious and

unknown persons, and 10 ABC Corporations identified as fictitious and unknown entities.

On July 14, 2022, the United States moved pursuant to the Westfall Act, 28 U.S.C. § 2679

(d)(i), to substitute itself as Defendant for James Comey, Andrew McCabe, Peter Strzok, Lisa

Page, and Kevin Clinesmith.  (DE 224).  On July 21, 2022, I granted the motion to substitute.  (DE

234).

On September 8, 2022, I dismissed the case with prejudice as to all Defendants except for

the United States.[3]  I issued a detailed and lengthy Order, which I incorporate by reference here.

(DE 267).  I found that fatal substantive defects which had been clearly laid out in the first round

of briefing, precluded the Plaintiff from proceeding under any of the theories presented.  I found

that the Amended Complaint was a quintessential shotgun pleading, that its claims were foreclosed

by existing precedent, and its factual allegations were undermined and contradicted by the public

reports and filings upon which it purported to rely.  I reserved jurisdiction to adjudicate issues

pertaining to sanctions.

Undeterred by my Order and two rounds of briefing by multiple defendants, Ms. Habba

continued to advance Plaintiff's claims.  In a September 10, 2022, interview with Sean Hannity,

the host asked her "Why isn't [Hillary Clinton] being held accountable for what she did?"  Ms.

Habba's response reiterated misrepresentations on which this lawsuit was based:

> Because when you have a Clinton judge as we did here, Judge
> Middlebrooks who I had asked to recuse himself but insisted that he
> didn't need to, he was going to be impartial, and then proceeds to
> write a 65-page scathing order where he basically ignored every
> factual basis which was backed up by indictments, by investigations,

---

[3] The United States' Motion to Dismiss under Federal Rule 12(b)(i) was granted and the Amended
Complaint as to it was dismissed without prejudice.

the Mueller report, et cetera, et cetera, et cetera, not to mention
Durham, and all the testimony we heard there, we get dismissed.
Not only do we get dismissed, he says that this is not the proper
place for recourse for Donald Trump.  He has no legal ramifications.
Where what [sic] is the proper place for him?  Because the FBI
won't help when you can do anything, obstruct justice, blatantly lie
to the FBI, Sussmann's out, he gets acquitted, where do you go?
That's the concern for me, where do you get that -- that recourse?[4]

She also indicated that, while Mr. Trump doubted the suit would succeed, she nevertheless

"fought" to pursue it:

You know, I have to share with you a story, Sean, that I have not
shared with anybody.  The recourse that I have at this point is
obviously to appeal this to the 11th Circuit as Gregg said.  But when
I brought this case and we were assigned you know, this judge and
we went through the recusal process, we lost five magistrates,
including Reinhart [sic] who's dealing with the boxes as we know.
The former president looked at me and he told me, you know what
Alina.  You're not going to win.  You can't win, just get rid of it,
don't do the case.  And I said, no, we have to fight.  It's not right
what happened.  And you know, he was right, and it's a sad day for
me personally because I fought him on [it] and I should have
listened, but I don't want to lose hope in our system.  I don't.  So,
you know I'm deciding whether we're going to appeal it.[5]

Defendants now move to recover attorneys' fees and costs under Fed. R. Civ. P. 11, 28

U.S.C. § 1927, the Defend Trade Secrets Act, and/or this Court's inherent power.  (DE 280 at 1).

In Part II, I find that a sanction under this Court's inherent power is appropriate.  I do so by

examining Plaintiff's (and his lawyers') conduct throughout this litigation.  In Part III, I look to

Plaintiff's conduct in other cases.  And in Part IV, I determine the reasonableness of Defendants'

attorneys' fees and costs.

---

[4] Transcript from FOX: Hannity WLNR 28709447, Sept. 10, 2022.

[5] *Id*.

II.      **ANALYSIS OF LITIGATION CONDUCT IN THIS CASE**

"'[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation omitted).  A court's inherent power includes the ability to assess attorneys' fees and costs against the client, the attorney or both when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46.

The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 46.  "[I]f in the informed discretion of the Court, neither the statute nor the Rules are up to the task," the Court may safely rely on its inherent power "to sanction bad faith conduct in the course of litigation." *Id.* at 50; *see also Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir 2010).

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted).

"The inherent-powers standard is a subjective bad faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).  However, absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is "tantamount to bad faith," meaning the "attorney's conduct is so egregious that it could only be committed in bad faith." *Id.* at 1224–25 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).  An attorney's conduct is "tantamount to bad faith" if he "recklessly raises a frivolous argument." *Id.* at 1225 (quoting *Barnes*, 158 F.3d at 1214).  "Recklessness alone does not satisfy the inherent powers standard," but "recklessness plus a frivolous argument suffice." *Id.*

The inherent power "is both broader and narrower than other means of imposing sanctions." *Peer*, 606 F.3d at 1314 (quoting *Chambers*, 501 U.S. at 46).  It is broader in the sense

5

that while other sanction mechanisms only reach certain individuals or conduct, the inherent power extends to the full range of litigation abuses.  *Id.*

In my informed discretion, I find that Rule 11, 28 U.S.C. § 1927, and the Defend Trade Secrets Act are not "up to the task" of confronting the litigation abuse involved here.  Rule 11 is backward looking, limited to pleading and motion abuse, and experience has shown it to be ineffective at deterrence.  *See* Fed. R. Civ. P. 11, Advisory Committee Notes.  Section 1927 "only applies to unnecessary filings after the lawsuit has begun."  *Macort v. Prem Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006).  And the Defend Trade Secrets Act may only provide limited relief.  The purpose of the inherent power to sanction a party is to vindicate judicial authority without resorting to contempt of court and to make the non-violating party whole.  *See Chambers*, 501 U.S. at 45-46*; see also Purchasing Power, LLC*, 851 F.3d at 1223.

Here, we are confronted with a lawsuit that should never have been filed, which was completely frivolous, both factually and legally, and which was brought in bad faith for an improper purpose.  Mr. Trump is a prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries.  He is the mastermind of strategic abuse of the judicial process, and he cannot be seen as a litigant blindly following the advice of a lawyer.  He knew full well the impact of his actions.  *See Byrne*, 261 F.3d at 1121.  As such, I find that sanctions should be imposed upon Mr. Trump and his lead counsel, Ms. Habba.

## A.  <u>The Case Was Initiated By A Shotgun Pleading Designed To Serve A Political Purpose.</u>

The deliberate use of a shotgun pleading is an abusive litigation tactic which amounts to obstruction of justice.  *See Davis v. Coca Cola Bottling Co. Consol.*, 516 F.3d 955, 982 n.66 (11th Cir. 2008), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  This case involved three categories of shotgun pleadings condemned by the Eleventh Circuit: (1) a

complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; and (3) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. *See Barmapov v. Amulal*, 986 F.3d 1321, 1324 (11th Cir. 2021); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

I find that the pleadings here were abusive litigation tactics. The Complaint and Amended Complaint were drafted to advance a political narrative; not to address legal harm caused by any Defendant.

The 819 paragraphs of the 186-page Amended Complaint are filled with immaterial, conclusory facts not connected to any particular cause of action. Consider the incendiary charge that Mr. Comey, the Director of the FBI, conspired with Ms. Clinton to maliciously prosecute him. Leaving aside the fact that Mr. Trump was never prosecuted, examine the allegations in the Amended Complaint pertaining to Mr. Comey. The first mention of Mr. Comey, other than identifying him as a party, was in paragraph 349: "Therefore, senior FBI officials Comey, McCabe, Page, Strzok, the DNC and Clinton orchestrated a plan to falsely accuse Flynn of colluding with Russia to protect the potential dissemination of the intimate details of their plot." The next few paragraphs pertain to the FBI's investigation of Michael Flynn, Mr. Trump's former security advisor, who was subsequently fired for lying to the Vice President and the FBI. (¶ 383). The Amended Complaint alleges that Mr. Comey "scrambled to reopen" the investigation into Mr. Flynn (¶ 356), met with Mr. McCabe to discuss the investigation (¶ 359), and decided not to notify

the incoming Trump administration of the investigation of Flynn (¶¶ 360-63).  Next, the Amended

Complaint cites a letter from the Director of National Intelligence, John Ratcliff, to Senator

Lindsey Graham:

> Ratcliff's letter stated that Clinton and her campaign conceived the
> false Russia collision [sic] story to protect Clinton's presidential bid,
> which was at the time, in trouble because of revelations about her
> illegally using a private email server to handle classified
> information.  Ratcliff confirmed in the letter that Obama, Comey
> and Strzok knew about it.

(Amended Complaint at ¶ 369).[6]

The Amended Complaint continues with allegations about a meeting between Mr. Comey,

President Obama, Vice President Biden, and Sally Yates (then a national security advisor) where

President Obama directed Mr. Comey to investigate Mr. Flynn and not inform Mr. Trump.  (*Id.* ¶¶

372-377).  The Amended Complaint alleges that Mr. Flynn was interviewed by the FBI, and that

subsequently Acting Attorney General Yates informed Mr. Trump's White House Counsel Don

McGahn that Mr. Flynn misled Vice President Pence and other administration officials about the

nature of his conversations with the Russian Ambassador.  (*Id.* ¶ 379).  The Amended Complaint

then concludes: "Ultimately, the Defendants, including Comey, McCabe, Strzok, and Page, were

successful in causing Flynn to be ousted as National Security Advisor."  (*Id.* ¶ 384).

The Amended Complaint then turns to the FBI's Crossfire Hurricane investigation and four

---

[6] This provocative allegation stirred my curiosity, so I looked up the Ratcliff letter.  The allegation
in the Amended Complaint fails to mention that the information came from a Russian intelligence
analysis and that Mr. Ratcliffe commented: "The IC (intelligence community) does not know the
accuracy of this allegation or the extent to which the Russian intelligence analysis may reflect
exaggeration or fabrication."  Letter from John Ratcliffe, Dir. of Nat'l Intel., to Sen. Lindsey
Graham,        U.S.        Senate        (Sept.        29,        2020)
https://www.judiciary.senate.gov/press/rep/releases/chairman-graham-releases-information-
from-dni-ratcliffe-on-fbis-handling-of-crossfire-hurricane.    Mr. Trump's lawyers saw no
professional impediment or irony in relying upon Russian intelligence as the good faith basis for
their allegation.

court-approved FISA applications targeting Carter Page.  (*Id.* ¶¶ 385-90).  The Amended Complaint alleges:

> The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by the FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.

(*Id.* ¶ 391).

From there, the Amended Complaint states: "In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump campaign." (*Id.* ¶ 392).

The Amended Complaint then discusses the FISA warrant application and Mr. Comey's approval of those warrants and alleges: "Mr. Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA application, and that the Steele Dossier was not a credible source." (*Id.* ¶¶ 292-407).

The next mention of Mr. Comey states that on May 8, 2017, he was fired from his position as Director of the FBI.  The Amended Complaint then alleges that Mr. Comey "had documented several of his interactions with Mr. Trump in a series of memos," and that after leaving the FBI, Mr. Comey shared those memos with a friend who he directed to leak to a New York Times reporter.  (*Id.* ¶¶ 449-52).

The Amended Complaint continues:

> 453.   The outcome that Comey desired – per his own admission to Congress – was to "prompt" the appointment of a special counsel to investigate Donald J. Trump's alleged conspiracy with the Russian government.
>
> 454.   The IG's report noted that Comey had "set a dangerous example" by "releas[ing] sensitive information" to "create public pressure for official action."

455.    Comey was successful in getting the special master [sic] appointed, due to his unlawful leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

456.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 Presidential Election and related matters."[7]

This is what the Plaintiff's lawyers considered to be the short and plain statement of the claim that Mr. Comey maliciously prosecuted Mr. Trump and conspired with Ms. Clinton to do so. These allegations, about investigating Mr. Flynn, signing FISA warrant applications pertaining to Mr. Page, or leaking information about his interactions with Mr. Trump, do not allege that Mr. Comey initiated an investigation of Mr. Trump, much less a prosecution. And the implausible claim that Mr. Comey conspired with Ms. Clinton, given the impact of his announcements on her 2016 campaign, not only lacks substance but is categorically absurd.

The Amended Complaint is a hodgepodge of disconnected, often immaterial events, followed by an implausible conclusion. This is a deliberate attempt to harass; to tell a story without regard to facts.

In order to understand the scope of this abuse, multiply the above discussion by thirty-one defendants and their lawyers, forced to try to analyze and defend against the sprawling Complaints.

---

[7] In a footnote to paragraph 456, the Amended Complaint cites to the Justice Department announcement of the appointment of the Special Counsel. That statement by Deputy Attorney Rosenstein, also sued by Mr. Trump, reads in part as follows: "'My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command.'" *See* Press Release, Office of Public Affairs, Appointment of Special Counsel, U.S. Dep't of Just., (May 17, 2017) https://www.justice.gov/opa/pr/appointment-special-counsel.

I sifted through the thread of allegations against each defendant only to find they added up to no cognizable claim.  And the pleadings were drafted in a way to disguise that fact.

In three instances the Eleventh Circuit has found shotgun pleadings, less problematic than the pleadings here, as a basis for sanctions.  *See Jackson v. bank of Am., N.A.,* 898 F.3d 1348 (11th Cir. 2018); *Byrne v. Nezhat,* 261 F.3d 1075 (11th Cir. 2001); *Pelleteir v. Zweifel,* 921 F.2d 1465 (11th Cir. 1991).

In *Jackson,* the court described the case as an "abuse of process" effectuated "by filing a multi-count, incomprehensible complaint that flouted the Federal Rules of Civil Procedure and this Circuit's well-established precedent." *Jackson*, 898 F.3d at 1348.  "By attempting to prosecute an incomprehensible pleading to judgment, the Plaintiffs obstructed the due administration of justice in the District Court." *Id.*

The facts in *Jackson* are similar, although less egregious than here.  The complaint in *Jackson* alleged fourteen causes of action and contained 109 paragraphs of allegations and each of the claims incorporated all previous allegations.  The Defendants filed a motion for more definite statement identifying the complaint as a shotgun pleading.  The Plaintiff did not oppose the motion but sought leave to file an amended complaint.  The amended complaint "swelled to twenty-three pages and 123 paragraphs, made minor changes to a number of factual allegations, added two new counts, and listed one or more Defendants in parentheses under the heading of each count . . . . " *Id.* at 1348.  The Court of Appeals stated: "[h]ere, after being put on notice by Defendants of the specific defects in their complaint, the Jacksons filed an amended complaint afflicted with the same defects . . . . " *Id.*  Stating that "[t]olerating such behavior constitutes toleration of obstruction of justice," the Court affirmed the trial judge's order dismissing the amended complaint and instructed plaintiff's counsel to show cause why he should not be ordered to pay double costs and

expenses, including attorney's fees and costs incurred in defending the appeal pursuant to Rule 38 of the Federal Rules of Appellate Procedure. *Id.* at 1357-59. The Court pointed out that the defendants had identified the deficiency and the Eleventh Circuit's precedent in their motion. "If [plaintiffs' counsel] was not aware of the precedent when he filed the [plaintiffs'] initial complaint, Defendants' motion told him all he needed to know." *Id.* at 1359. Nevertheless "he stood fast, brazenly filing a facsimile of his initial pleading." *Id.*

Similarly here, Defendant Neustar identified the shotgun pleading deficiency and the Eleventh Circuit's precedent as one of its grounds for dismissal of Mr. Trump's initial Complaint. (DE 160 at 7-8, n.8). The Defendants' joint Motion to Dismiss the Amended Complaint did likewise. (DE 226 at 46-47). The Plaintiff refused to acknowledge this clear precedent. Instead, he added 80 new pages, and new defendants (including his former Deputy Attorney General and a California Congressman) in order to rehash old grievances from the 2016 election.

The other two Eleventh Circuit opinions analyze the use of shotgun pleadings to support a frivolous RICO claim. In both, the Court found the tactic deserving of sanctions. In *Pelletier*, the Court of Appeals reversed the denial of a Rule 11 sanctions motion in a civil RICO case. *Pelletier*, 921 F.2d at 1465.[8] Analyzing in detail the amended complaint in that case, the Court of Appeals concluded that the plaintiff failed to establish any of the required predicate acts, to show any continuing relationship or pattern of acts, or any injury flowing from those acts. *Id.* at 1496-1500.

---

[8] *Pelletier* and *Byrne* were abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding "plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). I do not rely on *Pelletier* and *Byrne* as they relate to mail fraud. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358, 1360 (11th Cir. 2018) (citing *Pelletier* and *Byrne* as good law for purposes of sanctions resulting from improper pleading). A more detailed analysis of why Mr. Trump lacked standing to bring his RICO claim is set forth in my Order granting Defendants' Motion to Dismiss. (DE 267 at 42-43).

Concluding that each of the counts in the amended complaint were objectively frivolous when filed, the Court of Appeals found it apparent that the case was brought to harass the defendants:

> Our conclusion is buttressed by the manner in which [plaintiff] pled his case in the district court and briefed it on appeal . . . . [These] are quintessential "shotgun" pleadings, replete with factual allegations that could not possibly be material to any of the causes of action they assert. Each count incorporates all of these factual allegations and states, further, that it is based on the conduct in the complaint attributable to [defendant] and "those acting in concert with him." Anyone schooled in the law who read these complaints, however, would know that many of the facts alleged could not possibly be material to all of the counts.

*Pelletier,* 921 F.2d at 1518. The appellate court found the amended complaint was conclusory, baseless and without any merit. In deciding that the claim was prosecuted in bad faith, the court rejected the thought that it might have been the "product of incompetent lawyering, and thus excusable, rather than" a tool of harassment, because the plaintiff was skilled in the law and had been warned he was likely to run afoul of Rule 11. *Id.* at 1519. The Court concluded:

> We think that imposing sanctions in this case would serve the dual purpose of deterring the filing of frivolous claims and defenses while not chilling attorneys' legitimate enthusiasm and creativity in advancing legal and factual theories. At a time when the federal courts -- which are a scarce dispute resolution resource, indeed -- are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation. Particularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them.

*Id*. at 1522 (emphasis in original)*.*[9]

In *Byrne*, the court affirmed a $400,000 sanction against counsel, under Rule 11, Section 1927, and the court's inherent powers, finding that the expansion of a simple "garden variety

---

[9] In *Pelletier*, the Court not only reversed the district court's denial of Rule 11 sanctions and remanded for a determination of an appropriate amount, but also determined that the appeal was frivolous on the merits and awarded double costs and reasonable attorney's fees pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

medical malpractice" case to include RICO and other baseless claims was frivolous from the outset

and doomed to fail. *Byrne*, 261 F.3d at 1115.

Identifying the complaint and amended complaint in *Byrne* as shotgun pleadings, *id.* at

1106, 1129, the Court of Appeals emphasized the harm presented by the tactic and the authority

of Article III courts to control the practice through inherent powers:

> Shotgun pleadings, if tolerated, harm the court by impeding its
> ability to administer justice.  The time a court spends managing
> litigation framed by shotgun pleadings should be devoted to other
> cases waiting to be heard . . . .  Although obstruction of justice is
> typically discussed in the context of criminal contempt, the concept
> informs the rules of law—both substantive and procedural—that
> have been devised to protect the courts and litigants (and therefore
> the public) from abusive litigation tactics, like shotgun pleadings.  If
> use of an abusive tactic is deliberate and actually impedes the
> orderly litigation of the case, to-wit: obstructs justice, the perpetrator
> could be cited for criminal contempt.

*Byrne*, 261 F.3d at 1131-32, 1130 n.110 (citations omitted).

In *Byrne,* the Court pointed out that plaintiffs file shotgun pleadings and frivolous claims

to extort settlement of unmeritorious claims.  Here, although his complaint asked for damages in

excess of twenty-four million dollars, treble damages under RICO, and attorneys' fees and costs,

I do not think Mr. Trump or his lawyers actually thought the Defendants would ever agree to settle.

This suit was filed for equally improper purposes—to harass and punish, for fundraising, and to

advance a political agenda.

**B.  <u>The Pleadings Contained Factual Allegations That Were Knowingly False Or Made
With Reckless Disregard For The Truth.</u>**

The Plaintiff consistently misrepresented and cherry-picked portions of public reports and

filings to support a false factual narrative.  Often the report or filing actually contradicted his

allegations.  It happened too often to be accidental; its purpose was political, not legal.  Factual

allegations were made without any evidentiary support in circumstances where falsity is evident.

Examples include:

**The Mueller Report.** A section of the Amended Complaint is titled "A String of Federal Investigations Clear Donald J. Trump and Uncover the Defendant's Illicit Conspiracy." (Amended Complaint ¶100). After a two-year investigation, the Special Counsel "found no evidence that Donald Trump or his campaign ever colluded with the Russian Government." (*Id.* ¶460). The Amended Complaint further alleges that Special Counsel Mueller "went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia." (*Id.* at ¶7). While perhaps acceptable as a cable news talking point, that allegation is neither an accurate nor fair reading of the Mueller Report.[10]

First, the Mueller Report stated that "[i]n evaluating whether evidence about collective action constituted a crime, we applied the framework of conspiracy, not the concept of 'collusion.'" *Mueller* Report Volume I at 8. Second, in determining whether the conduct "amounted to a violation of federal criminal law" the question was "whether admissible evidence would probably be sufficient to obtain and sustain a conviction." *Mueller Report* Volume I at 8. Third, the Report found:

> [W]hile the investigation identified numerous links between individuals with ties to the Russian government and individuals associated with the Trump Campaign, the evidence was not sufficient to support criminal charges . . . . [T]he investigation established that several individuals affiliated with the Trump Campaign lied to the [Special Counsel's Office], and to Congress about their interactions with Russian-affiliated individuals and related matters.

*Mueller Report* at 9. Fourth, with respect to obstruction of justice, the Report states: "While this

---

[10] 1 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019); 2 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019).

report does not conclude that the President committed a crime, it also does not exonerate him." Mueller Report Volume II at 2; (DE 147-1).

*Crossfire Hurricane Investigation.* A core aspect of the Plaintiff's claim is his contention that Ms. Clinton, Mr. Comey, and others were responsible for the Crossfire Hurricane Investigation. The Complaint and Amended Complaint copiously cite to the IG Report to support these allegations. But the IG Report found that the FBI opened the investigation "for an authorized purpose" and "with adequate factual predication" that had nothing to do with the Defendants or the Steele Dossier. (DE 143-1 at 347).

*Charles Dolan Allegations.* As set forth in my Order granting Rule 11 sanctions (DE 284), the Plaintiff alleged that Mr. Dolan was a former Chairman of the DNC (Amended Complaint ¶ 96), a senior Clinton Campaign Official (*id.* ¶ 4), and "an individual with intimate ties to the Clinton Campaign and one of its close associates" (DE 177 ¶ 96). In fact, as Mr. Dolan's lawyer told Plaintiff's counsel, he was none of those things. It made no difference. Despite an affidavit from Mr. Dolan saying he lived in Virginia, and the fact that service upon him occurred there, the Amended Complaint claimed he lived in New York. The Plaintiff's lawyers' excuse: There are a lot of Dolans—some of them live in New York. (DE 270 at 10).

The Complaint and Amended Complaint allege that Mr. Dolan was responsible for allegations in the Steele Dossier concerning salacious activity by Mr. Trump in Moscow. Mr. Dolan's lawyers' warnings that this was untrue went unheeded. In defending against sanctions, the Plaintiff's lawyers pointed to the Danchenko Indictment.[11] However, the Danchenko Indictment does not support Plaintiff's claims, rather it contradicts and undermines them.

---

[11] *United States v. Danchenko*, No. 1:21-cr-00245-AJT, (E.D. Va. Nov. 3, 2021) (hereinafter "Danchenko Indictment").

*Criminal Indictments.*  The Complaint and Amended Complaint rely substantially on the Sussmann,[12] Danchenko, and Clinesmith[13] Indictments.  The Plaintiff alleges that "these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner workings of the Defendants' conspiratorial enterprise.  Based on the facts that have already been uncovered throughout the course of Durham's investigation, it seems all but certain that additional indictments are forthcoming."  (Amended Complaint ¶ 8).

The Indictments themselves are not relevant.  An untried indictment is not evidence of the conduct alleged.  *See United States v. Machado,* 886 F.3d 1070 (11th Cir. 2018).  A criminal indictment should be no more than the starting point for a lawyer's good faith pre-filing investigation.  The danger of overreliance has been demonstrated here, in light of the acquittals of Mr. Sussmann and Mr. Danchenko.  That is not to say an indictment has no significance -- a grand jury has issued it with the assistance of a lawyer for the government.  But a plaintiff's good faith pre-filing inquiry cannot simply ignore the facts in an indictment that contradict and undermine his allegations while touting those he likes.

The Sussmann Indictment charged Mr. Sussmann with falsely telling the FBI's General Counsel that he was not acting on behalf of a client when he conveyed allegations about email communications between the Trump Organization and a bank affiliated with the Russian government.  But the Plaintiff relied on the Indictment to support his allegations of theft of trade secrets, violations of the Computer Fraud and Abuse Act, and violations of the Stored Communications Act in Counts I, VII, VIII, and IX.  (DE 177 at 119, 163, 166, 170).

---

[12] *United States v. Sussmann*, No. 1:21-cr-00582-CRC, (D.D.C. Sept. 16, 2021) (Hereinafter "Sussmann Indictment").

[13] *United States v. Clinesmith*, No. 1:20-cr-00165-JEB, (D.D.C. Aug. 14, 2020) (Hereinafter "Clinesmith Indictment").

As the Order of Dismissal points out, there are legal deficiencies in these claims.  But the Sussmann Indictment also warned the Trump lawyers of factual problems.  It specified that the communications involved "purported DNS data reflecting apparent DNS lookups between Russian Bank-1 and an email domain, 'mail l.trump-email.com.'" (Sussmann Indictment ¶ 16).  DNS data is meant to be public and as part of the infrastructure for the internet, accessible to any entity.  The Indictment further advises that the FBI determined "that the email server at issue was not owned or operated by the Trump Organization, but rather had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients." (Sussmann Indictment ¶ 7).  The Sussmann Indictment does not support and instead contradicts the conclusory trade secret and unauthorized access allegations set forth in Plaintiff's Amended Complaint.

And as noted above, the Danchenko Indictment contains allegations that, if true, were fatal to the Plaintiff's conspiracy claims.  The Danchenko Indictment states that, according to Mr. Dolan, "individuals affiliated with the Clinton Campaign did not direct and were not aware of" Mr. Dolan's meetings and activities with Mr. Danchenko and other Russian nationals.  (Danchenko Indictment ¶ 36).  Further, it alleges that according to Mr. Dolan, he was unaware of the specifics of Mr. Danchenko's project against Trump or that Mr. Danchenko's reporting would be provided to the FBI.  (*Id.* ¶ 52).  In responding to Mr. Dolan's sanctions motion, the lawyers claimed their allegations were "directly sourced" from the Danchenko Indictment.  (DE 270 at 10).  That is plainly untrue.

***Twitter Suspension.***  To support his damages claim, Plaintiff alleged that he was "banned from different social media platforms, including Twitter" as a result of "the misinformation campaign waged by Hillary Clinton."  (Amended Complaint ¶ 524 n.277).  However, Twitter

suspended Mr. Trump on January 8, 2021—two days after the January 6th attack on the Capitol—because it determined Mr. Trump's tweets posed "the risk of further incitement of violence."[14]

Moreover, in a lawsuit Mr. Trump filed against Twitter, attempting to show state action, he alleges that "Democrat legislators" pressured Twitter to censor him and that he was banned for exercising his right of free speech. *Trump et al. v. Twitter et al.,* No. 3:21-CV-08378 (N.D. Cal. July 7, 2021) (DE 1 ¶¶ 6, 48).

The assertion that the Twitter ban was caused by misinformation by Ms. Clinton five years earlier is plainly false.

**C.   The Plaintiff's Legal Theories Were Frivolous, Foreclosed By Existing Precedent.**

The Plaintiff recklessly advanced claims foreclosed by existing precedent that the most basic legal research would have revealed.  It was not that the Complaint and Amended Complaint were inadequate in any respect, they were inadequate in nearly every respect, even after the deficiencies had been identified in the multiple motions to dismiss.  The Eleventh Circuit has squarely held that to knowingly advance frivolous claims constitutes bad faith meriting sanctions under a court's inherent powers. *Peer,* 606 F.3d at 1316 (reversing district court's failure to award sanctions under inherent powers based upon Circuit Court's finding that lawyer "knowingly pursued a frivolous claim, and thus acted in bad faith.").

I will not detail all of the failings of the Amended Complaint here.  Most are identified in the Order of Dismissal.  I concluded that fundamental substantive defects precluded the Plaintiff from proceeding under any of the theories he advanced.

In arguing against the imposition of sanctions, the Plaintiff attempts to defend his legal

---

[14] Twitter Inc., *Permanent Suspension of @realDonaldTrump,* Twitter Blog (Jan 8, 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.

positions.  For instance, he contends that while novel, his assertion that the RICO statute of limitations should be tolled because of the former President's duties is a compelling argument for an extension of existing law.  (DE 284 at 4).  But *Clinton v. Jones,* 520 U.S. 681 (1997), does not leave room for that argument. *See Trump v. Vance,* 140 S. Ct. 2412 (2020) (holding that President is "neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need"); *Trump v. United States*, No. 22-13005, 2022 WL 17352069 (11th Cir. 2022) (holding district court lacks equitable jurisdiction to block government investigation of former President).  That is especially true here where Mr. Trump, in his personal capacity, found time during his presidency to file other civil actions.  *See, e.g., Trump v Mazars USA, LLP,* 140 S. Ct. (2019); *Trump v Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019); *Trump v Comm. on Ways & Means,* 391 F. Supp. 3d 93, 95 (D.D.C. 2019).

The argument that the statute of limitations should be extended because of the tolling provision of the Clayton Act is likewise frivolous.  Even were it to be applicable to RICO, none of the government proceedings identified by the Plaintiff—the Sussmann and Danchenko Indictments, or the FEC proceeding—bear any relation to RICO.  And in addition to the statute of limitations, Plaintiff's RICO claim failed at every step of the substantive RICO analysis.

The Plaintiff does not even *attempt* to respond with respect to most of the legal failings of his claims.  To reiterate a few:

- The malicious prosecution claim without a prosecution;

- The theory of personal jurisdiction based on an allegation that defendants "knew that Florida is a state in the United States which was an important one;"

- The trade secret claim without a trade secret or ownership;

- The Computer Fraud and Abuse claim foreclosed by *Van Buren v United States,* 141 S. Ct. 1648 (2021); and

- Obstruction of justice untethered to any official proceeding.

Despite its 193 pages, the Amended Complaint did not come close to stating a legal claim. That was never its intended purpose.

## III.   A PATTERN OF ABUSE OF THE COURTS.

I have explained why the totality of the problems with the Complaint, Amended Complaint, and the arguments and statements of Plaintiff's counsel show that this lawsuit was filed and prosecuted in bad faith. But this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes. Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct that impairs their ability to carry out Article III functions. *Procop v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986); *see also Martin-Trigona v. Shaw*, 986 F. 2d 1384, 1388 (11th Cir. 1993) (affirming dismissal because lawsuit filed on behalf of vexatious litigant); *O'Neal v. Allstate Indem. Ins. Co. Inc.*, No. 20-14712, 2021 WL 4852222, at *6 (11th Cir. Oct. 19, 2021).

Thus, while a litigant's conduct in other cases would normally not be relevant, when the court is faced with a sanctions motion against a repeat offender, undeterred by admonitions, it has the authority to consider that litigant's outside conduct. *See Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1313-14 (11th Cir. 2021) (finding district court had "inherent power to investigate the scope and extent" of litigant's misconduct that "threaten[ed] the integrity of the court."); *O'Neal*, 2021 WL 4852222, at *5 (rejecting a plaintiff's sanctions appeal, in part, because "the district court [] conducted a comprehensive examination of Plaintiff's litigation history, cited dozens of Plaintiff's past cases, concluded that only two had merit, and provided examples of past cases where Plaintiff followed an abusive strategy similar to that employed in this case . . . . ").

A. **Trump v. Pulitzer Board**

On November 15, 2021, on behalf of Mr. Trump, Ms. Habba demanded the Pulitzer Prize Board "take immediate steps to strip the New York Times and the Washington Post of the 2018 Pulitzer Prize for National Reporting."[15] By correspondence styled "Demand Letter, Notice of Potential Litigation and Non-Spoliation of Evidence," she threatened "prompt legal action" should the prize not be withdrawn.

Then, on May 27, 2022, Mr. Trump wrote stating: "I again call on you to rescind the Prize you awarded on blatantly fake, derogatory and defamatory news. If you choose not to do so, we will see you in court."[16]

On October 13, 2022, Weber, Crabb, & Wein, P.A., another law firm representing Mr. Trump, wrote again threatening suit, claiming that in refusing to rescind the award "the Board and its members acted not only with reckless disregard for the truth, but with authentic animosity and malice toward President Trump and the desire to cause him true harm [sic]."  As such, according to these lawyers, "the members of the Board are individually liable" for damages, including punitive damages for defamation.[17]

---

[15] Demand Letter from Alina Habba, Lawyer for Former President Donald J. Trump, to Bud Kliment, Interim Administrator, The Pulitzer Prizes (Nov. 15, 2021), https://www.documentcloud.org/documents/21112616-habba-and-trump-demand-letters-to-pulitzer-prizes-board.

[16] Letter from Donald J. Trump, to Ms. Marjorie Miller, Administrator, The Pulitzer Prize (May 27, 2022).  For copy of letter see Katie Robertson, *Pulitzer Board Rejects Trump Request to Toss Out Wins for Russia Coverage*, N.Y. Times (July 18, 2022), https://www.nytimes.com/2022/07/18/business/media/pulitzer-prizes-trump.html.

[17] Letter from R. Quincy Bird and Jeremy D. Bailie, Lawyers for Donald J. Trump, to Marjorie Miller, Administrator, The Pulitzer Prize Board (Oct. 13, 2022) https://cdn.nucleusfiles.com/bf/bf8ec68a-f0b8-400d-a74b-e6c480f89c07/pulitzer-prize-board-letter-final.pdf.

A little over a week later, Mr. Trump, at a rally in Robstown, Texas, held on October 22, 2022, announced: "Within the next two weeks we're suing the Pulitzer organization to have those prizes taken back."[18]

On December 13, 2022, Mr. Trump followed up on his threat by filing a lawsuit in a state court in Okeechobee, Florida, a location with no apparent connection to Mr. Trump or any of the defendants. *Trump v. Members of the Pulitzer Prize Board et al.,* No. 22-CA-000246, (Fla. 19th Cir. Ct. Dec. 13, 2022) (hereinafter "*Trump v. Pulitzer*") (DE 1).  He sued, individually, nineteen members of the Pulitzer Prize Board alleging defamation by implication."[19]  The complaint, 29 pages, 145 paragraphs, similar to the Amended Complaint at issue here, misrepresents the findings of the Mueller Report and the origins of the Operation Crossfire investigation.  The alleged defamatory statement reads:

> A. Statement from the Pulitzer Prize Board.  The Pulitzer Prize Board has an established formal process by which complaints against winning entries are carefully reviewed.  In the last three years, the Pulitzer Board has received inquiries, including from former President Donald Trump about submissions from the New York Times and the Washington Post on Russian interference in the U.S. elections and its connections to the Trump campaign – submissions that jointly won the 2018 National Reporting Prize.
>
> These inquires prompted the Pulitzer Board to commission two independent reviews of the work submitted by those organizations to our National Reporting competition.   Both reviews were

---

[18] *See* Julia Shapero, *Trump doubles down on threats to sue Pulitzer board at Texas rally*, The Hill (Oct. 22, 2022, 11:06 PM), https://thehill.com/blogs/blog-briefingroom/3699833-trump-doubles-down-on-threats-to-sue-pulitzer-board-at-texas-rally/.

[19] Defamation by implication is "the concept that literally true statements can be defamatory where they create a false impression." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). (citations omitted). The Florida Supreme Court explained that "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Id.* at 1108.

> conducted by individuals with no connection to each other. The separate reviews converged in their conclusions: that no passages or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the [2018 Pulitzer Prizes in National Reporting Stand] conferral of the prizes.

(*Trump v. Pulitzer*, DE 1 ¶ 117).

It has been said that journalism is the first draft of history.[20] The 2018 Pulitzer Award for National Reporting honored the staffs of the New York Times and the Washington Post "[f]or deeply sourced, relentlessly reported coverage in the public interest that dramatically furthered the nation's understanding of Russian interference in the 2016 presidential election and its connection to the Trump campaign, the President-elect's transition team and his eventual administration."[21] The effort by Mr. Trump and his lawyers to use the courts to bully journalists as part of a dishonest and futile attempt to rewrite history is a shameless attack on a freedom essential to democracy. *See Mills v Alabama*, 384 U.S. 214, 218-19 (1966) ("[T]he press serves . . . as a powerful antidote to any abuses of power by government officials and a constitutionally chosen means for keeping officials elected by the people responsible to all of the people who they were selected to serve.").

### B.  Trump v. New York Attorney General

In March 2019, the New York Office of the Attorney General ("OAG") headed by Attorney General Letitia James ("AG James"), began investigating Mr. Trump and his New York business.[22]

---

[20] While first use of the phrase is debated, it is often attributed to Philip Graham, the former president and publisher of the Washington Post from a speech he gave to Newsweek reporters in 1963: "So let us today drudge on about our inescapably impossible task of providing every week a first rough draft of history that will never be completed . . . . " Katherine Graham, *Personal History* (1998).

[21] *Staffs of The New York Times and The Washington Post*, The Pulitzer Prizes, https://www.pulitzer.org/winners/staffs-new-york-times-and-washington-post.

[22] The following procedural history and underlying facts are taken from filings in the case which

(James AC ¶ 64).  The OAG initiated its investigation following Congressional testimony by Michael Cohen, "a former senior executive of the Trump Organization and Special Counsel to Mr. Trump," wherein he produced copies of Plaintiff's financial statements that allegedly *inflated* the value of his assets to obtain favorable loans and insurance coverage, while the Trump Organization simultaneously *deflated* the value of those same assets to reduce its tax burden.  (*Trump v. James*, DE 9 at 8-9).  According to Mr. Trump, the Cohen testimony was a pretext to justify the OAG Investigation, and he points to various public statements by AG James as support for his theory that the OAG is "nothing more than a weapon in [AG James's] arsenal to wage war on [Mr. Trump]."  (James AC ¶¶ 67, 76).

On August 24, 2020, the OAG commenced a special proceeding in the New York Supreme Court, New York County, to enforce subpoenas served during the Investigation.[23]  (James AC ¶ 75).  On February 17, 2022, Justice Engoron, the state-court Justice presiding over the special proceeding, denied a motion to quash filed by Mr. Trump and granted the OAG's motion to compel ("February 2022 Order").  *See People of the State of New York v. The Trump Organization, Inc.*, No. 451G85/2020, 2022 WL 489625 (Sup. Ct. N.Y. Cnty. Feb. 17, 2022).  Justice Engoron rejected the Trump Respondents'[24] argument that the OAG Investigation was based on "personal animus" and that it amounted to selective prosecution.  *See id.* at *5-6.

Justice Engoron's Order has been affirmed by the state-appellate courts in New York.  On May 26, 2022, the February 2022 Order was unanimously affirmed by the New York Appellate

---

subsequently ended up before me: *Donald J. Trump v. Letitia James*, No. 22-81780-CV-DMM (S.D. Fla.) (hereinafter "*Trump v. James*").  The amended complaint in that case is at Docket Entry 19 and is hereafter referred to as "James AC."

[23] The special proceeding is styled, *People v. The Trump Organization*, Index No. 451685/2020.

[24] Donald J. Trump, Ivanka Trump, and Donald Trump, Jr.

Division's First Department. *People by James v. Trump Org., Inc.*, 205 A.D.3d 625 (1st Dep't 2022) (affirming finding that the OAG Investigation was "lawfully initiated" and not selective prosecution). On June 14, 2022, in a two-sentence order, the New York Court of Appeals—New York's highest court—dismissed Mr. Trump's appeal. *People by James v. Trump Org., Inc.*, 38 N.Y.3d 1053 (2022) (holding that "no substantial constitutional question is directly involved.").

Simultaneously, in December 2021, Mr. Trump and the Trump Organization LLC sued AG James under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York. *Trump v. James*, No. 21-cv-1352, 2022 WL 1718951 at *1 (N.D.N.Y. May 27, 2022). Mr. Trump alleged that the OAG's investigation infringed on various of his constitutional rights. As summarized by Judge Sannes, Mr. Trump (and the Organization) asserted that AG James:

> (1) violated their Fourteenth Amendment due process rights by commencing "investigations against Plaintiffs in bad faith and without a legally sufficient basis," (2) violated their First Amendment rights by seeking to stifle Plaintiffs' free speech and retaliate against Plaintiffs based upon Mr. Trump's political views, (3) violated their Fourth Amendment rights by issuing subpoenas without any "justifiable legal or factual basis," and (4) abused process to advance her own political career and injure Mr. Trump personally and politically.

*Id*. at *4. Judge Sannes granted AG James's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds of *Younger* Abstention, *id*. at *14, and stated that, in the alternative, the case would be dismissed under Rule 12(b)(6) because of *res judicata*, *id*. at *19. The Court also noted: "Plaintiffs' assertions that [AG James] conducted a 'baseless fishing expedition' and 'knowingly advanced claims that were unwarranted under existing law,' are wholly unsupported." *Id*. at *12 n.13 (citation omitted). Mr. Trump has appealed to the Second Circuit. (*Trump v. James* DE 9 at 11).

On September 21, 2022, following its Investigation, the OAG commenced an enforcement

action pursuant to New York Law §63(12) ("Enforcement Action").  (*Id*. at 12).  On November

14, 2022, following a granting of the OAG's motion for preliminary injunction, Justice Engoron

appointed the Honorable Barbara Jones, a retired federal judge, to serve as monitor of the Trump

Organization.  (*Trump v. James*, DE 9-1 at 2).  Mr. Trump appealed to the New York Appellate

Division's First Department, where it remains pending.  (*Trump v. James*, DE 9 at 13).

Then, on November 2, 2022, Mr. Trump filed a lawsuit against AG James in a Florida state

court, the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida.  (*Trump

v. James*, DE 1-1 at 11).  The following day, he posted the following on Truth Social:

> Statement by Donald J. Trump, 45th President of the United States
> of America
>
> A puppet judge of the New York Attorney General and other sworn
> enemies of President Trump and the Republican Party has just
> issued a ruling never before seen anywhere in America. It is
> Communism come to our shores.
>
> Businesses will be fleeing New York, which they already are, for
> other states and other countries. Today's ridiculous ruling by a
> politically-motivated, hand-picked judge makes it even more vital
> for courts in both New York and Florida to do the right thing and
> stop this inquisition.
>
> We have to fight back against radical tyranny and save our
> Country![25]

On November 14, 2022, Plaintiff filed an Amended Complaint and an Emergency Motion

for Temporary Injunction.  (*Trump v. James*, DE 19; DE 1-1 at 113).  Plaintiff brought three counts

against Defendant, "individually."   Count I is brought under 42 U.S.C. § 1983 for various

constitutional violations.  (James AC at 26).  Count II alleges violations of Plaintiff's rights to

---

[25]   @realDonaldTrump,  Truth  Social  (Nov.  2,  2022,  5:51  PM),
https://truthsocial.com/@realDonaldTrump/posts/109282083674316908.

privacy and property under Florida law. (*Id*. at 31). Count III alleges violations of Plaintiff's

rights as grantor and beneficiary of the Trust. (*Id*. at 35). In his Emergency Motion, Plaintiff

requested a temporary injunction against Defendant, "either personally, through an agent or

through any other persons acting in active concert or participation with her, from requesting,

demanding, possessing or disclosing the 2020 or 2022 amendments" of Plaintiff's Trust. (*Trump

v. James*, DE 1-1 at 113).

On November 16, 2022, Defendant removed the case to this Court, where it is now pending

before me. (*Trump v. James*, DE 1). The James AC copies verbatim substantial portions of the

dismissed New York federal action. It begins with provocative rhetoric, all too familiar:

> Extraordinary wrongdoing requires extraordinary relief. As set
> forth below, James has repeatedly abused her position as Attorney
> General for the State of New York to pursue a vendetta against
> President Trump, a resident of Palm Beach County, Florida, with the
> stated goal of destroying him personally, financially, and politically.
> Suffice it to say that these actions are contrary to both the
> Constitutions and the laws of New York and Florida and the United
> States Constitution.

(James AC ¶ 1).

On December 21, 2022, I denied the Emergency Motion for Temporary Injunction finding

that none of the prerequisites for an injunction were met. (*Trump v. James*, DE 14). I found that

Plaintiff's attempt to sidestep rulings by the New York courts by suing AG James individually

rather than in her official capacity was plainly frivolous. (*Id*. at 6). I found there was no likelihood

of success on the merits, no irreparable harm, and to "impede a civil Enforcement Action by the

New York Attorney General would be unprecedented and contrary to the interests of the people of

New York." (*Id*. at 8). I urged Mr. Trump and his lawyers to reconsider their opposition to AG

James's Motion to Dismiss because "[t]his litigation has all the telltale signs of being both

vexatious and frivolous." (*Id*. at n.6).

### C. **Trump v. Twitter**

On July 7, 2021, Mr. Trump, Linda Cuadros, and the American Conservative Union, individually and on behalf of the class, sued Twitter, Inc. and Jack Dorsey.  The complaint was filed in U.S. District Court in the Southern District of Florida.  *Donald J. Trump et al. v. Twitter, Inc. et al.*, No. 21-CV-22441 (S.D. Fla.) (hereinafter "*Trump v. Twitter*").[26]  The case was subsequently transferred to the Northern District of California pursuant to Twitter's forum selection clause.  (*Trump v. Twitter*, DE 87).

Shortly after announcing the lawsuits, Mr. Trump started sending "breaking news alert" text messages directly to his followers including a link[27] that asked them to donate to his Save America PAC:

> President Trump is filing a LAWSUIT against Facebook and Twitter for UNFAIR CENSORSHIP!  *For the NEXT HOUR we've activated a 5X-IMPACT on ALL GIFTS!*  **Please contribute IMMEDIATELY to INCREASE your impact by 500% and to get your name on the Donor List President Trump sees!**[28]

---

[26] That same day, Mr. Trump also sued YouTube, LLC; Sundar Pichai, the chief executive officer of Google LLC and Alphabet Inc.; Facebook, Inc.; and its chief executive officer, Mark Zuckerberg.  *See Trump et al. v. YouTube, LLC,. et al.*, No. 21-CV-22445 (S.D. Fla.) (hereinafter "*Trump v. YouTube*"); *Trump et al. v. Facebook, Inc. et al.*, No. 21-CV-22440 (S.D. Fla.) (hereinafter "*Trump v. Facebook*").  Both of these cases were transferred to the Northern District of California.

[27] The text message read, "Pres Trump: I am SUING Facebook & Twitter for UNCONSTITUTIONAL CENSORSHIP. For a short time, 5X-IMPACT on all gifts! Donate NOW: bit.ly/3hiWKi5."  The link in the text message brought recipients to a dynamic website prompting them with the above request for donations.  While the website has since changed, it has been documented in other places.  *See, e.g.*, Jake Lahut, *Trump announces lawsuits against Facebook and Twitter, immediately starts fundraising off it*, Business Insider (July 7, 2021, 12:54 PM), https://www.businessinsider.com/trump-facebook-twitter-lawsuit-fundraising-immediately-2021-7.

[28] Lahut, *supra* note 26 (showing a Tweet from Twitter User @NYTnickc including screenshots of the text message and donation website) (emphasis in original).

Mr. Trump's primary claim in all three of the cases is that the defendants censored his speech in violation of the First Amendment to the United States Constitution. *See Trump v. Twitter*, DE 1; *Trump v. YouTube*, DE 1; *Trump v. Facebook*, DE 1. A problem with his argument is that Twitter, Facebook, and YouTube are private companies, and the First Amendment applies only to governmental abridgements of speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("[T]he Free Speech Clause prohibits only *governmental* abridgment of speech. The free-speech clause does not prohibit *private* abridgment of speech.") (emphasis in original). Mr. Trump's only viable course of action was to allege that the companies were so dominated by governmental authorities as to be considered "state actors."

With respect to Twitter, aspects of Mr. Trump's argument bear directly on the claims made against Ms. Clinton and the Defendants here. Recall that in this case, Mr. Trump's lawyers point to the suspension of his Twitter account as the only example of economic injury that he suffered and blame the suspension on disinformation by Ms. Clinton; never mind that Twitter closed Mr. Trump's account after the Jan 6th attack on the Capitol because of "the risk of further incitement of violence." (*Trump v. Twitter*, DE 21 ¶114).

But in the Twitter litigation, the Trump lawyers claim that it was Democratic members of Congress, Vice President Harris, and First Lady Michelle Obama, that "coerced" Twitter to censor Mr. Trump. (*Id.* ¶¶ 48-61).

The District Court for the Northern District of California dismissed the case in its entirety finding that "the amended complaint does not plausibly allege that Twitter acted as a government entity when it closed plaintiffs' accounts." *Trump v. Twitter Inc.*, No. 21-cv-08378-JD 2022 WL 1443233, at *7 (N.D. Cal. May 6, 2022). Appeal of the dismissal is currently pending in the Ninth Circuit. *See Trump v. Twitter, Inc.*, *et al.*, 22-cv-15961 (9th Cir.).

30

### D. **Trump v. CNN**

On October 16, 2019, Charles Harder, as "litigation counsel for President Donald J. Trump and Donald J. Trump for President, Inc." advised CNN that "my clients intend to file legal action against you to seek compensatory damages, treble damages, punitive damages, injunctive relief, reimbursement of legal costs, and all other available legal and equitable remedies to the maximum extent permitted by law."[29]  Claiming violation of the Lanham Act because of "misrepresentations to the public, to your advertisers, and others," the letter claimed "[n]ever in the history of this country has a President been the subject of such a sustained barrage of unfair, unfounded, unethical and unlawful attacks . . . . " *Id.*

On March 6, 2020, represented by Mr. Harder, Donald J. Trump for President, Inc. sued CNN for libel based upon an article by a contributor entitled "Soliciting dirt on your opponents from a foreign government is a crime.  Mueller should have charged Trump campaign officials with it."[30]  *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 20-CV-01045-MLB (N.D. Ga. Mar. 6, 2020) (hereinafter "*Trump v. CNN*") (DE 1).  The district court found the complaint did not adequately plead actual malice and dismissed it with leave to amend no later than November 30, 2020.  *Trump v. CNN*, 500 F. Supp. 3d 1349, 1358 (N.D. Ga. Nov. 11, 2020).

---

[29] Demand Letter from Charles J. Harder, Lawyer for Donald J. Trump, to Jeff Zucker, President and CEO of CNN, and David Vigilante, Executive Vice President and General Counsel of CNN (Oct. 16, 2019).  For copy of letter see @michaelglassner, Twitter (Oct. 18, 2019 12:04 PM), https://twitter.com/michaelglassner/status/1185225081141772290?ref_src=twsrc%5Etfw%7Ctw camp%5Etweetembed%7Ctwterm%5E1185225081141772290%7Ctwgr%5E3343fa879f8ca95c6 fc5c5a9f5c9ac5e765d8097%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.foxnews.com% 2Fmedia%2Ftrump-legal-team-threatens-cnn-with-lawsuit-over-unfair-unfounded-unethical-and-unlawful-coverage (posting copy of letter).

[30] Larry Noble, *Soliciting dirt on your opponents from a foreign government is a crime. Mueller should have charged Trump campaign officials with it*, CNN (June 13, 2019 at 3:37 PM), https://www.cnn.com/2019/06/13/opinions/mueller-report-trump-russia-opinion-noble/index.html.

31

Plaintiff's counsel subsequently advised that an amended complaint would not be filed, so on December 31, 2020, the case was dismissed without prejudice for failure to comply with the Court's order. (*Trump v CNN*, DE 38).

Mr. Trump then began fundraising for another lawsuit against CNN, issuing the following appeal:

> I'm calling on my best and most dedicated supporters to add their names to stand with me in my impending lawsuit against fake news CNN . . . Add your name immediately to show your support for my upcoming lawsuit against fake news CNN.[31]

On October 3, 2022, Mr. Trump sued CNN for Defamation Per Se (Count I) and Defamation (Count II). *Trump v. Cable News Network, Inc.*, No. 22-CV-61842-AHS (S.D. Fla. Oct. 3, 2022) (hereinafter "*Trump v CNN* II"), DE 1 at 19, 24. While claiming to meet the "actual malice" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), Mr. Trump's lawyers argue it "does not—and should not—apply where the defendant is not publishing statements to foster debate, critical thinking, or [the] 'unfettered interchange of ideas' but rather seeks to participate in the political arena by offering propaganda." (*Trump v CNN* II, DE 1 ¶ 65 n.42).

Less than 24 hours later, a fundraising email from Mr. Trump proclaimed: "I am suing the Corrupt News Network (CNN) for DEFAMING and SLANDERING my name." Supporters were encouraged to contribute $5 or more.[32]

To be clear, the sanction in this case is not imposed against Mr. Trump for the Pulitzer, Twitter, or CNN litigation. Those cases are before other judges who will make their own

---

[31] Marco Margaritoff, *Trump Begs Supporters For Donations Toward 'Upcoming' CNN Lawsuit*, Yahoo News (August 6, 2022), https://news.yahoo.com/trump-begs-supporters-donations-toward-164711363.html.

[32] *See* Erik Larsen, *Trump Uses CNN Lawsuit to Raise Money*, Bloomberg (Oct. 4, 2022), https://money.yahoo.com/trump-uses-cnn-lawsuit-raise-143932468.html.

determinations.  And a decision in Mr. Trump's Florida lawsuit against the New York Attorney General, a case now pending before me, is premature.

However, this widespread and persistent conduct points to the need for deterrence in this case and helps explain why Rule 11, Section 1927, and the Defend Trade Secrets Act are not up to the task.  This is purposeful conduct, some of which occurs beyond the pleadings and even outside of the courtroom.  "[I]t is a wrong against the institutions set up to protect and safeguard the public." *Chambers*, 501 U.S. at 44.  Mr. Trump's deliberate use of a frivolous lawsuit for an improper purpose constitutes bad faith.  And the behavior is not unique, but part of a plan, or at least a playbook.  The telltale signs:

- Provocative and boastful rhetoric;

- A political narrative carried over from rallies;

- Attacks on political opponents and the news media;

- Disregard for legal principles and precedent; and

- Fundraising and payments to lawyers from political action committees.[33]

And when a ruling is adverse, accusations of bias on the part of judges—often while the litigation is ongoing.

---

[33] Mr. Trump's Save America PAC has spent $9.7 million in legal bills since 2021 according to a Washington Post review of FEC Filings.  Devin Barrett, Josh Dawsey, and Isaac Stanley-Becker, *Trump's committee paying for lawyers of key Mar-a-Lago witnesses*, The Washington Post (Dec. 5, 2022, 5:52 PM), https://www.washingtonpost.com/national-security/2022/12/05/trump-witnesses-legal-bills-pac/.  Over $2 million has reportedly been paid to Ms. Habba.  Steven Lubet, *Cassidy Hutchinson transcript reveals new low for Trump World*, The Hill (Dec 28, 2022, 8:00 AM), https://thehill.com/opinion/judiciary/3789257-cassidy-hutchinson-transcript-reveals-new-low-for-trump-world/.  Ms. Habba, in addition to her role as a lawyer, has become a senior advisor for Mr. Trump's new MAGA, political action committee.  According to a MAGA Inc. spokesperson, "whether it's on legal matters or political issues, she is more than capable to represent President Trump in a variety of venues."  Ryan King, *Trump Attorney Alina Habba joins MAGA Inc.*, Washington Examiner (Oct. 26, 2022, 9:55 AM), https://www.washingtonexaminer.com/politics/trump-attorney-alina-habba-joins-maga-inc.

But "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U.S. 252, 270 (1940). Frivolous lawsuits should not be used as a vehicle for fundraising or fodder for rallies or social media. Mr. Trump is using the courts as a stage set for political theater and grievance. This behavior interferes with the ability of the judiciary to perform its constitutional duty.

## IV.   CONSEQUENCES

Having determined that sanctions are appropriate under inherent authority, I must now determine what those sanctions should be. I find that an award of Defendants' attorneys' fees and costs is a fair and just sanction given Plaintiff's and his counsel's actions in this case. *See Chambers*, 501 U.S. at 56-58. What follows, then, is an analysis of what amount of fees and costs is reasonable. *See Bynum v. Am. Airlines, Inc.*, 166 Fed. Appx. 730, 736 (5th Cir. 2006) (remanding imposition of sanctions for proof of incurred fees and expenses to determine reasonableness).

### A. <u>Defendants' Fee Application And Plaintiff's Objections</u>

Before analyzing the reasonableness of Defendants' fee request, I will briefly explain what materials I considered in reaching my conclusions. A fee applicant bears the burden of providing an adequate application, but the opposing party must raise clear objections for a court to rule on them. *See Am. Civ. Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) ("'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'") (citation omitted).

Defendants request **$1,058,283.50** in fees and costs. *See generally* Defendants' Joint Motion for Sanctions (DE 280-2) (hereinafter "Application"). The Application is a 304-page document filed in support of Defendants' fee request. *See id.* The Application contains eleven

exhibits in support of the requested fees for each set of lawyers/law firms representing (some jointly) the Defendants in this case.  Each exhibit contains (1) a declaration attesting to the authenticity of the hours and rates billed, with a corresponding summary of fees based on stages of the case; (2) background information on each timekeeper that describes professional experience and credentials; and (3) time entries.

In response, Plaintiff filed largely indecipherable objections.  (DE 285-1) (hereinafter "Objections"); (DE 297) (hereinafter "Corrected Objections").  I will highlight just a few of these issues.  First, Plaintiff's Objections relied on an unsigned draft of the Application.  *Compare* Objections at 241 (stating on Mr. Tyrrell's signature line, "draft for circulation") *with* Application at 255 (containing Mr. Tyrrell's signature).  This was significant not just because it was unsigned, but because some of the calculations changed from the draft to the final Application.  *Compare* Objections at 273 (Ms. Lett's declaration stating total fees under Chart C as $5,650) *with* Application at 285 (Ms. Lett's declaration stating total fees under Chart C as $9,375).  In an effort to clarify the record, I *sua sponte* ordered Plaintiff to file corrected objections.  (DE 292).

Plaintiff's Corrected Objections were equally unhelpful.  First, Plaintiff still relies on certain draft portions of the Application.  *Compare* Corrected Objections at 307 (Ms. Lett's declaration stating in all caps and yellow highlighted text "DATE" and "FILL IN RESULT OF CONFERRAL") *with* Application at 285 (Ms. Lett's declaration stating the date and result of conferral).  As a result, many of the same numerical discrepancies remained.  *See, e.g., id.*  Second, there are multiple miscalculations.  For instance, in raising line-by-line objections to Defendant Joffe's attorneys' fees, Plaintiff failed to multiply the hourly rate by the number of hours billed, making the total amount objected to uncertain.  (*See* Corrected Objections at 302).  I doubt that this was intentional because nowhere else in the Corrected Objections does this appear to happen.

(*See, e.g., id.* at 268).  In another example, in calculating the total fees incurred by Defendant DNC, Plaintiff failed to include the $15,632.50 incurred in the third stage of the case.  (*See id*. at 93) (concluding total fees incurred $170,192, rather than $185,824.50).

These errors, taken as a whole, render the entire document unreliable.  I considered whether to offer Plaintiff yet another opportunity to cure his objections.  Without a motion, however, I did not find it to be a fair exercise of this Court's discretion.  In almost every area of law, a party waives an objection for failing to properly raise it.  So too here.  Thus, to the extent that Plaintiff's objections were not clearly identifiable, I did not consider them.

## B.  Reasonableness Of Fees

Of the total request for fees and costs ($1,058,283.50), $14,292.39 are costs incurred for electronic legal research and $600 in *pro hac vice* filing fees.  Plaintiff does not object to either.[34] (*See generally* Corrected Objections at 33-35).  Filing fees are taxable costs under 28 U.S.C. § 1920.  However, consistent with the finding of other courts in this Circuit and other circuit courts, costs incurred for electronic legal research are considered a component of attorneys' fees rather than costs under 28 U.S.C. § 1920.  *Springer v. Convergy's Corp.*, 2006 WL 8439203 at *2 (M.D. Fla. July 7, 2006).  I find the award of $14,292.39 for electronic legal research reasonable given Plaintiff's lack of objection and the sprawling nature of his claims, which while frivolous, were numerous enough to necessitate substantial legal research.

"[T]he starting point in any determination for an objective estimate of the value of a

---

[34] Plaintiff appears to object, without explanation, to Defendant Danchenko's costs incurred for electronic legal research ($6,389) as "vague."  (Corrected Objections at 244).  This is nonsensical and likely a mistake.  "Vague," as used by Plaintiff everywhere else in his Corrected Objections refers to vague *time entries* (more on this below).  Nowhere else does Plaintiff raise a "vague" objection for costs incurred for electronic legal research, which are typically barebones receipts. (*See, e.g., id*. at 301).  I will overrule this objection as I can discern no basis for it.

lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The product of these two figures is the lodestar and there is a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (citation omitted). In determining the lodestar, "the court is to consider the 12 factors enumerated in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974)."[35] *Id.* at 1350. "After the lodestar is determined . . . the court must next consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302. And finally, "'[t]he court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.'" *Id.* at 1303 (citation omitted).

### 1. *Reasonable Hourly Rate*

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1302. The "relevant legal community" is generally "'the place where the case is

---

[35] As summarized in *Bivins*, the 12 factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Bivins*, 548 F.3d at 1350 n.2.

filed.'" *Barnes*, 168 F.3d 437.  "More typically, the fee applicant asks for rates approximating the highest charged in the community, whereas the fee opponent generally submits evidence of the lowest rate charged in any part of the community."  *Norman*, 836 F.2d at 1300.  That is not the case here.

Almost all of Defendants' attorneys seek substantially discounted rates, ranging from 28% to 66% less than the rates actually billed.  (*See, e.g.,* Application at 102).  On a sliding scale based on experience, Defendants' attorneys seek rates ranging from $255-800 for lawyers and $120-150 for paralegals.  Plaintiff objects to the total amount as "unreasonable or excessive," but he limits those objections to purported deficiencies in "billing judgment" (more on this below).  Nowhere in his response in opposition or dozens of pages of line-by-line objections does Plaintiff challenge the *rate* charged by Defendants' attorneys.

Defendant Joffe's attorneys (and paralegal) are the only ones not to have discounted their rates.  Defendant Joffe's lead attorney, Mr. Tyrrell, seeks his "ordinary non-local rates," on the grounds that he qualifies for an exception applicable to attorneys with "extensive prior experience with a particular factual situation."  (*Id.* at 252 n.1); *see also Barnes*, 168 F.3d at 438 (stating that non-local rates *may* be acceptable if attorney had "extensive prior experience with a particular factual situation," but refusing to apply that exception where no obvious savings or efficiencies resulted).  While Plaintiff does not object, I refuse to apply the *Barnes* exception where it is not obvious that Defendant Joffe's attorneys provided any significant gains in efficiencies.  *Compare* (Application at 283) (Defendant Orbis Business Intelligence Ltd.'s attorneys, who raised a successful personal jurisdiction challenge, seeking fees for about 90 hours) *with* (*id.* at 251) (Defendant Joffe's attorneys, who also raised a successful personal jurisdiction challenge, seeking fees for about 208 hours).  Moreover, Mr. Tyrell's declaration (Application at 251) speaks to *his*

purported prior knowledge, not that of Defendant Joffe's other attorneys and paralegal who also seek their non-local rates. Accordingly, in considering the *Johnson* factors, the discounted rate of the other attorneys in this case, and my own experience, I will discount Defendant Joffe's attorneys' and paralegal's fees. *See* Appendix A at 5.

I find the rest of the rates charged by Defendants' attorneys reasonable. *See generally* Appendix A. In reaching this conclusion, I considered my own experience, the *Johnson* factors, and what reasonably comparable attorneys in a similar case in this legal community might be expected to charge. Plaintiff's lack of objection further supports the reasonableness of the rates. Given that there are dozens of attorneys, I will refrain from explaining my reasoning for each and every one of them—although I have considered them all. In reference to the *Johnson* factors, I considered the complexity of the allegations leveled by Plaintiff and the skill it required to succinctly respond to each allegation with well-reasoned arguments. In my view, this case required excellent lawyering to defend against the overwhelming number of convoluted allegations and frivolous claims raised by Plaintiff. Indeed, these lawyers are some of the best in the country, and accordingly charge top dollar (as evidenced by the rates actually paid by Defendants). In their ranks are litigators that have argued, and won, several cases before the U.S. Supreme Court; served in positions of great significance in government; graduated from and taught at prestigious law schools; clerked for federal district courts, circuit courts, and the U.S. Supreme Court; and obtained victories for their clients to the tune of billions of dollars. (*See, e.g.,* Application at 9, 53, 56, 105, 209).

Having set reasonable rates for the lawyers involved (*See generally* Appendix A), I now move on to evaluating the time they spent on their work in this case.

**2.  *Hours Reasonably Expended***

In determining the number of hours "reasonably expended," the Supreme Court requires fee applicants to exercise "billing judgment."  *Hensley*, 461 U.S. at 434 (citations and quotations omitted).  Therefore, attorneys "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id*.  "This must necessarily mean that the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*."  *Norman*, 836 F.2d at 1301 (emphasis in original).  "Redundant hours generally occur where more than one attorney represents a client," but in such cases attorneys may still be compensated "if they are not unreasonably doing the same work."  *Id*. at 1302.

Where—as is the case here—"fee documentation is voluminous . . . an hour-by-hour review is simply impractical and a waste of judicial resources."  *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994); *see also Fox v. Vice*, 563 U.S. 826, 838 (2011) (explaining that "trial courts . . . should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate courts must give substantial deference to these determinations, in light of 'the district court's superior understanding of the litigation.'").  Notwithstanding, I am mindful of this Court's obligation to "produce an order on attorneys' fees that allows for 'meaningful review.'" *Barnes*, 168 F.3d at 428.

Here, the fee documentation is certainly voluminous.  *See, e.g., Padurjan v. Aventura Limousine & Transp. Serv., Inc.*, 441 Fed. Appx. 684, 687 (11th Cir. 2011) ("The more than $200,000 [the movant] seeks in attorneys' fees is indication enough that this case is voluminous.").

Defendants' Application seeks over a million dollars in fees, is 304-pages long, and includes hundreds of time entries by dozens of lawyers.

In response, Plaintiff raised line-by-line objections by way of tables at the end of each exhibit. (*See generally* Corrected Objections). The tables, while not descriptive in any meaningful way, do identify objected to entries under the following categories: block billing, duplicative, excessive, vague, and clerical. Accordingly, I will balance the aforementioned competing directives—not to attempt "auditing perfection" yet still allow for "meaningful review"—by analyzing a mostly random selection[36] of Plaintiff's "billing judgment" objections under each of his categories. The entries excerpted below serve as a representative sample of the entries that I examined and the reasoning applied therein.

### C. **Objections**

#### 1. *Block Billing*

Plaintiff's objections to block billing are largely overblown. It is true that lawyers should avoid block billing (*i.e.*, billing for several tasks in the same time entry) to, at least in this context, allow a court to ascertain the number of hours reasonably expended per task. The degree of block billing identified by Plaintiff simply does not rise to a level that merits an across-the-board cut of hours. However, I am inclined to cut back in individual cases if the block billing spanned several hours and included numerous tasks. *See, e.g., Barnes*, 168 F.3d at 429 ("The records often lump together all the tasks performed by an attorney on a given day without breaking out the time spent on each task.").

By way of example, Plaintiff objects to the following entries for block billing:

---

[36] For "block billing" and "excessive," I focused primarily on entries with unusually high amounts charged. The logic being that such entries were more likely to yield examples of improper block billing or excessive billing.

1)  Review & revise defendants' draft reply brief; review Trump's opposition brief; emails re: draft reply brief.

(Application at 122) (8/10/2022, 3.9 hours, $2,145).

2)  Review Trump amended complaint; review previous motions practice; review draft portion of motion to dismiss Trump amended complaint; discussion with A. Eisen re: draft motion to dismiss.

(*Id*. at 241) (6/28/2022, 5 hours, $3,500).

3)  April 2022: Confer and strategize via email and telephone with counsel regarding case, initial appearances, local rules, and complaint; review complaint; review draft motion to dismiss; draft and file pro hac motions; review and file response to motion to expedite.

(*Id*. at 21) (4/1/2022, 15 hours, $9,375).

The first two examples do not merit a reduction in hours. The second tows the line, but I find that even if the timekeeper had entered those times separately, five hours would nonetheless be reasonable. This same reasoning applies to the first example *and* to all of the other objections for block billing that I looked at. The third, however, is the sort of block billing that requires a reduction in hours because it is impossible for the Court to accurately divvy up the time per task in a reasonable manner. The timekeeper for this entry is Attorney Markus. A closer look at his time entries revealed a similar pattern. I note however that as local counsel, his role was not as susceptible to itemized billing and his total hours were not substantial. But I will cut his hours by 15%. *See* Appendix A at 2.

## 2. *Duplicative*

Plaintiff's objections for "duplicative" time entries are not presented in a way that allows this Court to properly review and analyze them. Plaintiff's table simply points out entries that he believes are "duplicative" but does not say *what it duplicates*. Instead, Plaintiff leaves it up to the Court to piece together a cogent series of objections. I refuse to do so. But even when I reviewed

the relevant time entries with an eye for duplicative billing, I did not find any unreasonable billing that merits a cut in hours.

### 3. *Excessive*

Plaintiff objects to, among others, the following time entries as "excessive":

> 1) Review draft DNC motion to dismiss brief and share with RAK for final review

(Application at 76) (5/6/2022, 2.3 hours, $1,610).

> 2) Reviewing amended complaint; reviewing, editing draft brief.

(*Id*. at 24) (7/7/2022, 5.5 hours, $3,850).

> 3) Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from I. Garcez, A. Lopez re: same

(*Id*. at 118) (5/4/2022, 2.9 hours, $1,595).

Plaintiff's objections are unconvincing. It is no surprise that these lawyers, when responding to such an egregious example of shotgun pleadings and subsequent opposition, had to spend numerous hours thoroughly analyzing the allegations and crafting exhaustive responses. I find these time entries, and others like it, reasonable.

### 4. *Vague*

"[T]he general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. Notwithstanding, the court can rely on "its own knowledge and experience . . . and may form an independent judgment" when determining the reasonableness of fees. *Id*. Plaintiff objects to the following time entries as "vague":

> 1) Review complaint and continue revisions to [redacted].

(Application at 65) (4/6/2022, 4.5 hours, $3,150).

> 2) Research [redacted].

43

(*Id*. at 79) (5/18/2022, 1.7 hours, $637.50).

> 3) Miscellaneous communications, including with client and other counsel, regarding status of matter, ongoing coordination, and related matters; review and analyze materials re: same.

(*Id*. at 275) (7/19/2022, 1.4 hours, $1,435.50).[37]

The first and third time entries provide sufficient detail to overcome an objection for being vague. The same is true for almost all other time entries viewed under this category. Only the second time entry rises to the level of being vague. The timekeeper for the second entry is Attorney Turner. A closer look at her time entries revealed a similar pattern. While I find Attorney Turner's total hours to be relatively low, I will cut her hours by 15% to account for the handful of vague entries. *See* Appendix A at 2.

### 5. *Clerical*

Consistent with the idea that, "the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*," *Norman*, 836 F.2d at 1301 (emphasis in original), lawyers should not (in the interest of reducing fees) bill their clients for clerical work that a non-lawyer could just as well do.

It appears that Plaintiff's only objections under the category of "clerical" (totaling $390) is for work done by Ms. Dietrich, a "Senior Case Manager," a role akin to a paralegal. (Corrected Objections at 33-35; 56; 92). Ms. Dietrich's hourly rate is $150, a reasonable rate for paralegals. (Application at 58). Billing a client for clerical work done by a non-lawyer related to its case is completely reasonable and expected.

---

[37] This is Mr. Tyrell's non-local rate. For the reasons explained above, I am reducing it to $700. *See* Appendix A at 5.

### D. **Adjustment Of The Lodestar**

The lodestar in this case is **$937,989.39**.  *See* Appendix A at 1.  Having determined the lodestar, the Court must next "consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302.  The Parties have not argued for an adjustment, and I do not find one to be necessary.

Relatedly, however, I find that *apportionment* of the lodestar is necessary.  The amount of fees awarded in this case, while reasonable, is substantial.  As such, joint and several liability (a presumption under Rule 11, but not here) would be inappropriate.  *Cf. Fowler v. Ritz-Carlton Hotel Co., LLC*, No. 3:10-CV-884-J-34JRK, 2016 WL 11468583, at *7 (M.D. Fla. Aug. 2, 2016) (apportioning fee based on ability to pay).  The parties that bear the brunt of the responsibility for the sanctionable conduct—Plaintiff and his lead attorney—should be jointly and severally liable for the sanction.  The Rule 11 sanctions that I imposed on the other lawyers in this case (*See* DE 284) is sufficient.  *See Gallop v. Cheney*, 667 F.3d 226, 231 (2d Cir. 2012)*, as amended* (Feb. 3, 2012) (vacating sanctions against local counsel due to level of involvement).

Accordingly, Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba, and Habba Madaio & Associates—are jointly and severally liable for the total amount.

## IV.    **CONCLUSION**

For the forgoing reasons, and having carefully considered the record, the written submissions of the Parties, and applicable law, it is hereby **ORDERED AND ADJUDGED** that:

1.  Defendants' Joint Motion for Sanctions (DE 280) is **GRANTED.**

2. Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba and Habba Madaio & Associates—are jointly and severally liable for **$937,989.39**.[38]

**SIGNED** in chambers at West Palm Beach, Florida this 19th day of January, 2023.

Donald M. Middlebrooks
United States District Judge

cc:     counsel of record

---

[38] "[S]anctions must never be hollow gestures: their bite must be real." *Martin v. Automobile Lamborghini Exclusive, Inc.*, 307 F. 3d 1332, 1336 (11th Cir. 2002). But for the bite to be real it must be an amount a person can pay. *Id.* I believe the monetary sanctions imposed here are well within Plaintiff and Plaintiff's lawyer ability to pay, and therefore I have not thought it necessary to conduct an intrusive inquiry into their finances. However, should Plaintiff or Plaintiff's lawyer (and law firm) believe that the amount would seriously jeopardize their financial status, *see, e.g., Baker v Alderman*, 158 F. 3d 516 (11th Cir. 1998), that individual or firm should file within ten (10) days of this Order, under seal, a verified statement of net worth which includes assets and liabilities. In the event of such a filing, the obligation of that individual or law firm will be tolled until further order of the Court.

**<u>Appendix A</u>**

**Summary Chart**

| Chart | Defendants | Fees and Costs |
|---|---|---|
| 1 | Hillary R. Clinton | $171,631.06 |
| 2 | HFACC, Inc. and John Podesta | $20,349.00 |
| 3 | DNC, DNC Services Corporation, Congresswoman Debbie Wasserman Shultz | $179,685.44 |
| 4 | Robert Mook | $70,207.08 |
| 5 | Fusion GPS, Glenn Simpson, and Peter Fritsch | $55,820.00 |
| 6 | Bruce and Nellie Ohr | $59,310.00 |
| 7 | Igor Danchenko | $23,749.00 |
| 8 | Neustar, Inc. | $134,143.50 |
| 9 | Neustar Security Services | $53,547.98 |
| 10 | Rodney Joffe | $119,496.33 |
| 11 | Orbis Business Intelligence Ltd. | $50,050.00 |
| **Total** | | **$937,989.39** |

**Chart 1: Hillary R. Clinton's Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| David E. Kendall | $700 | 89.8 | $62,860.00 |
| Katherine M. Turner | $700 | 35.6 | $24,920.00 |
| Michael J. Mestitz | $450 | 116.8 | $52,560.00 |
| David Oscar Markus | $625 | 43.35 | $27,093.75 |
| **Total** | | | **$167,433.75** |

Electronic Legal Research: **$4197.31**

TOTAL: **$171,631.06**

**Chart 2: HFACC, Inc. and John Podesta's Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Robert P. Trout | $700 | 16.2 | $11,340.00 |
| Paola Pinto | $450 | 18.1 | $8,145.00 |
| Sarah Wilson (paralegal) | $120 | 1.9 | $228.00 |
| Natalie Henriquez (paralegal) | $120 | 5.3 | $636.00 |
| **Total** | | | **$20,349.00** |

TOTAL: **$20,349.00**

**Chart 3: DNC, DNC Services Corporation, Congresswoman Debbie Wasserman Shultz's Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Roberta Kaplan | $700 | 24.3 | $17,010.00 |
| Shawn Crowley | $700 | 35.9 | $25,130.00 |
| Joshua Matz | $700 | 42.8 | $29,960.00 |
| Maximillian Feldman | $450 | 99 | $44,550.00 |
| Anna Collins Peterson | $375 | 98.1 | $36,787.50 |
| Maggie Turner | $375 | 40.89 | $15,333.75 |
| James Blum | $375 | 2.3 | $862.50 |

| | | | |
|---|---|---|---|
| Kelsey Dietrich (paralegal) | $150 | 14 | $2,100.00 |
| Gerald Greenberg | $525 | 9.5 | $4,987.50 |
| Christopher Sundby | $262.50 | 3 | $ 787.50 |
| **Total** | | | **$177,508.75** |

Electronic Legal Research: **$2,176.69**

TOTAL: **$179,685.44**

### Chart 4: Robert Mook's Attorneys' Fees

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Andrew J. Ceresney | $700 | 2.2 | $1,540.00 |
| Wendy B. Reilly | $550 | 58.2 | $32,010.00 |
| Isabela Garcez | $450 | 46.8 | $21,060.00 |
| Alexa Busser Lopez | $375 | 40 | $15,000.00 |
| **Total** | | | **$69,610.00** |

Electronic Legal Research: **$597.08**

TOTAL: **$70,207.08**

### Chart 5: Fusion GPS, Glenn Simpson, and Peter Fritsch's Attorneys' Fees

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Joshua A. Levy | $700 | 0.5 | $350.00 |
| Rachel Clattenburg | $600 | 47.1 | $28,260.00 |
| Kevin P. Crenny | $300 | 71.8 | $21,540.00 |
| E. Andrew Sharp | $300 | 2.5 | $750.00 |
| Adam S. Fels | $600 | 8.2 | $4,920.00 |
| **Total** | | | **$55,820.00** |

TOTAL: **$55,820**

**Chart 6: Bruce and Nellie Ohr's Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Joshua Berman | $800 | 6.7 | $5,360.00 |
| Benjamin Peacock | $500 | 98.5 | $49,250.00 |
| Adam Fels | $500 | 8.4 | $4,200.00 |
| Victoria Pantin (paralegal) | $125 | 0.8 | $ 100.00 |
| **Total** | | | **$58,910.00** |

*Pro hac vice* fees: **$400**

TOTAL: **$59,310**

**Chart 7: Igor Danchenko's Attorney's Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Franklin Monsour Jr. | $700 | 24.8 | $17,360.00 |
| **Total** | | | **$17,360.00** |

Electronic Legal Research: **$6,389**

TOTAL: **$23,749**

**Chart 8: Neustar, Inc.'s Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Samantha L. Southall | $560 | 128.9 | $72,184.00 |
| Jennifer Olmedo-Rodriguez | $560 | 28 | $15,680.00 |
| Patrick Doran | $475 | 23.4 | $11,115.00 |
| Anna Sanders | $255 | 137.9 | $35,164.50 |
| **Total** | | | **$134,143.50** |

TOTAL: **$134,143.50**

**Chart 9: Neustar Security Services' Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| John M. McNichols | $700 | 39.8 | $27,860.00 |
| Kathryn E. Garza | $300 | 43.2 | $12,960.00 |
| Allison S. Eisen | $300 | 21.5 | $6,450.00 |
| James E. Gillenwater | $700 | 8.5 | $5,950.00 |
| **Total** | | | **$53,220.00** |

Electronic Legal Research: **$327.98**

TOTAL: **$53,547.98**

**Chart 10: Rodney Joffe's Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Steven A. Tyrrell | $700 | 77.5 | $54,250.00 |
| Edward Soto | $700 | 1.5 | $1,050.00 |
| Brian Liegel | $600 | 49.9 | $29,940.00 |
| Leah Saiontz | $450 | 72.2 | $32,490.00 |
| Ann Merlin (paralegal) | $130 | 7.4 | $962.00 |
| **Total** | | | **$118,692.00** |

Electronic Legal Research: **$604.33**
*Pro hac vice* fees: **$200**

TOTAL: **$119,496.33**

**Chart 11: Orbis Business Intelligence Ltd.'s Attorneys' Fees**

| Timekeeper | Hourly Rate | Hours | Fees |
|---|---|---|---|
| Enjoliqué A. Lett | $700 | 35.5 | $24,850.00 |
| Akiesha G. Sainvil | $450 | 56 | $25,200.00 |
| **Total** | | | **$50,050.00** |

TOTAL: **$50,050**

**TAB 308**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DONALD J. TRUMP, | |
| Plaintiff, | |
| v. | CASE NO. 2:22-cv-14102-DMM |
| HILLARY R. CLINTON, HFACC, INC., DEMOCRATIC NATIONAL COMMITTEE, DNC SERVICES CORPORATION, PERKINS COIE, LLC, MICHAEL SUSSMANN, MARC ELIAS, DEBBIE WASSERMAN SCHULTZ, CHARLES HALLIDAY DOLAN, JR., JAKE SULLIVAN, ADAM SCHIFF, JOHN PODESTA, ROBERT E. MOOK, PHILLIPE REINES, FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR, BRUCE OHR, DEFENDANT BUSINESS INTELLIGENCE, LTD., CHRISTOPHER STEELE, IGOR DANCHENKO, NEUSTAR, INC., NEUSTAR SECURITY SERVICES, RODNEY JOFFE, JAMES COMEY, PETER STRZOK, LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE, ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10 (said names being fictitious and unknown persons), and ABC CORPORATIONS 1 THROUGH 10 (said names being fictitious and unknown entities), | **NOTICE OF CIVIL APPEAL** |
| Defendants. | |

Notice is hereby given that Alina Habba, Habba Madaio & Associates, and Donald J. Trump appeal to the United States Court of Appeals for the Eleventh Circuit from the Sanctions Order of the Hon. Donald M. Middlebrooks entered on January 19, 2023 (ECF No. 302) in the instant action.

Dated: February 6, 2023                        Respectfully submitted,

/s/ Jared Roberts
Jared J. Roberts (FL Bar #1036550)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jared@binnall.com

*Counsel for Donald J. Trump, Alina
Habba, and Habba Madaio &
Associates*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Jared Roberts
Jared J. Roberts

*Counsel for Donald J. Trump, Alina Habba, and Habba Madaio & Associates*